1 | NICOLA T. HANNA
United States Attorney
2 | CHRISTOPHER D. GRIGG
Assistant United States Attorney
3 | Chief, National Security Division
WILLIAM M. ROLLINS (Cal. Bar No. 287007)
4 | GEORGE E. PENCE (Cal Bar No. 257595)
Assistant United States Attorneys
5 | Terrorism and Export Crimes Section
    1500 United States Courthouse
6 |     312 North Spring Street
    Los Angeles, California 90012
7 |     Telephone: (213) 894-7407/2253
    Facsimile: (213) 894-2927
8 |     E-mail:   william.rollins@usdoj.gov
              george.pence@usdoj.gov
9 |
Attorneys for Plaintiff
10 | UNITED STATES OF AMERICA

```
                            FILED
                   CLERK, U.S. DISTRICT COURT

                        8/31/2020

                   CENTRAL DISTRICT OF CALIFORNIA
                   BY: ___DL___ DEPUTY
```

11 |                   UNITED STATES DISTRICT COURT

12 |              FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 | UNITED STATES OF AMERICA,          No. MJ 20-04071

14 |          Plaintiff,               GOVERNMENT'S NOTICE OF REQUEST FOR
                                       DETENTION OF MATERIAL WITNESS YANG
15 |               v.                  ZHIHUI

16 | GUAN LEI,

17 |          Defendant.

18 |

19 |      Plaintiff United States of America, by and through its counsel

20 | of record, the United States Attorney for the Central District of

21 | California and Assistant United States Attorneys George E. Pence and

22 | William S. Rollins, hereby files its Notice of Request for Detention

23 | of Material Witness YANG ZHIHUI.

24 | //

25 |

26 |

27 |

28 |

This Notice is based upon the attached memorandum of points and authorities, the files and records in this case, including the government's Motion for Designation and Detention of a Material Witness, and such further evidence and argument as the Court may permit.

Dated: August 31, 2020                Respectfully submitted,

NICOLA T. HANNA
United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division


                                      _____/s/_____
                                      GEORGE E. PENCE
                                      WILLIAM S. ROLLINS
                                      Assistant United States Attorney

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   INTRODUCTION

Material witness YANG ZHIHUI ("YANG") should be detained because there is no condition or combination of conditions of release that would practically secure her appearance at trial by subpoena.   YANG is citizen of the People's Republic of China ("PRC") and computer science researcher who is presently in the United States on a J-1 student visa.   YANG's entitlement to remain in the United States lawfully on that visa will expire on September 22, 2020.

YANG was served on August 21, 2020 with a subpoena to testify in a federal proceeding on September 3, 2020, in connection with a criminal case against her boyfriend, GUAN LEI ("GUAN"), who was charged and arrested on a criminal complaint in the above-captioned case on August 26, 2019 with violating 18 U.S.C. § 1519 (Destruction of Evidence).   On August 28, 2020, YANG's counsel spoke with Assistant United States Attorney ("AUSA") William Rollins and scheduled a follow-up call for August 31, 2020 to discuss YANG's forthcoming testimony.

Despite the requirement that she appear in a federal proceeding, YANG booked a flight from Los Angeles International Airport ("LAX") to the PRC departing on August 31, 2020 at 12:15 a.m.

On August 30, 2020, the Honorable Rozella A. Oliver authorized an arrest warrant for YANG and issued an order designating her as a material witness and that she be detained.   Later that evening, the undersigned AUSAs contacted YANG's counsel, informed her of the warrant and order, and requested that YANG not attempt to board the flight to the PRC.   Thereafter, YANG's counsel, after speaking with YANG, advised AUSA Rollins that YANG would, in fact, self-surrender

the following day.  Despite this assurance, at approximately midnight on August 31, 2020, agents of the Federal Bureau of Investigation ("FBI") observed YANG at LAX running toward the flight she had booked to the PRC.  Those agents intercepted YANG before she could board that flight and arrested her.

YANG has few if any connections to the Central District of California or to the United States more generally.  She has no job or family here, no real property, and no authorized research that she may conduct under the terms of her visa.  Moreover, the government is not aware of any sureties for her appearance at future court proceedings.

## II.  ARGUMENT

Title 18, United States Code, Section 3144, provides that where it appears by affidavit that "the testimony of a person is material in a criminal proceeding," and where it is "shown that it may become impracticable to secure the presence of the person by subpoena," the Court may order the arrest of the person and treat him or her in accordance with 18 U.S.C. § 3142.[1]  Section 3142 requires the Court to order that, pending trial, the person be either released on personal recognizance, release conditions, an unsecured appearance bond, a secured appearance bond, or detained.  See 18 U.S.C. § 3142(a)(1)-(4).

As detailed in the affidavit in support of the government's application for a warrant to arrest YANG and for an order designating

---

[1] Section 3144 further provides that "[n]o material witness may be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice."  18 U.S.C. § 3144

2

her as a material witness, which is attached hereto as **Exhibit A**, YANG's testimony is plainly material. (Ex. A, ¶ 7.) YANG shared an apartment with GUAN and apparently traveled with him to the PRC consulate, acted as a lookout while GUAN attempted to dispose of a damaged hard drive, purchased a replacement hard drive for GUAN, and used a computer (and possibly other digital devices) belonging to GUAN that the FBI has seized. (Id.)

Furthermore, YANG's conduct in connection with the underlying allegations against GUAN, as well as her duplicitous behavior in attempting to flee the United States despite an order requiring her appearance before a federal proceeding and after purportedly negotiating a self-surrender with the government, establish that she is an unreliable surety on her own behalf and has no regard for the orders of this Court. In light of YANG's strong connections to the PRC, and absent any other sureties or any reasonable proposal to guarantee her appearance as a witness at trial, she must detained.

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court detain YANG.

Dated: August 31, 2020          Respectfully submitted,

NICOLA T. HANNA
United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division

_____/s/_____
GEORGE E. PENCE
WILLIAM S. ROLLINS
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

3

# Exhibit A

**AFFIDAVIT**

I, TIMOTHY D. HURT, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2016. I am currently assigned to the Los Angeles Field Office. I have been involved in investigating, among other violations, visa fraud, the destruction of evidence, conspiracy, the theft of trade secrets, the illegal export of dual-use items (meaning items that have both military and commercial applications) and strategic technology commodities from the United States, and the illegal export of defense articles and other technology. I attended 21 weeks of New Agent Training at the FBI Academy in Quantico, Virginia. I have also received training in identifying the techniques, methods, and procedures used by foreign governments, groups, organizations, companies, and individuals to engage in visa fraud, destroy evidence, and attempt to export items and information in violation of United States export laws. As an FBI agent, I have also received both formal and informal training concerning foreign militaries and their organization, to include the People's Liberation Army ("PLA") of the People's Republic of China ("PRC"), as well as training in the examination of digital devices and digital device networks. Before joining the FBI, I collectively served for four years in the United States Air Force and United States Air Force National Guard.

1

## I.   PURPOSE OF AFFIDAVIT

2.    This affidavit is made pursuant to 18 U.S.C. § 3144 and in support of the government's motion for designation and detention of material witness YANG ZHIHUI ("YANG") in connection with a criminal complaint against GUAN LEI ("GUAN") for a violation of Title 18, United States Code, Section 1519 (Destruction of Evidence).   On August 26, 2020, the Honorable Rozella A. Oliver authorized that Complaint, which is attached hereto as **Exhibit A** and incorporated by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents, witnesses, and open-source online resources.   This affidavit is submitted solely for the purpose of establishing probable cause for a Warrant for the Arrest of a Material Witness in a Pending Criminal Case, namely YANG, and for an order that she be designated and detained as a material witness pursuant to 18 U.S.C. § 3144.   Title 18, United States Code, Section 3144 provides that where it appears by affidavit that "the testimony of a person is material in a criminal proceeding," and where it is "shown that it may become impracticable to secure the presence of the person by subpoena," the Court may order the arrest of the person and treat him or her in accordance with 18 U.S.C. § 3142.[1]

_____

[1] Section 3142 requires the Court to order that, pending trial, the person be either (1) released on personal recognizance, an unsecured appearance bond, a secured appearance bond, or (2) detained.   See 18 U.S.C. § 3142(a)(1),(4).

4.   This affidavit does not purport to set forth all of my knowledge of, or investigation into, the offense.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are approximate.

## III.  <u>PROBABLE CAUSE THAT AN OFFENSE WAS COMMITTED AND MATERIAL WITNESS INFORMATION</u>

5.   As detailed in the affidavit in support of the Complaint, GUAN is a student at the National University of Defense Technology ("NUDT") in China, an institution affiliated with the People's Liberation Army of the People's Republic of China ("PRC").  (Ex. A, ¶¶ 10, 12.)  The U.S. Department of Commerce has placed NUDT on its Entity List for non-proliferation reasons related to NUDT's development of supercomputers believed to be used in nuclear explosive activities using U.S.-origin multicores, boards, and (co)processors.  (<u>Id.</u>, ¶ 11); <u>see also</u> 80 Fed. Reg. 8524 (Feb. 18, 2015).

6.   On August 14, 2018, defendant completed a J-1 visa application to come to the United States to conduct research on an optimization algorithm and its application in machine learning at the University of California, Los Angeles ("UCLA").  (Ex. A, ¶ 12.)  Based on my review of GUAN's travel records, I know that he thereafter flew to the United States on October 17, 2018.  While at UCLA, after his faculty advisor apparently departed the school to work elsewhere, GUAN used UCLA's Graphics Processing Unit machine to complete his research.  (<u>Id.</u>, ¶¶ 15-

16.)  After being alerted to the fact that NUDT was on a United States "black list" (as GUAN referred to it), GUAN repeatedly reached out to the PRC consulate in Los Angeles and the PRC embassy in Washington, D.C. (Id., ¶ 33.)  GUAN also used his computer science skills to delete data from his phones and computer.  (Id., ¶¶ 37-38.)  Moreover, after an interview with agents from the Federal Bureau of Investigation ("FBI"), during which GUAN lied about his activities in the United States, GUAN apparently attempted to conceal a destroyed hard drive by surreptitiously placing it in a dumpster near his apartment. (Id., ¶¶ 44, 52-56.)  He had previously attempted to leave the United States by boarding a flight to the PRC. (Id., ¶ 45.a.)

7.    YANG is, at a minimum, a material witness to GUAN's unlawful conduct.  Specifically:

a.    During the period of GUAN's unlawful conduct, GUAN resided with YANG (who is referred to as "Z.Y." in the affidavit in support of the Complaint) in an Irvine, California apartment.  (Ex. A, ¶ 15.)  YANG is GUAN's girlfriend, a citizen of the PRC, and is in the United States pursuant to a J-1 visa.

b.    Lyft receipts show that on July 8, 2020, YANG traveled from that apartment to a street address across from the Chinese consulate in Los Angeles.  (Id., ¶¶ 48-49.)  Throughout July and August 2020, FBI employees saw GUAN and YANG repeatedly share what appeared to be rideshare cars, and GUAN has admitted traveling to the Chinese consulate in early July 2020.  (Id. ¶ 50.)

4

c.   On July 25, 2020, FBI employees saw YANG standing lookout while GUAN apparently attempted to dispose of a damaged 2.5-inch internal hard drive in a dumpster near the apartment. (Id. ¶ 52.)

d.   Google records show that YANG received an email from a vendor on Amazon indicating that sometime before July 15, 2020, she purchased a 2.5-inch internal hard drive – the same type of hard drive that is currently installed in one of GUAN's computers, a Lenovo L450, which was seized by FBI. (Id., ¶ 56.)

e.   According to an FBI laboratory report, male and female DNA was found on the Lenovo L450, and there is "very strong support" to include both GUAN and YANG as contributors of DNA to the Lenovo L450. (Id., ¶ 57.)

f.   During the July 30, 2020 execution of a search warrant at the Irvine apartment, FBI discovered five digital devices containing storage drives in the bedroom shared by GUAN and YANG. (Id., ¶ 42.)

8.   YANG presents an extraordinary risk of flight from future legal proceedings and securing her presence by subpoena is impracticable.

a.   On August 21, 2020, I served YANG with a subpoena to testify before a Grand Jury in the Central District of California on September 3, 2020.

b.   Based on my discussions with Assistant United States Attorney ("AUSA") William Rollins, I know that on August 28, 2020, YANG's attorney spoke on the phone with AUSA Rollins and scheduled a follow-up call for August 31, 2020 to

5

discuss YANG's forthcoming Grand Jury testimony.  At no time on that call did YANG's attorney indicate her awareness that YANG intended to leave the Central District of California.

  c. Department of Homeland Security, Customs and Border Protection ("DHS CBP") records show that YANG apparently booked a flight on August 29, 2020 from Los Angeles to Xiamen, PRC, which is scheduled to depart from Los Angeles International Airport on August 31, 2020 at 12:15 a.m. (PT).

  d. Based on information provided by DHS CBP attorneys, YANG's entitlement to remain in the United States lawfully on her J-1 visa will expire on September 22, 2020.

  9. For all these reasons, I believe that YANG intends to defy the Grand Jury subpoena requiring her to appear for testimony on September 3, 2020, and that YANG intends to attempt to flee the United States for China early in the morning of August 31, 2020.

  //

  //

## IV.   <u>CONCLUSION</u>

10.   Based on the foregoing, I believe there are sufficient facts to establish probable cause for a Warrant for the Arrest of a Material Witness in a Pending Criminal Case, namely YANG, and for an order designating and detaining her as a material witness pursuant to 18 U.S.C. § 3144.

Attested to by the applicant in
accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this 30th
day of August, 2020.

_Rozella A. Oliver_
THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT A

AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>GUAN LEI,<br><br>Defendant(s) | Case No. |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 25, 2020 in Orange County, in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1519 | Destruction of Evidence |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/S/
*Complainant's signature*

_____
Timothy D. Hurt, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____08/26/2020_____

_____
*Judge's signature*

City and state:  Los Angeles, California

_____
Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, TIMOTHY D. HURT, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2016.  I am currently assigned to the Los Angeles Field Office.  I have been involved in investigating, among other violations, visa fraud, the destruction of evidence, conspiracy, the theft of trade secrets, the illegal export of dual-use items (meaning items that have both military and commercial applications) and strategic technology commodities from the United States, and the illegal export of defense articles and other technology.  I attended 21 weeks of New Agent Training at the FBI Academy in Quantico, Virginia.  I have also received training in identifying the techniques, methods, and procedures used by foreign governments, groups, organizations, companies, and individuals to engage in visa fraud, destroy evidence, and attempt to export items and information in violation of United States export laws.  As an FBI agent, I have also received both formal and informal training concerning foreign militaries and their organization, to include the People's Liberation Army ("PLA") of the People's Republic of China ("PRC"), as well as training in the examination of digital devices and digital device networks.  Before joining the FBI, I collectively served for four years in the United States Air Force and United States Air Force National Guard.

1

## II.   PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a criminal complaint against GUAN LEI ("GUAN") for a violation of 18 U.S.C. § 1519 (Destruction of Evidence).

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents, witnesses, and open-source online resources.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are approximate.

## III.  SUMMARY OF PROBABLE CAUSE

4.   In July of 2020, the FBI began investigating GUAN in connection with visa fraud and the possible transfer of sensitive software or technical data from the University of California, Los Angeles ("UCLA") to high-ranking PRC military officers and the PRC's National University of Defense Technology ("NUDT"), an entity suspected of procuring U.S.-origin items to develop supercomputers with nuclear explosive applications.

5.   During the federal investigation, GUAN – an NUDT student from the PRC conducting research at UCLA on a J-1 visa[1] –

_____

[1] Based on my review of the U.S. Citizenship and Immigration Services website, I know that a J-1 classification (exchange visitors) is authorized for those who intend to participate in an approved program for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting,

2

appears to have deliberately concealed digital storage drives from the FBI, falsely told U.S. Customs and Border Protection ("CBP") officers that he never contacted the PRC consulate while in the United States, and, several days after refusing the FBI's request to conduct an offsite search of his laptop, walked circuitously around his apartment building, reached into his sock, and threw a destroyed hard drive into a trash dumpster nearby.  As detailed further below:

      a.    GUAN was a student at NUDT and originally came to Los Angeles to work as a researcher in UCLA's Department of Mathematics in 2018.  On his student visa application, GUAN stated under oath that he never previously served in the military.  When later questioned about serving in the PLA, however, GUAN told FBI personnel that he previously wore Chinese military uniforms and participated in military training (but continued to claim that he had not served in the military).  GUAN also acknowledged that his faculty supervisors at NUDT were high-ranking Chinese military officers.

      b.    During an FBI interview on July 17, 2020, FBI personnel warned GUAN that he could not lie to federal law enforcement officers, and the FBI asked GUAN a series of questions about his visa application, NUDT, his potential affiliation with the PLA, his work at UCLA, as well as his

---

demonstrating special skills, receiving training, or to receive graduate medical education or training.  See https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/exchange-visitors (last accessed Aug. 24, 2020).

computer, hard drives, and cell phones.  In response to FBI questioning, GUAN indicated that apart from a Lenovo laptop, his iPhone, and his Huawei phone, he did not have any other hard drives or digital storage devices.  On July 18, 2020, when asked specifically by FBI personnel whether he had any storage drives "anywhere else," GUAN responded "no[.]"  GUAN consented to an on-site search of his laptop, but when the FBI asked for permission to take the laptop with them to conduct the search and bring it back the next day, GUAN refused.

c.  Two days later, on July 19, GUAN attempted to board a flight from Los Angeles International Airport ("LAX") to China.  CBP officers once again asked GUAN questions about the PLA, NUDT, and his electronic devices, including his laptop and his cell phone, and Homeland Security agents later informed GUAN that multiple federal agencies were interested in him.  When asked by CBP whether GUAN ever had "contact" with "anyone" from the Chinese consulate during his stay in the United States, GUAN responded that he had not.

6.  As detailed further below, GUAN's representations to federal law enforcement officers were false.  Contrary to what GUAN told CBP officers on July 19, Google records show that GUAN repeatedly emailed the Chinese consulate throughout June and July.  Moreover, GUAN destroyed evidence:  On July 25, several days after GUAN lied to CBP officers and attempted to board a flight from Los Angeles to Xiamen, FBI employees witnessed GUAN throw an item in the trash dumpster outside his apartment that, upon further investigation, was a destroyed hard drive.

## IV.   STATUTORY BACKGROND

### A.   Destruction of Evidence

7.   Title 18, United States Code, Section 1519 provides:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

### V.   BACKGROUND ON THE CHINESE SCHOLARSHIP COUNCIL

8.   Based on my training and experience and my review of U.S. State Department and media reports, I know the following:

a.   The Chinese government established the Chinese Scholarship Council ("CSC") in 1996 as a non-profit institution affiliated with the PRC's Ministry of Education.

b.   The CSC is responsible for the enrollment and administration of Chinese Government Scholarship programs and provides funding for both undergraduate and graduate students, as well as post-doctoral visiting scholars, to Chinese citizens wishing to study abroad and to foreign citizens wishing to study in China.   CSC is financed mainly by the state's special appropriations or scholarship programs.

9.   According to the U.S. Department of State,[2] the Chinese Communist Party ("CCP") exploits the open and transparent nature

_____

[2] https://www.state.gov/military-civil-fusion/ (last accessed Aug. 24, 2020).

5

of academic research institutions in the United States to
bolster China's own military capabilities through bodies like
the CSC, which requires academic scholarship recipients to
report their overseas research to PRC diplomats.

### VI.  CHINA'S NATIONAL UNIVERSITY OF DEFENSE TECHNOLOGY

10.  Based on my training and experience, I know that the
PLA is the military arm of the CCP and the armed forces of the
PRC.  One of three schools the PLA uses to formulate military
strategy, conduct research, and advance its military
capabilities is the NUDT.

11.  According to the Federal Register, NUDT was placed on
the U.S. Department of Commerce's Entity List for nuclear
nonproliferation reasons related to the use of NUDT's Tianhe 1 &
2 supercomputers.[3]  According to the Federal Register, "NUDT has
used U.S.-origin multicores, boards, and (co)processors to
produce the TianHe-1A and TianHe-2 supercomputers located at the
National Supercomputing Centers in Changsha, Guangzhou, and
Tianjin," and "[t]he TianHe-1A and TianHe-2 supercomputers are
believed to be used in nuclear explosive activities as described

---

[3] The U.S. Department of Commerce, Bureau of Industry and
Security publishes the names of certain foreign persons –
including businesses, research institutions, government and
private organizations, individuals, and other types of legal
persons – that are subject to specific license requirements for
the export, reexport and/or transfer (in-country) of specified
items.  These persons comprise the Entity List, which is found
at Supplement No. 4 to Part 744 of the Export Administration
Regulations ("EAR").  The persons on the Entity List are subject
to individual licensing requirements and policies supplemental
to those found elsewhere in the EAR.

in § 744.2(a) of the [Export Administration Regulations ("EAR")]."  See 80 Fed. Reg. 8524 (February 18, 2015).

## VII.  STATEMENT OF PROBABLE CAUSE

### A.   GUAN Denies Serving in the Chinese Military on His 2018 Visa Application

12.  Based on my review of U.S. Department of State records, I know that GUAN completed a digital J-1 U.S. visa application on August 14, 2018.  In his visa application, GUAN stated that he was a student at NUDT in the PRC and claimed that he was applying for a U.S. visa in order study at UCLA's Department of Mathematics, and to collaborate with UCLA Professor 1[4] on an optimization algorithm and its application in machine learning.  GUAN denied ever having served in the military, and he denied seeking to engage in espionage, sabotage, export control violations, or any other illegal activity while in the United States.

13.  The visa application required GUAN to digitally certify that he had completed the application himself, that he read and understood the questions in the application, and the answers were true and correct to the best of his knowledge and belief.  The application warned that all of GUAN's declarations were made under the penalty of perjury.

14.  By clicking "Sign and Submit Application," GUAN certified that he understood that any willfully false or

---

[4] The FBI knows the identity of and interviewed UCLA Professor 1, but his name is concealed here to protect his identity.

misleading statement or willful concealment of a material fact within the application could subject him to permanent exclusion from the United States, as well as criminal prosecution and/or deportation.

**B.** **GUAN Admits to Wearing a Military Uniform and Acknowledges that His Supervisors at NUDT are Senior Chinese Military Officials**

15. On July 17, 2020, GUAN agreed to a voluntary interview with FBI personnel at an apartment GUAN shared with his girlfriend, Z.Y., and their roommate, M.Z., in Irvine. During the interview, GUAN told me that between 2018 and 2020, he conducted research at UCLA's Department of Mathematics. According to GUAN, his advisor at UCLA was UCLA Professor 1, and GUAN used UCLA's Graphics Processing Unit ("GPU") machine to complete research on deep neural networks in a pipeline fashion, otherwise described as the simultaneous use of multiple GPU machines working together to increase efficiency.

16. GUAN stated that UCLA Professor 1 (who later told the FBI he was not alarmed by GUAN's activities and could not think of military or proprietary applications GUAN might have unlawfully accessed at UCLA) left UCLA to work for a Chinese multinational technology company about "six months" after GUAN arrived in the United States (i.e. sometime in 2019). GUAN also stated that he (GUAN) could access the UCLA GPU machine remotely.

17. I know based on my training and experience, as well as online electronics and academic publications, that GPU machines

8

have both military and non-military applications.  For example,
according to an online publication issued by Military &
Aerospace Electronics,[5] GPU advancements are used in
intelligence, surveillance, and reconnaissance applications,
such as wide-area persistent surveillance, hyperspectral sensor
fusion, improvised-explosive device detection, and synthetic
aperture radar processing.  According to a research paper from
Iowa State University, GPU technology can also be used to
validate the effectiveness of hypervelocity kinetic impact and
nuclear subsurface explosions.[6]  GPU technology also has a
variety of civilian uses, ranging from videogames to astronomy
to medical imaging.

18.  During my July 17 interview with GUAN, he claimed that
there were two types of students at NUDT:  "normal" students,
and students who had to "obey" certain types of
"arrangement[s]."[7]  When asked if he had to listen to
instructions or orders, GUAN responded with, "No, we are two
different types of people."  GUAN claimed he was a normal
student, that some other students had to wear uniforms, but GUAN

---

[5]See
https://www.militaryaerospace.com/computers/article/14034425/emb
edded-computer-graphics-processing-unit-gpu-sensor-processing.

[6] See GPU-Accelerated Computational Tool Development For
Studying the Effectiveness of Nuclear Subsurface Explosions" and
https://iaaspace.org/wp-
content/uploads/iaa/Scientific%20Activity/conf/pdc2015/IAA-PDC-
15-03-15.pdf

[7] Quotation marks reflect the written verbatim translations
of GUAN's statements prepared by an FBI linguist in a draft
transcript.

wore plain clothes.  I understood GUAN to mean that there were
two types of students at NUDT:  civilian and military.

19.   GUAN said he was usually separated from students who
wore military uniforms, and that he didn't know if the uniforms
were hot because he wore plainclothes.  GUAN claimed he didn't
know if his professors were military or common people, but also
said that some wore military uniforms and some were common
people.

20.   Later in the interview, GUAN told agents that his
academic advisor at NUDT was X.L. and that he met X.L. no more
than five times.  According to GUAN, X.L. was GUAN's advisor "by
name only," but GUAN's real advisor was D.L.  GUAN stated that
he had never seen X.L. in military uniform and was unsure
whether X.L. wore military uniform.

21.   When asked if D.L. had worn a military uniform, GUAN
responded "probably, I have seen him wear it a couple times."
GUAN attempted to clarify by saying, "I guess he is, but I am
not sure if he is military or not."  GUAN stated he "didn't pay
attention" to whether or not D.L.'s uniform had ribbons or rank,
but sometimes professors had a 5-point star on their shoulder.
GUAN thought they "probably" had military rank.

22.   At this point in the interview, I warned GUAN that he
"cannot lie to a federal law enforcement officer."[8]  After the
admonishment, GUAN stated "I told you what I know."

_____

     [8] According to the draft verbatim translation, the FBI
linguist translated my warning as, "[h]e forgot to tell you
earlier, usually before we started talking, he should have told
you that you cannot lie to a federal law enforcement officer."

23.   GUAN also said he did not want to join the military. When GUAN was asked if he was a member of the "cadre," GUAN replied that he was just a "normal student," and asked if people wearing "green clothes" were "cadre."[9]

24.   Despite initially telling FBI agents that he never wore a military uniform, GUAN later changed his response.  In particular, when asked twice if photos could be found on the Internet of GUAN in military uniform, GUAN responded "probably not" both times and then said that he was "nervous."  After again claiming that the FBI "probably" would not find online photographs of GUAN in military uniform, GUAN ultimately admitted that he <u>did</u> in fact wear a military uniform when he first entered NUDT for "military training."

25.   GUAN told agents that, at NUDT, he wore a uniform during military training consisting of "green clothes" with "patterns" for about the first month of school and did a lot of walking, running, and standing.[10]

26.   When I asked GUAN if he no longer had to wear a military uniform after the first 15 days of school, GUAN initially said "correct."  Later, however, GUAN claimed that he sometimes did wear a military uniform but that the question was hard to answer because he had been in the U.S. for almost two years and he couldn't "remember clearly."  GUAN claimed he wore

---

[9] Based on my training and experience, I know that Civilian Cadre are uniformed PLA personnel in technical positions.

[10] Based on my training and experience, I know that the types of activities apparently required of GUAN are consistent with basic military training.

a uniform rarely, such as on holidays like the China National Holiday. But GUAN indicated that August 1 (PLA Day),[11] did not seem to be celebrated "much" at NUDT.

27.   According to GUAN, he did not "pay attention" to the uniform but described it as being green and stated they "all have lines" on the shoulder and no stars, "they are the same, not much difference" than military. Stars were for older personnel.

28.   When presented with several photos of GUAN's academic advisor – X.L. – in PLA military uniform, including the ones below, GUAN immediately recognized X.L.:[12]

 

29.   GUAN initially said he thought the stars on X.L.'s uniform were his rank, but said he wasn't sure what rank exactly. GUAN then said he "guess[ed]" the two stars on X.L.'s shoulder meant X.L. was a General. GUAN said again the stars on

---

[11] Based on my training and experience, as well as numerous open source web articles (e.g. https://www.chinadaily.com.cn/a/201908/01/WS5d42722ba310cf3e3556355f.html), I know that the founding of the People's Liberation Army is celebrated annually on August 1st.

[12] Multiple websites in China depict X.L. in PLA uniform. See, e.g., http://szb.jingjiang.gov.cn/art/2012/10/15_9765_285107.html from 2012, and www.gxbbs.cc/wap/4389-1.html from 2019 (accessed July 22, 2020)

X.L.'s shoulder "should be General."  He then was more specific and revealed he understood it to be either Lieutenant General or Major General, also referred to as "middle" General.

30.  GUAN stated again that X.L. was not his real advisor, that his real advisor was D.L. (who, as noted above, GUAN had already reported "probably" wore a military uniform).  X.L., he explained, was retired.

31.  According to an archived version of an apparent NUDT alumni website preserved by the Internet Archive, X.L. is an academic at the Chinese Academy of Engineering and an expert in computer science.[13]  X.L. was a researcher of the Galaxy series of giant computers made by NUDT.  X.L. has been with NUDT since 1965 and was the president of NUDT's Institute of Computers.  In 2006, X.L. became PLA General Armament Department's Science & Technology Committee deputy director.  X.L. is a lieutenant general in the PLA and was in charge of successful development of the Galaxy II high speed internet software system.  According to the same website, the Galaxy computers have been used in PLA General Staff Department, PLA General Armament Department, Air Force, military weather forecasts, and nuclear technology.

---

[13]The Internet Archive is a digital library that provides public access to archives of Internet websites, which the library makes accessible through an online portal called the "Wayback Machine."  The archived website related to LU is located at the following address:
https://web.archive.org/web/20120722171731/http://www.lovenudt.com/detail.asp?fileid=136.

C.   **GUAN Conceals His Knowledge of U.S. Government Restrictions on NUDT from the FBI**

32.   I also asked GUAN whether he knew that the United States had "denied" NUDT, and whether he knew it was on a U.S. Department of Commerce "list."  According to a draft verbatim translation of this portion of the interview, the FBI Linguist translated my question to GUAN as whether he knew that NUDT was "embargoed" by the U.S., meaning whether GUAN knew that it was "prohibit[ed] to sell" items to NUDT.  GUAN responded that he was not aware of any such prohibition, and said that he did not follow the U.S. news.  Additionally, GUAN said, "I really don't know much about it" and stated he did not "pay much attention to these."  GUAN suggested that I search the internet to find out whether NUDT was embargoed.

33.   The month before my interview with GUAN, however, emails obtained from Google pursuant to a federal search warrant show that, in fact, GUAN knew NUDT was on a United States "black list."  In particular, in an email dated June 18, 2020, GUAN specifically asked the Chinese consulate in Los Angeles about flights back to the PRC given that "[GUAN's] university in China" had been placed on the "so called black list" by the United States and that GUAN's DS-2019 (the Certificate of Eligibility for an Exchange Visitor (J-1) Status) was about to expire.

34.   The email address at which GUAN contacted the PRC Consulate in L.A. was "educationsection@gmail.com."  In response to GUAN's inquiry, consular employees referred GUAN to the

Office of Consular Protection and used a signature line that stated in English, "Consulate General of the People's Republic of China in Los Angeles, 433 Shatto Place, Los Angeles, CA 90020."

    D.    **GUAN Denies Having Additional Digital Storage Drives in His Apartment**

35.  During my interview, I also asked GUAN whether the PRC Consulate ever talked to him about WANG XIN's ("WANG") arrest and whether GUAN was worried about being in the same situation. (Agent's note: On June 11, 2020 WANG was arrested at LAX on charges that he falsely stated on his visa application he was no longer a PLA officer; in fact, WANG allegedly remained a "Level 9" technician in the PLA, employed by a military university lab, at the time he came to study at the University of California – San Francisco).

36.  In response to my question, GUAN asked "[w]hy would they talk to me about this" and said that he read about WANG's arrest online.  GUAN indicated that he (GUAN) "[s]houldn't be" worried; "isn't he [WANG] a soldier?  I am not in the same category as him.  Plus, the internet says WANG was stealing information.  I am here openly, you can search my stuff."

37.  At this point in the interview, I asked GUAN whether I could take his laptop, a Lenovo L450 (the "LENOVO L450") with me to search it offsite and bring it back to GUAN.  GUAN told me that I could copy anything I wanted to while at the apartment,

but that I could not take the LENOVO L450 with me.[14]   GUAN did, however, provide me with permission to take a Huawei phone and an iPhone with me to search them as long as I returned them the following day.   GUAN said that in early July, he gave the iPhone to his girlfriend who "formatted" it.   GUAN also said he received the Huawei phone from a friend in early July and had "reset" it to protect his friend's personal information.

38.   When I began searching the LENOVO L450 in GUAN's presence, I noticed that it looked as though someone recently deleted much of the computer's data.   I asked GUAN why his laptop looked so "clean."   GUAN said that in early July, he reinstalled the operating system on the LENOVO L450 because it was old and running slow.   GUAN said he changed the operating system from Windows to Ubuntu.

39.   Toward the end of our interview, GUAN stated "I want to reiterate, I didn't lie, whatever you said, I answered truthfully."

40.   The next day, July 18, I returned to GUAN's apartment with the phones that he allowed me to search and conducted another brief, recorded interview with GUAN.   During the interview, GUAN consented to a search of his Google drive account, part of which I was able to download from the LENOVO

---

[14] FBI personnel did not have the equipment necessary on location to copy the laptop in its entirety.

16

L450.   I also asked GUAN whether he had "any other thumb drives, or hard drives, or external hard drives?"[15]

41.   In response, GUAN stated "No, usually, basically all of my important information were on this."  The FBI linguist also asked GUAN specifically whether he had "any other storage drives anywhere else."  GUAN replied, "[n]o, everything is on the computer, the important stuff."

42.   When other FBI agents and I searched GUAN's apartment on July 30, 2020 pursuant to a federal search warrant, we discovered the following digital storage drives and devices containing hard drives in the bedroom shared by GUAN and Z.Y. (none of which were disclosed to the FBI by GUAN during his interview):

a.   One silver and black four-terabyte external hard drive.  An FBI computer analyst later discovered that nearly all of the data on the external hard drive was removed in its entirety on an unknown date before it was searched on July 30.

b.   One iPad Air 2.  The iPad Air 2 was logged into GUAN's WeChat account and contained photos of a Departure Control Order that the U.S. Department of Homeland Security served on GUAN at LAX on July 19 (as discussed further below).  GUAN's WeChat account also "favorited" digital items, including some dated in February of 2017, January of 2020, and March of 2020.

---

[15] The FBI linguist translated my question as, "[d]o you have any other drives? Like these . . ."

17

c.    One USB Storage Drive.  The USB drive had some photos and documents that appeared to belong to YANG, but, based on a rough Mandarin-language translation, it also had an application with GUAN's name addressed to the PRC Consulate in Los Angeles seeking a return flight to China on July 2, 2020 (i.e. roughly two weeks before I interviewed GUAN); the document also referenced GUAN's Chinese Scholarship Council number.

d.    One MacBook laptop.  The MacBook displayed Z.Y.'s name on its screensaver.

43.   There were two desks in the room shared by GUAN and Z.Y.  The devices above (with the exception of the iPad Air 2) were found on a desk that appeared to be used by Z.Y.  The desk that appeared to be used by Z.Y. was wooden and had women's vitamins, a small purse, a number of paper items appearing to belong to Z.Y., and her phone was plugged in and charging on the desk.  The desk that appeared to be used by GUAN was white with silver legs, had various photo clippings of GUAN, GUAN's passport, and other paper items appearing to belong to GUAN. The iPad Air 2 was found on the bed in the room.

44.   We also found the LENOVO L450 in the living room of the apartment.  As detailed further below, on July 25, 2020, several days after the FBI and CBP interviews (but before our search of GUAN's apartment), eyewitnesses and DNA analysis indicate that GUAN threw an irretrievably damaged 2.5 inch hard drive — which is capable of fitting inside the LENOVO L450 — into a trash dumpster outside his apartment.  FBI personnel seized the damaged hard drive on July 25.  At the time of our

search on July 30, the LENOVO L450 had a different, functioning 2.5 inch Seagate Laptop Thin SSHD installed inside of it.

**E.**   **GUAN Falsely Tells CBP He Never Had Contact with the Chinese Consulate**

45.   Based on my review of a CBP incident log report regarding an interview of GUAN at LAX, I know the following:

a.   On July 19, 2020, GUAN attempted to board a Xiamen Airlines flight from LAX to Xiamen.  GUAN was interviewed by three CBP officers, two of whom are fluent in Mandarin and provided translation assistance.  GUAN provided the LENOVO L450[16] and his Huawei phone to CBP for inspection.  CBP officers asked GUAN if at any point during his stay in the United States he had contact with anyone from the Chinese Embassy or Chinese consulate.  GUAN stated that he had not.

46.   GUAN's statement to CBP that he never had contact with the Chinese Embassy or Chinese consulate was false.  In fact, Google records obtained pursuant to a federal search warrant show that GUAN exchanged multiple emails with the Chinese consulate in Los Angeles and the PRC Embassy in Washington D.C. in June and July of 2020.  For instance, as detailed above, on June 18, 2020, GUAN emailed the PRC Consulate in Los Angeles[17]

---

[16] A CBP report describes the laptop as a "Lenovo T450," which I believe is a typographical error because I know that GUAN owns a Lenovo L450, despite Lenovo having a model T450.

[17] The email address at which GUAN contacted the PRC Consulate in L.A. was "educationsection@gmail.com." In responses to GUAN, consular employees used a signature line that stated in English, "Consulate General of the People's Republic of China in Los Angeles, 433 Shatto Place, Los Angeles, CA 90020[.]" Employees also used a signature block that stated, "Office of

about the fact his "university in China" had been placed on the "so called black list" by the U.S. government, and GUAN inquired about flights back to China.  GUAN also emailed the Chinese consulate on June 16, 2020 to ask about his options for flights back to China because his July 2nd flight was cancelled.  In addition, on June 18, 2020 GUAN emailed the PRC Embassy in Washington D.C.[18] and asked whether the Embassy was organizing a charter flight, and if they were, how he could get a ticket for it.  On June 24, 2020, GUAN again emailed the Embassy to ask if there was a charter flight scheduled.

47.  Records obtained from GUAN's Huawei phone also show that he saved the consulate's phone number in his contacts as "LA Consulate."  GUAN's iCloud account also showed that he had previously saved a total of three different phone numbers for the PRC Consulate in Los Angeles.

48.  In addition, Lyft receipts emailed to GUAN's girlfriend, Z.Y., (with whom GUAN lived at an apartment in Irvine) show that Z.Y. took a Lyft from their Irvine apartment to a street address across from the Chinese consulate in Los Angeles at 12:12 p.m. on July 8, 2020.

---

Consular Protection and Overseas Chinese Affairs, Consulate General of the P.R. China in Los Angeles."

[18] The email address at which GUAN contacted the PRC Embassy in Washington D.C. was "admin@sino-education.org."  PRC Embassy employees responded to GUAN's emails with a signature lined that stated in English, "The Office of Educational Affairs of the Chinese Embassy, 2600 Tilden Street, N.W., Washington, D.C. 2008."

49.   Z.Y. was picked up from across the street from the Chinese consulate approximately three hours later, at 2:56 p.m. Digital maps provided to me by an FBI Operational Support Technician showing the distance between GUAN and Z.Y.'s apartment and the drop off location (according to Z.Y.'s Lyft receipt) relative to the location of the Chinese consulate are below:



50.   Throughout July and August of 2020, FBI employees witnessed GUAN and Z.Y. repeatedly share what appear to be rideshare cars (e.g. those operated by Uber and Lyft).  In addition, as noted above, in contrast to what GUAN told CBP officers when he was attempting to leave the country, during his recorded FBI interview on July 17, GUAN admitted traveling to the Chinese consulate in early July.

51.   At the conclusion of GUAN's interview with CBP officers at LAX, GUAN (who is in the United States temporarily

pursuant to a visa, as noted above) was served with a Departure
Control Order pursuant to 8 C.F.R. § 215.  The Order stated that
CBP determined that GUAN's departure would be prejudicial to the
interests of the United States.  The Order informed GUAN that he
had a right to contest the Order in a hearing and warned GUAN
that he could be "required . . . to submit for official
inspection all documents, articles, and other property in his
possession which are being removed from the United States upon,
or in connection with," his departure.  Before GUAN left the
airport, federal agents from the Department of Homeland Security
also spoke with GUAN and asked him if he wanted to take the
opportunity to explain his side of things; the agents and GUAN
discussed the fact that multiple federal agencies spoke or
wanted to speak to GUAN, including the FBI.

      **F.**    <u>**After Being Denied Exit from the U.S., GUAN Appears to**</u>
           <u>**Throw a Destroyed Hard Drive into a Trash Dumpster**</u>
           <u>**Outside His Apartment**</u>

    52.  Following GUAN's interviews at LAX, GUAN left the
airport and returned to his apartment in Irvine on July 19,
2020.  On July 25, 2020, FBI employees witnessed GUAN leave his
apartment unit (with nothing in his hands) and walk in a
circuitous fashion around the outside of the building.
Eventually, GUAN appeared to reach into his sock and throw a
small item into a trash dumpster outside the apartment.  Z.Y.
was standing some distance away from GUAN as he walked toward
the dumpster, and Z.Y. appeared to be looking around the parking
lot.

53.   After GUAN and Z.Y. returned inside the apartment, FBI employees examined the dumpster.  Inside, they saw a small hard drive next to a napkin surrounded by a few kitchen-sized trash bags.  On July 25, 2020, FBI employees photographed the hard drive as it appeared in the dumpster and seized the hard drive as evidence:

 

**G.   <u>FBI Analysis Shows that GUAN Likely Contributed DNA to the Damaged Hard Drive, which Fits the LENOVO L450</u>**

54.   As noted above, on July 30, 2020, FBI agents executed a search of GUAN's apartment pursuant to a warrant issued by a United States Magistrate Judge.  Only Z.Y. and M.Z. (GUAN and Z.Y.'s roommate) were inside the apartment.  As soon as the other FBI agents and I arrived outside GUAN's building, GUAN –

who was doing laundry in a common space outside of his unit across the street – briskly walked toward the nearby U.C. Irvine campus when he saw the FBI team arrive.  Agents – who also had a warrant to search GUAN's person – followed GUAN but were unable to locate him that night.

55.  During our search of GUAN's apartment, we recovered (among other items) the LENOVO L450, as noted above.  Based on my review of the internal components of the laptop with a member of the FBI Computer Analysis Response Team, I know it has a 2.5-inch internal hard drive, the same type of hard drive FBI personnel retrieved from the dumpster on July 25, 2020.

56.  Additionally, based on my review of emails obtained pursuant to a federal search warrant, I know that Z.Y. received an email about rating her transaction from a vendor on Amazon indicating that sometime before July 15, 2020, Z.Y. bought a 2.5 inch internal hard drive.  That same type of hard drive is currently installed in the LENOVO L450.

57.  I sent the hard drive retrieved by FBI personnel and the LENOVO L450 to an FBI laboratory for DNA analysis on August 5, 2020.  The hard drive recovered from the dumpster and the LENOVO L450 were swabbed to determine if DNA was present.

57.  On August 21, 2020, I obtained a federal search warrant for buccal samples to create DNA exemplars for GUAN and Z.Y. to compare with the DNA samples recovered from the hard drive and laptop described above.  On August 22, 2020, the samples from GUAN and Z.Y. were sent to the FBI DNA laboratory in Quantico, Virginia, for comparison.  According to the FBI

24

laboratory's report dated August 24, 2020, male and female DNA was found on the LENOVO L450, and there is "very strong support" to include both GUAN and Z.Y. as contributors of DNA to the LENOVO L450.  In particular, the "likelihood ratio"[19] for GUAN on the exterior of the LENOVO L450 is "78 septillion," meaning it is 78 septillion times more likely that GUAN and an unknown source contributed DNA to the laptop than if two unknown sources contributed to the laptop.

58.   According the report, the damaged hard drive contained male DNA and was interpreted as originating from two individuals, although "[t]he presence of male DNA in a mixture may limit the ability to determine if female DNA is also present in that mixture."  While there was limited support for excluding Z.Y.'s DNA from the hard drive, it is 60 times more likely that GUAN and an unknown, unrelated person are contributors than if two unknown, unrelated people are contributors.  Thus, the report concludes that there is "limited support" for including GUAN as a contributor of DNA to the damaged hard drive.

**H.**   **The Hard Drive was Intentionally Destroyed**

58.   Based on my conversations with an FBI Computer Scientist, I know that the hard drive seized by FBI employees on July 25 was irreparably damaged and that all previous data associated with the hard drive appears to have been removed

---

[19] The likelihood ratio is a statistical approach that compares the probabilities of observing the DNA results under two alternative propositions. Calculations were performed using the African American, Caucasian, Southeastern Hispanic, and Southwestern Hispanic populations.  The lowest calculated likelihood ratio is reported.

deliberately and by force.  In particular, the FBI Computer
Scientist told me the following:

        a.   In order to access this type of hard drive's
platters, which stored the hard drive's data, the platters must
be accessed from the top of the hard drive chassis, rather than
by force through the bottom of the hard drive chassis.  The top
of the hard drive chassis had "torx" screws to remove the cover,
which would provide access to the hard drive's platters.

        b.   In this case, the top of the recovered hard drive
still had all of the torx screws in place, with one appearing to
be stripped.  The printed circuit board ("PCB") on the bottom of
the hard drive was removed by force, leaving only a small
portion of it attached to the PCB connection point.  The
connection point on the bottom still had the torx screws in
place, indicating that whoever destroyed the hard drive did not
have access to the correct torx screw driver or was in a
circumstance that did not allow for it.

        c.   After removing the PCB, whoever destroyed the
hard drive would have gained access to the platters and spindle
by forcefully prying, cutting, or breaking the aluminum casing.
The platters were then removed, which could have been easily
shattered.  There would be no data left on the recovered hard
drive.  Additionally, the label on the top of the hard drive was
removed, which would have had the product information.  The
label is typically not removed by hard drive technicians,
because it is a quality control measure.  Hard drive technicians
normally access the screws under the part sticker by puncturing

the sticker.   The technicians then usually leave a label indicating that a certified technician accessed the hard drive.

d.    In light of the foregoing facts, the FBI Computer Scientist's opinion is that the recovered hard drive appears to have been intentionally destroyed by someone who wanted to ensure that no data could ever be recovered from the device.

## VIII.    CONCLUSION

57.  For all the reasons described above, there is probable cause to believe that GUAN committed a violation of 18 U.S.C. § 1519 (Destruction of Evidence).


_____
              /S/
_____
Timothy D. Hurt, Special Agent
Federal Bureau of Investigation


Attested to by the applicant in
accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
26th day of August    , 2020.

*Rozella A. Oliver*

THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE