CUAUHTEMOC ORTEGA (Bar No. 257443)
Interim Federal Public Defender
MICHAEL A. SCHACHTER (Bar No. 298610)
(E-Mail: Michael_Schachter@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
GUAN LEI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-MJ-04071 |
| Plaintiff, | |
| v. | **DEFENDANT'S OPPOSITION TO GOVERNMENT'S REQUEST FOR DETENTION; EXHIBITS** |
| GUAN LEI, | |
| Defendant. | **FILED UNDER SEAL** |

Defendant Guan Lei, by and through his attorney of record, Michael A. Schachter, hereby files this opposition to the government's request for detention (Dkt. Nos. 3, 6, 12) in advance of the Court's September 3, 2020 hearing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Interim Federal Public Defender

DATED: September 3, 2020      By  */s/ Michael A. Schachter*

MICHAEL A. SCHACHTER
Deputy Federal Public Defender
Attorney for GUAN LEI

1

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.  INTRODUCTION**

The government's argument that Mr. Guan poses a serious flight risk ignores key facts and relies on misrepresentations.

The central alleged fact in the government's theory is that that on July 19th, Guan Lei "attempted to flee the United States by trying to board a flight to the PRC at Los Angeles International Airport."  (Dkt. No. 12.)  But this proffered fact is a fiction that willfully ignores key facts set out in the government's own documents.  Those documents tell a much simpler story: Guan Lei came to the United States on a J-1 student visa, his visa was set to expire on July 30th.  After an earlier July 2nd flight was cancelled because of the COVID-19 pandemic, Guan Lei was issued another ticket on July 7th, ten days before his first contact with the FBI on July 17th.  In fact, during the FBI's July 17th and 18th interviews, Mr. Guan told the FBI about his flight on July 20th and that he was packing for his trip.  The government's criminal complaint nowhere asserts that Mr. Guan attempted to board a flight to "flee" the United States.

The government's supplemental memorandum is riddled with many other misrepresentations.  For example, the government contends Mr. Guan concealed his PLA affiliation when he came to the United states, but the Complaint notes that Guan disclosed his affiliation with NUDT in his visa application.  The government also advised the defense that it intends to argue Mr. Guan is in the Chinese military, presumably because he told the FBI that he had participated in military training when he first arrived at NUDT.  But  it is well established that all high school and university students in China participate in military training courses as part of their education.  This compulsory military training is not the same as military service.

Because the government comes nowhere close to presenting sufficient evidence to carry its burden under 18 U.S.C. §3142(f)(2)(A) to prove by a preponderance of the evidence that Mr. Guan poses a "serious risk" of flight, it is not entitled to a detention hearing and the Court must release the defendant pending trial.

2

Further, even assuming for argument's sake the government could establish entitlement to a detention hearing, it cannot meet its burden to overcome the presumption of release.  Alternatively, and only if the Court finds that release on Mr. Guan's own recognizance or with an unsecured appearance bond would not "reasonably assure" his appearance, the Court can impose conditions such as location monitoring to reasonably assure his appearance.

The defense respectfully requests that the Court deny the government's request for detention and release Mr. Guan pending trial.

## II.  FACTUAL BACKGROUND

**A.    The Government's Own Documents Show That Guan Lei Tried to Fly Back to China in Late July Because His Student Visa Was Expiring on July 30th, Not Because He Was Attempting to "Flee" the United States, and His Flight Was Booked Before His First Contact With the FBI.**

As stated, the government's claim that Mr. Guan attempted to "flee" the United States on July 19th ignores available facts in the government's possession.

Here is the straightforward chronology that the government fails to provide in its misleading motion for detention:

- Mr. Guan traveled to the United States in October 2018 on a J-1 student visa to study as a researcher at UCLA.  Ex. 2 at 4; Compl. at ¶¶ 12, 15.[1]

- Mr. Guan's student visa was scheduled to expire on July 30, 2020.  Ex. 2 at 3, 31; Compl. at ¶ 33.

- In June 2020, Mr. Guan sought advice from the Chinese consulate in Los Angeles relating to booking a flight given that his visa was about to expire.  Compl. at ¶¶ 33, 46.

---

[1]     "Ex. 2" refers to draft transcripts of the FBI's July 17th and July 18th interviews with Mr. Guan.  The government produced Exhibit 2 on September 2nd.  "Compl." refers to the government's criminal complaint (Dkt. No. 1).

3

- At one point, Mr. Guan had a flight scheduled for July 2nd, but that flight was apparently cancelled because of the COVID-19 pandemic. Ex. 2 at 3; Compl. at ¶ 46.

- On July 7th, a new ticket was issued to Mr. Guan, for a flight leaving at 12:15 a.m. on July 20th. Ex. 1; Ex. 2 at 3.[2]

- Mr. Guan did not have his first contact with the FBI until July 17th. *See* Compl. at ¶ 15. During the FBI's July 17th interview, Mr. Guan told the FBI about his flight on July 20th. Ex. 2 at 3. During the FBI's July 18th interview, Mr. Guan told the FBI that he was packing for his trip. *Id.* at 43.

- Based on undersigned counsel's review of (a) the government's complaint, and (b) drafts of the FBI's July 17th and July 18th interviews with Mr. Guan, it appears that the FBI did not at any time before July 20th advise Mr. Guan that he could not leave the country, despite knowing of Mr. Guan's plans to do exactly that on July 20th.

- Late on July 19th, Mr. Guan attempted to board his flight that was scheduled to leave at 12:15 a.m. on July 20th, but the government prevented him from doing so.

The above makes clear that Guan Lei tried to fly back to China in late July because his student visa was expiring. The government's claim that he was attempting to "flee" makes no sense and is unsupported by the available evidence.

**B.    The Government's Proffers of "Facts" That Find No Support In Its Own Criminal Complaint and Do Not Support Its Claim That Guan Lei Poses a Serious Risk of Flight.**

To bolster its claim that Mr. Guan Lei poses a serious risk of flight, the government makes numerous claims that are have no support in its Complaint. The defense objects to each of the below proffers, and requests the opportunity to cross-examine government

---

[2]    Ex. 1 is an internet airline record. It was not produced by the government.

4

witnesses to the extent the government seeks to rely on them for its request for detention. *See United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986) (implying that if the defense proffers that the government's proffered information is incorrect, the court may be required to allow the defense cross-examination of government witnesses); *United States v. Bibbs*, 488 F. Supp. 2d 925, 926 (N.D. Cal. 2007) ("*Winsor* suggests that where facts material to the detention decision are in dispute, a defendant may have a right to cross-examine adverse witnesses.").

First, the government proffers that Mr. Guan "conceal[ed] [his] PLA affiliation[]" when he "c[a]me to the United States." Mot. at 3:2-3. The Complaint does not make this assertion. To the contrary, it notes that "[i]n his visa application, GUAN stated that he was a student at NUDT in the PRC." Compl. at ¶ 12.

Second, the government intends to proffer that Mr. Guan is in the Chinese military.[3] The Complaint nowhere states that Mr. Guan is in the Chinese military. The Complaint does assert that, during his FBI interview, Mr. Guan said he participated in military training while at NUDT and wore military uniforms. Compl. at ¶¶ 24-26. But these activities are consistent with Mr. Guan's assertion that he is not in the Chinese military.

The government, at best, lacks basic knowledge about military service in China or, at worst, is knowingly misrepresenting the facts. It is well established that all high school and university students in China must participate in a military training course as part of their education. *See* Celine Sui, *Chinese Universities' First Course is Nationalism 101*, FOREIGN POLICY (Oct. 25, 2019), https://tinyurl.com/yxa2oggc ("Every university student in China is required to complete a military training program (junxun) ranging from two weeks to a month as part of their matriculation."); Sean Silbert, *Forced Military Training For Chinese Students Encounters Resistance*, LOS ANGELES TIMES (Oct. 12,

---

[3]       On September 2nd, the government advised the defense that it plans to make this argument at the September 3rd hearing.

2014), https://tinyurl.com/yyjfdnre ("Training became compulsory for all high school and university students in 2001."). Students must wear uniforms and perform activities such as drills and marching. This military training is not the same as military service. It is a compulsory educational credit and the public has generally seen it as a physical fitness program. *See id.*.

Accepting the government's position that participation in this military training program is tantamount to serving in the military, despite the fact that no civilian student from China would view it this way, would essentially allow the government to arrest any student from China for visa fraud.

Third, the government proffers that Mr. Guan "may be a PRC military officer." Mot. at 5:13. The Complaint does not make this assertion.

Fourth, the government proffers in its supplemental memorandum that Mr. Guan "sought to obfuscate his PLA affiliations when interviewed by the FBI." Mot. 3:20-21. But neither the government's Complaint nor its supplemental memorandum identifies any such obfuscations. Indeed, the very next sentence in the government's supplemental memorandum states that, during his FBI interview, Mr. Guan "admitted participating in military training and wearing military uniforms while at NUDT." Mot. at 3:23-4:1.

Fifth, the government proffers that "Defendant's conduct is also uncannily similar to the conduct of several PRC nationals with PLA connections who have recently been arrested and detained in similar visa fraud investigations." Mot. at 2:18-3:2. The Complaint does not make this assertion. Further, of the cases cited in the government's supplemental memorandum, the only one that is mentioned in the Complaint is Wang Xin, and the Complaint's discussion of Wang Xin's case, if anything, draws a distinction between Mr. Guan and Mr. Wang's respective circumstances. *See* Compl. at ¶¶ 35-36.

Sixth, the government proffers in supplemental memorandum that Mr. Guan "falsely told FBI that he did not have any other digital storage drives in his apartment." Mot. at 4:3-5. As an initial matter, it's not clear what the government's proffer means. (Mr. Guan had no other digital storage drives aside from what? The memorandum

6

doesn't say.)  At any rate, when the government searched Mr. Guan's residence on July 30th, three of the four devices it found -- an external hard drive, a USB storage drive, and a MacBook laptop -- were found on the desk of Mr. Guan's girlfriend, suggesting all of these devices belonged to her, not Mr. Guan.  Compl. at ¶ 42.  And the fourth device, an iPad Air 2, was found on a bed shared by the couple (the Complaint also does not claim the iPad had a storage drive).

Seventh, the government proffers that "when asked specifically by FBI whether he knew that NUDT was embargoed by the U.S., [Mr. Guan] concealed his knowledge that NUDT was on a U.S. government 'black list.'"  Mot. at 4:10-12.  The Complaint does not make this assertion.  It explains that when Mr. Guan was asked whether NUDT was "embargoed" by the U.S., he was told that the term meant that the U.S. was "prohibit[ed] to sell" items to NUDT.  Compl. at ¶ 32.  He was not separately asked whether NUDT was on a "black list," and so did not conceal any knowledge of a "black list" at this time.  Further, the words embargo and "black list" have different meanings, and a person or entity can be subject to an embargo without being subject to a black list, and vice versa.  And, during his FBI interview, Mr. Guan stated he wasn't sure whether NUDT was subject to an embargo, suggesting that he perhaps didn't really understand what the word meant.

Eighth, the government proffers that "Defendant has no ties to this district, or to the United States more generally."  Mot. at 2:6-7.  But as the Complaint makes clear, Mr. Guan was accepted to study at UCLA and "work[ed] as a researcher in UCLA's Department of Mathematics" between 2018 and 2020, collaborating with a UCLA professor.  Compl. at ¶ 5(a).

Ninth, the government proffers that "GUAN lied about his activities in the United States" during "an interview with agents from the Federal Bureau of Investigation ('FBI')."  Mot. at 1:26-28.  The Complaint does not establish that Mr. Guan lied about his activities in the United States during his FBI interview.

1
2
3

**C.    Numerous Other Facts Proffered in the Government's Motion Are Irrelevant and Do Not Support Its Claim That Guan Lei Poses a Serious Risk of Flight.**

4
5
6

The government's supplemental memorandum is also replete with proffered facts that are wholly irrelevant to the Court's analysis of whether Mr. Guan poses a serious risk of flight.  For example:

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

- Mr. Guan's affiliation with NUDT: In the third sentence of its memorandum, the government proffers that "GUAN is a computer scientist at the National University of Defense ('NUDT') in China, an institution affiliated with the People's Liberation Army ('PLA') of the People's Republic of China ('PRC')." Mot. at 1:9-12.  The fourth sentence continues: "The U.S. Department of Commerce has placed NUDT on its Entity List for non-proliferation reasons related to its development of supercomputers believed to be used in nuclear explosive activities using U.S.-origin multicores, boards and (co)processors.  *See* 80 Fed. Reg. 8524 (Feb. 18, 2015)."  *Id.* at 1:12-16.   The government presumably includes this information about NUDT from more than half a decade ago because it believes highlighting Mr. Guan's connection to the institution will make him seem more scary.  But, as stated, Mr. Guan stated in his visa application that he was a student at NUDT.  Compl. at ¶ 12.  This was after NUDT was placed on the U.S. Department of Commerce's Entity List.  If Mr. Guan's affiliation was not a basis for denying his visa application, how can it be a basis for detaining him now?

24
25
26
27

- Mr. Guan's ability to delete computer files: The government proffers that Mr. Guan "used his computer science skills to delete data from his phone and computer."  Mot. at 1:25-26.  The government's choice of language appears aimed at generating an aura of mystery.  But it does not take a PhD

28

8

in Computer Science to know how to delete a file or reset a phone.  Most people able to use a computer is capable of performing these tasks.

- <u>Mr. Guan's contacts with the Consulate</u>: The government asks the Court to fault Mr. Guan for seeking assistance from the Chinese consulate in scheduling a flight home.  *See* Mot. at 4:27-5:4.  But there is nothing inherently sinister about a Chinese national seeking assistance from the Chinese consulate.  To the contrary, Article 22 of the Consular Convention Between the People's Republic of China and the United States explicitly provides that the functions of a consular officer include "rendering assistance to and cooperating with nationals of the sending state."[4] In fact, nonessential travel to Asia from the United States was banned due to the ongoing global pandemic, which would give Mr. Guan a good reason to seek advice given the upcoming expiration of his student visa.  Geoff Whitmore, *Is International Travel Banned?  Here's the Latest For June 2020*, FORBES (June 15, 2020), https://tinyurl.com/y4bm8rsc.

- <u>Allegations regarding assistance form the Consulate</u>: The government also proffers that Mr. Guan "likely has the support of the PRC government and therefore the resources and ability to flee from the United States regardless of any restrictions the Court could impose."  Mot. at 5:13-16.  But the Complaint does not make this assertion and the government does not provide any support for this inflammatory allegation.

---

[4]     Treaty available at https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/intl-treaties/Bilateral-Consular-Conventions/Chinese-Treaty.html.

9

1   **D.    The Government's Dubious Claim that Guan Lei Lied to CBP About His**
2        **Contacts with the Chinese Consulate Makes No Sense and is Unreliable**
3        **Due to the Unavailability of a Certified Interpreter During the CBP's**
4        **Interview.**

5        The government also asserts that Mr. Guan, during an interview by Customs and
6   Border Control at Los Angeles International Airport on July 19th, denied having had
7   contact with the Chinese consulate.  Mot. at 2:15-16, 4:14-16.

8        This proffered "fact" is presented in a July 19th report prepared by CBP Officer
9   Elmer Reyes.  *See* Ex. 3 at 2 ("GUAN was asked if at any point during his stay in the US
10  he had contact with anyone from the Chinese embassy or Chinese consulate and he stated
11  that he had not.").  The government has not produced an audio recording or transcript of
12  the interview.  The July 19th report was the source material for the Complaint's allegation
13  regarding this alleged fact.

14       <u>First</u>, it would have made no sense for Mr. Guan on July 19th to deny having had
15  contact with the Chinese consulate.  As documented in the Complaint, on July 17th, just
16  two days earlier, Mr. Guan advised the FBI that he had had contact with the Chinese
17  consulate.  *See* Compl. at ¶ 50.  And Mr. Guan also contacted the consulate on July 19th
18  during a later interview with HIS.  Ex. 3 at 3.

19       <u>Second</u>, the report makes clear that a certified interpreter did not assist Officer
20  Reyes in his interview.  Instead, "translation assistance" was provided by two other CBP
21  officers.  Ex. 3 at 1.  The report does not elaborate on the Mandarin or interpretation
22  abilities of those two officers.   As the Court is well aware, even assuming the assisting
23  CBP officers were fluent in Mandarin, being bilingual isn't enough to qualify someone
24  to be an interpreter.  That is why the Court appoints certified interpreters for non-English
25  speakers in criminal cases.

26       <u>Third</u>, the report emphasizes that "[t]hroughout the inspection process, GUAN
27  provided indirect responses and questions had to be asked multiple times before a clear
28  answer was given."  Ex. 3 at 3.  This observation underscores the fact that the "translation

assistance" being provided was likely inadequate to translate the questions and answers between Officer Reyes and Mr. Guan, undermining the reliability of Mr. Guan's supposed "lie" to the CBP.  Respectfully, the circumstances of Mr. Guan's interview undermine the reliability of this claim.

Given all of these above, the government's proffered fact lacks reliability: it appears to be highly possible that something got lost in translation during the Mr. Guan's interview with Officer Reyes.  The defense therefore objects to this proffered fact, and requests the opportunity to cross-examine government witnesses to the extent the government seeks to rely on them for its request for detention.  *See United States v. Winsor*, 785 F.2d at 757; *Bibbs*, 488 F. Supp. 2d at 926.

### III. ARGUMENT

As the Supreme Court held in *United States v. Salerno*, 481 U.S. 739 (1987), "[i]n our society, liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *Id.* at 755.  To that end, when the Government seeks pretrial detention, the Bail Reform Act establishes a two-step process that is intended to funnel most defendants toward pretrial release:

First, the Court must determine whether the Government is entitled to a detention hearing at all.  A detention hearing may take place only in the limited set of cases described in 18 U.S.C. § 3142(f).  Moreover, if the Government cannot prove that it is entitled to a detention hearing under § 3142(f), the Court must release the defendant pending trial.

Second, even if the Court determines that a detention hearing is authorized under §3142(f) factors authorizing a detention hearing, the Bail Reform Act presumes release except in a narrow range of cases.  For that reason, the Court may not maintain a blanket policy of detention. Instead, every bail determination must be individualized.  *See* 18 U.S.C. § 3142(g).

1    **A.      The Government is Not Entitled to a Detention Hearing.**

2           The government is **not entitled** as a matter of law to a detention hearing, and the

3    Court must immediately release Mr. Guan on personal recognizance or unsecured

4    appearance bond under § 3142(b), or on conditions under § 3142(c).

5           **1.      The Government Cannot Present Sufficient Evidence to Prove that**

6                    **Guan Lei Poses a "Serious Risk" of Flight.**

7           The government first contends it is entitled to a detention hearing because this case

8    allegedly involves a "serious risk defendant will flee."  (Dkt. No. 3 at 4.)

9           Where, as here, the government claims it is entitled to a detention hearing based

10   on a defendant's alleged flight risk, it must present sufficient evidence to carry its burden

11   under 18 U.S.C. §3142(f)(2)(A) to prove by a preponderance of the evidence that the

12   defendant poses a "serious risk" of flight.  The Court should view with skepticism the

13   government's request for detention when it is based solely on alleged "serious risk" of

14   flight.[5]  The government must present some specific evidence to prove that this particular

15   defendant represents more than the ordinary risk of flight posed by any defendant in any

16   criminal case.

17          Notably,  data collected by the Administrative Office of the Courts demonstrates

18   that there is a negligible risk that a released defendant will flee.  Of 2,205 federal

19

20          [5]      When the Bail Reform Act was created, Congress clarified that detention
21   hearings are to be held only in limited circumstances, including when there is "a serious
     risk that the defendant will flee."  *See Bail Reform Act of 1984: Rep. of the Comm. on*
22   *the Judiciary*, 98th Cong. 48, S. Rep. 98-225 at 21 (1983).  In measuring what constitutes
23   such a "serious risk" of flight, Congress meant that "serious risk" would "reflect the
     scope of current case law that recognizes the appropriateness of denial of release in such
24   cases."  *Id.*  Congress specifically cited *United States v. Abrahams*, 575 F.2d 3, 8 (1st
     Cir. 1978) — which held that only a "*rare case of extreme and unusual circumstances .*
25   *. . justifies pretrial detention*" — as representing the "current case law."  *Id.* at n.71
26   (emphasis added).  For example, in *Gavino v. McMahon*, 499 F.2d 1191, 1195 (2d Cir.
     1974), the court held that in a noncapital case the defendant is guaranteed the right to
27   pretrial release except in "extreme and unusual circumstances[.]"
28

defendants released on bond in this district in 2019, 0.9% were rearrested (20 people) and just 1.13% failed to appear (25 people).  *See* ADMIN. OFF. U.S. COURTS, Judicial Business: Federal Pretrial Services, Table H-15, FY 2020 First Quarter, *available at* https://jnet.ao.dcn/court-services/probation-pretrial-services/caseload-tables, *public link available at* https://perma.cc/LYG4-AX4H.  *Id.*  To overcome this data, the government must provide the Court with very specific, concrete facts to show that this particular defendant, Mr. Guan, presents a "serious risk" of flight.

For the reasons discussed above in Part II, the government has failed to present sufficient evidence to carry its burden under 18 U.S.C. §3142(f)(2)(A) to prove by a preponderance of the evidence that Mr. Guan poses a "serious risk" of flight.[6]

## 2.    The Government Has Not Met its Burden to Prove Entitlement to a Detention Hearing Under 18 U.S.C. § 3142(f)(2)(B).

The government also claims it is entitled to a detention hearing under 18 U.S.C. § 3142(f)(2)(B).  (*See* Dkt. No. 3 at 4.)  Under this provision, the government is entitled to a detention hearing where it can present sufficient evidence to carry its burden to prove by a preponderance of the evidence that there is a "serious risk" a defendant will "obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."

The government's request for detention does not specify which part of 18 U.S.C. § 3142(f)(2)(B) purportedly applies here.  The government instead checks off a box on its form request that seemingly contends every part of this subsection applies.  There, it asserts entitlement to detention hearing based on a purported "serious risk defendant will (obstruct or attempt to obstruct justice) or (threaten, injure, or intimidate prospective

---

[6]    At this stage, the defense is not required to volunteer any information.  To the extent the defense does so here or at the hearing, doing so does not shift the burden of persuasion under § 3142(f) onto itself.  The burden remains on the government to show that detention is warranted.  *See United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985), *abrogated on other grounds by* 895 F.2d 810, 812 (1st Cir. 1990); *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

witness or juror, or attempt to do so).”  (Dkt. No. 3 at 4.)  At any rate, the government does not argue in its supplemental memorandum that there is a serious risk that, if released, Mr. Guan would obstruct justice or threaten, injure, or intimidate a prospective witness or juror.  (*See generally* Dkt. No. 12.)

Accordingly, the government has not, and cannot, present sufficient evidence to carry its burden under 18 U.S.C. §3142(f)(2)(B) to prove by a preponderance of the evidence that there is a “serious risk” Mr. Guan will “obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.”

### 3.    Because the Government is Not Entitled to a Detention Hearing, Guan Lei Must Be Released.

Every court of appeals to address the issue agrees that it is unlawful to detain a defendant without a basis under § 3142(f).[7]

_____

[7]    *See United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003) (“We are not persuaded that the Bail Reform Act authorizes pretrial detention without bail based solely on a finding of dangerousness.  This interpretation of the Act would render meaningless 18 U.S.C. § 3142(f)(1) and (2).”); *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988) (“Congress did not intend to authorize preventive detention unless the judicial officer first finds that one of the § 3142(f) conditions for holding a detention hearing exists.”); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) (“[T]he Bail Reform Act does not permit detention on the basis of  dangerousness in the absence of risk of flight, obstruction of justice or an indictment for the offenses enumerated [in § 3142(f)].”); *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) (“[I]t is reasonable to interpret the statute as authorizing detention only upon proof of a likelihood of flight, a threatened obstruction of justice or a danger of recidivism in one or more of the crimes actually specified by the bail statute.”); *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) (“Detention can be ordered, therefore, only in a case that involves one of the six circumstances listed in (f), and in which the judicial officer finds, after a hearing, that no condition or combination of conditions will reasonably assure . . . appearance . . . and . . . safety.” (internal quotations omitted)); *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) (“[A] judicial officer must find one of six circumstances triggering a detention hearing.  *See* 18 U.S.C. § 3142(f).  Absent one of these circumstances, detention is not an option.”).

Because the government is not entitled to a detention hearing, Mr. Guan should be released on his own recognizance or with an unsecured appearance bond.  18 U.S.C. § 3142(b).

Alternatively, and **only if** the Court finds that release on Mr. Guan's own recognizance or with an unsecured appearance bond will not "reasonably assure" the defendant's appearance, the Court should impose the following as the "least restrictive" condition or combination of conditions to reasonably assure — not "guarantee"[8] — Mr. Guan's appearance: (a) location monitoring; (b) travel restrictions; and (c) surrender of passport to pretrial services.[9]

## B.   Even if the Government is Entitled to a Detention Hearing, Pretrial Release is Still Warranted.

Even assuming for argument's sake that the government established entitlement to a detention hearing, pretrial release is still appropriate.

Where, as here, the presumption of detention does not apply, the government must overcome the presumption of release by showing by a preponderance of the evidence that no condition or combination of conditions can "reasonably assure" Mr. Guan's appearance.  *See Chen*, 820 F. Supp. at 1208.

Here, for the reasons discussed above in Part II, the government cannot meet its burden to overcome the presumption of release, and the Court should therefore release Mr. Guan on bond and on his own recognizance or with an unsecured appearance bond.  18 U.S.C. § 3142(b).

---

[8]   "Section 3142 does not seek ironclad guarantees, and the requirement that the conditions of release 'reasonably assure' a defendant's appearance cannot be read to require guarantees against flight."  *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992).

[9]   The Court may not impose a financial condition that results in pretrial detention of the defendant.  18 U.S.C. § 3142(c)(2).

Alternatively, and **only if** the Court finds that release on Mr. Guan's own recognizance or with an unsecured appearance bond will not "reasonably assure" the defendant's appearance, the Court should impose the following as the "least restrictive" condition or combination of conditions to reasonably assure — not "guarantee"[10] — Mr. Guan's appearance: (a) location monitoring; (b) travel restrictions; and (c) surrender of passport to pretrial services.

## IV.  CONCLUSION

For the foregoing reasons, the defense respectfully requests that the Court deny the government's request for detention and release Mr. Guan pending trial.[11]

Respectfully submitted,

CUAUHTEMOC ORTEGA
Interim Federal Public Defender

DATED:  September 3, 2020          By  */s/ Michael A. Schachter*
-----------------------------------------------------------------
MICHAEL A. SCHACHTER
Deputy Federal Public Defender
Attorney for LEI GUAN

---

[10]     *Chen*, 820 F. Supp. at 1208.

[11]     Undersigned counsel reserves the opportunity to supplement the defense's position during oral argument.

16

## **PROOF OF SERVICE**

I, DELFINA ARELLANO, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the **DEFENDANT'S OPPOSITION TO GOVERNMENT'S REQUEST FOR DETENTION UNDER SEAL; EXHBITS 1-3 (UNDER SEAL)  FILED UNDER SEAL** on the following individual(s) by:

| [ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [X ] via E-mail addressed as follows: |
|---|---|---|---|

**WILLIAM ROLLINS, AUSA**
 **[E-mail:  william.rollins@usdoj.gov]**

**GEORGE PENCE, AUSA**
**[E-mail: George.pence@usdoj.gov]**

**JUDITH GLASCOW**
**U.S. Pretrial officer**
[Judith_Glascow@cacp.uscourts.gov]
**Yvette Trepichio,**
 **U.S. Pretrial Officer**
[yvette_trepichio@cacp.uscourts.gov]

This proof of service is executed at Los Angeles, California, on **September 3, 2020**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*/s/ Delfina Arellano                          .*
**DELFINA ARELLANO**