NICOLA T. HANNA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
WILLIAM M.ROLLINS (Cal. Bar No. 287007)
GEORGE E. PENCE (Cal Bar No. 257595)
Assistant United States Attorneys
Terrorism and Export Crimes Section
      1500 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-7407/2253
      Facsimile: (213) 894-2927
      E-mail:    william.rollins@usdoj.gov
                 george.pence@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-127-MWF |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO MATERIAL WITNESS ZHIHUI YANG'S MOTION FOR VIDEOTAPED DEPOSITION |
| v. | |
| GUAN LEI, | Hearing Date: 11/9/2020 |
| Defendant. | Hearing Time: 1:30 p.m.<br>Location:   Courtroom of the Hon. Michael W. Fitzgerald |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys George E. Pence and William M. Rollins, hereby files its Opposition to Material Witness Zhihui Yang's Motion for Videotaped Deposition.

//

This Opposition is based upon the attached memorandum of points and authorities and exhibits thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 19, 2020                    Respectfully submitted,

                                           NICOLA T. HANNA
                                           United States Attorney

                                           CHRISTOPHER D. GRIGG
                                           Assistant United States Attorney
                                           Chief, National Security Division


                                           _____/s/_____
                                           GEORGE E. PENCE
                                           Assistant United States Attorney

                                           Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Zhihui Yang ("YANG") is a material witness in the above-captioned case, which the United States brought against her boyfriend, Guan Lei ("GUAN"), who is charged with Destruction of Evidence, in violation of 18 U.S.C. § 1519.  Although YANG was detained at the time she filed her Motion for Videotaped Deposition (CR 43), she was subsequently released on an appearance bond and subject to various conditions of release to ensure her appearance at future court proceedings.

YANG's motion should be denied because she is no longer detained, as is required for her to bring her motion.  Moreover, YANG's motion fails because she has not, and cannot, demonstrate that her release on conditions of bond pending trial is unnecessary to prevent a failure of justice.  Critical issues in this case remain unresolved that will impact the scope and timing of her proposed deposition, such as: whether GUAN's trial will proceed as scheduled in four weeks, or November 17, 2020; whether it will be a bench or jury trial; who will represent GUAN at that trial and any deposition that may precede it; and what additional relevant discovery, if any, should be disclosed to GUAN by the government.  In light of these unresolved issues, the government requests that the Court deny YANG's motion without prejudice.  Moreover, as YANG has now been released, a deposition is not only unavailable under Rule 15 but it may also prejudice GUAN's full exercise of his constitutional due process and confrontation rights.  Any such deposition would be premature as the government continues to produce discovery to GUAN and the parties

have yet to file, let alone the Court consider, several critical
pretrial motions.

## II.  STATEMENT OF FACTS

### A.   Procedural Background

YANG was served on August 21, 2020 with a subpoena to testify in
a federal proceeding in connection with the government's
investigation of GUAN, who was arrested on August 26, 2020 based on a
criminal Complaint charging him with violating § 1519.  Since that
time, GUAN has been represented by Michael Schachter and Nadine
Hettle, both of whom are Deputy Federal Public Defenders ("DFPD").

Despite the requirement that she appear in a federal proceeding,
YANG booked a flight from Los Angeles International Airport ("LAX")
to the People's Republic of China ("PRC") departing on August 31,
2020 at 12:15 a.m.

On August 30, 2020, the Honorable Rozella A. Oliver authorized a
material witness arrest warrant for YANG.  (CR 8).  Later that
evening, the undersigned AUSA contacted YANG's counsel, informed her
of the warrant, and requested that YANG not board a flight to the
PRC.  Thereafter, YANG's counsel, after speaking with YANG, advised
AUSA William Rollins that YANG would, in fact, self-surrender the
following day.  Despite this assurance, at approximately midnight on
August 31, 2020, special agents of the Federal Bureau of
Investigation ("FBI") arrested YANG at LAX, as she was attempting to
board a flight to the PRC.

On August 31, 2020, on the government's motion (CR 14), Judge
Oliver designated YANG as a material witness pursuant to 18 U.S.C.
§ 3144 and ordered that YANG be detained, (CR 16).

On September 10, 2020, a Grand Jury in the Central District of California returned a one-count Indictment against GUAN, charging him with the same violation alleged in the Complaint.  (CR 35).

On October 16, 2020, YANG filed an Unopposed Ex Parte Application for Proposed Order Setting Bond, which reflected terms that she had agreed upon with the government to ensure her appearance at GUAN's trial.  Judge Oliver granted that Application, which authorized YANG's release from the Metropolitan Detention Center subject to certain conditions, including conditions that restrict her travel and provide for home detention and electronic monitoring.  The hearing on YANG's previously-filed Motion for Videotaped Deposition is scheduled for November 9, 2020, only eight days before GUAN's trial date of November 17, 2020.  The Government has also subpoenaed YANG to testify at the November 17, 2020 trial.

### B.    YANG Is a Percipient Witness to GUAN's Unlawful Conduct

As detailed in the affidavit in support of the Complaint, GUAN is a student at the National University of Defense Technology ("NUDT") in China, an institution affiliated with the PRC's People's Liberation Army.  (Ex. A, ¶¶ 10, 12.)  The U.S. Department of Commerce has placed NUDT on its Entity List for non-proliferation reasons related to NUDT's development of supercomputers believed to be used in nuclear explosive activities using U.S.-origin multicores, boards, and (co)processors.  (Id., ¶ 11); see also 80 Fed. Reg. 8524 (Feb. 18, 2015).

On August 14, 2018, GUAN completed a J-1 visa application to come to the United States to conduct research on an optimization algorithm and its application in machine learning at the University of California, Los Angeles ("UCLA").  (Ex. A, ¶ 12.)  GUAN thereafter

flew to the United States on October 17, 2018.  While at UCLA, GUAN used UCLA's Graphics Processing Unit machine to complete his research.  (Id., ¶¶ 15-16.)  After being alerted to the fact that NUDT was on a United States "black list" (as GUAN referred to it in an email with the PRC Consulate in Los Angeles), GUAN repeatedly reached out to the PRC consulate in Los Angeles and the PRC embassy in Washington, D.C. (Id., ¶ 33.)  GUAN also deleted data from his phones and computer.  (Id., ¶¶ 37-38.)  Moreover, after an interview with agents from the FBI, during which GUAN lied about his activities in the United States, GUAN apparently attempted to conceal a destroyed hard drive by surreptitiously placing it in a dumpster near his apartment.  (Id., ¶¶ 44, 52-56.)  He had previously attempted to leave the United States by boarding a flight to the PRC.  (Id., ¶ 45.a.)

YANG is a material witness to GUAN's unlawful conduct because she was with GUAN during these incidents and has firsthand knowledge of the events described in the criminal Complaint.  Specifically:

- During the period of GUAN's unlawful conduct, GUAN resided with YANG (who is referred to as "Z.Y." in the affidavit in support of the Complaint) in an Irvine, California apartment.  (Ex. A, ¶ 15.)  YANG is GUAN's girlfriend, a citizen of the PRC, and was also in the United States pursuant to a J-1 visa until that visa expired in September 2020.

- Lyft receipts show that on July 8, 2020, YANG traveled from that apartment to a street address across from the PRC Consulate in Los Angeles.  (Id., ¶¶ 48-49.)  Throughout July and August 2020, FBI employees saw GUAN and YANG

repeatedly share what appeared to be rideshare cars, and GUAN has admitted traveling to the PRC consulate in early July 2020. (Id. ¶ 50.)

- On July 25, 2020, FBI employees saw YANG standing lookout while GUAN disposed of a damaged 2.5-inch internal hard drive in a dumpster near the apartment. (Id. ¶ 52.)

- Google records show that YANG received an email from a vendor on Amazon indicating that sometime before July 15, 2020, she purchased a 2.5-inch internal hard drive – the same type of hard drive that is currently installed in one of GUAN's computers, a Lenovo L450, which was seized by FBI. (Id., ¶ 56.)

- According to an FBI laboratory report, male and female DNA were found on the Lenovo L450, and there is "very strong support" to include both GUAN and YANG as contributors of DNA to the Lenovo L450. (Id., ¶ 57.)

- During the July 30, 2020 execution of a search warrant at the Irvine apartment, FBI special agents discovered five digital devices containing storage drives in the bedroom shared by GUAN and YANG. (Id., ¶ 42.)

### C. Status of Discovery

The government has provided voluminous discovery to GUAN, including recordings, forensic images of electronic devices, and documents bates numbered GUAN_00000001 through GUAN_00002766.

On October 19, 2020, the Government filed a Notice in this case indicating that, in addition to the discovery already produced, the government anticipates that it may need to bring to the Court's attention certain discovery issues or other matters relating to

classified material, and to do so, it would need to proceed under the Classified Information Procedures Act, 18 U.S.C. App. III ("CIPA").

On October 8 and again on October 16, 2020, attorney Harland Braun sent emails to the United States Attorney's Office for the Central District of California, which are attached hereto as Exhibit B.  Those emails state that GUAN's family retained Mr. Braun to represent GUAN, that the U.S. Bureau of Prisons has restricted Mr. Braun's access to his prospective client, and that Mr. Braun doubted that the government could "take an admissible deposition of Ms. Zang (sic) while the issue of the representation of Mr. Guan is left unresolved."

## III.  GOVERNING LEGAL STANDARD

Section 3144 governs the release or detention of a material witness.  "It permits a judicial officer to order the arrest of a material witness to a criminal proceeding 'if it is shown that it may become impracticable to secure the presence of the person by subpoena . . . .'"  <u>In re Material Witness Summons in re Motor Tanker Zao Galaxy</u>, No. 19-XR-90626-KAW-1, 2019 WL 4221727, at *2 (N.D. Cal. Sept. 5, 2019) (quoting 18 U.S.C. § 3144).  The Court may order the deposition be taken of a material witness "detained" pursuant to § 3144, and may discharge the witness after the witness has signed under oath the deposition transcript.  Fed. R. Crim. P. 15(a)(2).  "[A] court need not contemporaneously order automatic and immediate release" of the material witness after her Rule 15(a)(2) deposition and may require the issue of continued detention be raised by separate motion.  <u>United States v. Lai Fa Chen</u>, 214 F.R.D. 578, 582 (N.D. Cal. 2003).

Read together, Rule 15(a) and § 3144 provide a detained
witness with a mechanism for securing his own release.  He
must file a 'written motion,' Fed. R. Crim. P. 15(a),
requesting that he be deposed.  The motion must demonstrate
that his "testimony can adequately be secured by
deposition,' and that 'further detention is not necessary
to prevent a failure of justice.'  18 U.S.C. § 3144.  Upon
such a showing, the district court *must* order his
deposition and prompt release.  *Id.*

Torres-Ruiz v. U.S. Dist. Court for S. Dist. of California, 120 F.3d
933, 935 (9th Cir. 1997) (per curiam) (emphasis in original) (quoting
Aguilar-Ayala v. Ruiz, 973 F.2d 411, 413 (5th Cir. 1992)).

**IV.  ARGUMENT**

**A.  YANG Cannot Bring a Rule 15(a)(2) Motion Because She is Not
Detained**

Only a material witness "detained" pursuant to § 3144 may
request to be deposed under Rule 15(a)(2).  Although neither § 3144
nor Rule 15(a)(2) define that term, its meaning may be determined in
light of other statutes on the same subject matter.  See Erlenbaugh
v. United States, 409 U.S. 239, 243 (1972).  "[S]tatutes addressing
the same subject matter should be construed in pari materia.  Under
that doctrine, related statutes should be construed as if they were
one law."  California v. Trump, 963 F.3d 926, 947 n.15 (9th Cir.
2020) (internal citations and quotations marks omitted).  "The rule
of in pari materia — like any canon of statutory construction — is a
reflection of practical experience in the interpretation of statutes:
a legislative body generally uses a particular word with a consistent
meaning in a given context."  Erlenbaugh, 409 U.S. at 243; see also
United States v. Williams, 553 U.S. 285, 294 (2008) ("[T]he
commonsense canon of *noscitur a sociis* . . . counsels that a word is
given more precise content by the neighboring words with which it is
associated.").

7

Here, the term "detained" in Rule 15(a)(2) should be interpreted in light of Congress's use of same term in 18 U.S.C. §§ 3144 and 3142.  Section 3144, which Rule 15(a)(2) cross-references, expressly distinguishes between "detention" and "release" of a witness:

> No material witness may be **detained** because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice.  **Release** of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

18 U.S.C. § 3144 (emphasis added).

While neither § 3144 nor § 3142, which § 3144 cross-references, defines "detained," it is clear from context that the term signifies incarceration in a corrections facility.  Like § 3144, § 3142 plainly distinguishes between "release" (such as on a personal recognizance bond, upon execution of an unsecured appearance bond, or subject to a condition or combination of conditions), on the one hand, and "detention" (both permanent and temporary), on the other.  Compare 18 U.S.C. § 3142(a)(1)-(2) with § 3142(a)(3)-(4).  Moreover, § 3142 requires that a "detention order" must "direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal." Id. at § 3142(i)(2).  Thus, the statutory scheme plainly contemplates that release, even subject to travel restrictions, is categorically different than detention.  That distinction should control the Court's interpretation of Rule 15(a)(2) because that rule relates to the same subject matter.

1   Because YANG is no longer confined in a corrections facility,

2   she is not "detained" within the meaning of Rule 15(a)(2) and

3   therefore cannot bring a motion under that rule seeking an order

4   authorizing her deposition.[1]

5   **B.   A Premature Deposition of a Percipient Witness who has been
          Released Pending Trial May Unnecessarily Prejudice GUAN,
6         Thus Giving Rise to a Failure of Justice**

7   Depositions in a criminal case are authorized only where they

8   are consistent with a defendant's constitutional rights.  _See_ Fed. R.

9   Crim. P. 15.  "Where testimonial evidence is at issue . . . the Sixth

10  Amendment requires the unavailability of the witness and a prior

11  opportunity for cross-examination."  _Crawford. v. Washington_,

12  541 U.S. 36, 68 (2004).  "In order to provide an adequate opportunity

13  for cross-examination, the Defendant must have full access to

14  relevant discovery before any deposition is taken which may be used

15  at trial."  _United States v. Guzman-Torres_, No. 09CR3772 WQH, 2010 WL

16  3521973, at *3 (S.D. Cal. Sept. 7, 2010)  (granting motion to deny

17  material witness depositions where the charges defendant faced were

18  "significant" and involved "extensive discovery," a "firm trial date"

19  was fast approaching, and the witness's testimony was central to the

20  case).  Otherwise, an order setting a material witness deposition may

21  result in a failure of justice.  _Id._

22  As of the date of this filing, there is substantial uncertainty

23  as to who will represent GUAN at YANG's proposed deposition, much

24  less whether that attorney will be prepared to defend GUAN's

25  interests at that deposition after having reviewed all of the

26

27  _____

    [1] _But see_ _In re Material Witness Summons in re Motor Tanker Zao_
28  _Galaxy_, 2019 WL 4221727, at *3 (holding, without conducting a textual
    analysis of the rule, that a Rule 15(a)(2) petitioner was
    "functionally detained" when his freedom to travel was restricted).

9

relevant discovery.  Without question, the issue of GUAN's representation should be resolved as a precondition to the issuance of any order setting YANG's deposition.  Moreover, in light of the Government's Notice pursuant to § 2 of CIPA, it also makes practical sense not to conduct any such deposition at least until after CIPA proceedings are complete, in the event such proceedings may be necessary.

Finally, due to the Court's protocols related to the COVID-19 pandemic, the government does not anticipate that a jury trial can or should proceed on November 17, 2020.  However, DFPD Schachter has informed the undersigned that GUAN may waive his right to a jury trial.  The Court has not determined whether a bench trial could safely proceed on November 17, and the undersigned is not aware of any similar bench trial occurring in the Central District of California after jury trials were suspended in March 2020.  In any event, were the Court to authorize a bench trial and schedule it for November 17, the interests of justice would best be served by requiring YANG's live testimony at trial, especially in light of the significant challenges posed by scheduling YANG's safe deposition on short notice during the current pandemic and the relatively minor inconvenience to her of remaining under pre-trial supervision at least until that trial, which is estimated to last four days, is finished.  Should GUAN's trial be rescheduled, YANG can always re-apply to the Court for an order that her deposition be taken.

//

///

10

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny without prejudice YANG's Motion for Videotaped Deposition.

Dated: October 19, 2020         Respectfully submitted,

                                NICOLA T. HANNA
                                United States Attorney

                                CHRISTOPHER D. GRIGG
                                Assistant United States Attorney
                                Chief, National Security Division


                                _____/s/_____
                                GEORGE E. PENCE
                                Assistant United States Attorney

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

# EXHIBIT A

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

<table>
<tr><td>**LODGED**<br>CLERK, U.S. DISTRICT COURT<br><br>08/26/2020<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: **DM** DEPUTY</td></tr>
</table>

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>**FILED**<br>CLERK, U.S. DISTRICT COURT<br><br>08/26/2020<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: DEPUTY</td></tr>
</table>

United States of America

v.

GUAN LEI,

     Defendant(s)

Case No.   2:20-mj-04071

# CRIMINAL COMPLAINT BY TELEPHONE
# OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 25, 2020 in Orange County, in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1519 | Destruction of Evidence |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

 

/S/
_____
*Complainant's signature*

Timothy D. Hurt, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    08/26/2020
_____

*Rozella A. Oliver*
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
_____
*Printed name and title*

**AFFIDAVIT**

I, TIMOTHY D. HURT, being duly sworn, declare and state as
follows:

## I.    INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since 2016.  I
am currently assigned to the Los Angeles Field Office.  I have
been involved in investigating, among other violations, visa
fraud, the destruction of evidence, conspiracy, the theft of
trade secrets, the illegal export of dual-use items (meaning
items that have both military and commercial applications) and
strategic technology commodities from the United States, and the
illegal export of defense articles and other technology.  I
attended 21 weeks of New Agent Training at the FBI Academy in
Quantico, Virginia.  I have also received training in
identifying the techniques, methods, and procedures used by
foreign governments, groups, organizations, companies, and
individuals to engage in visa fraud, destroy evidence, and
attempt to export items and information in violation of United
States export laws.  As an FBI agent, I have also received both
formal and informal training concerning foreign militaries and
their organization, to include the People's Liberation Army
("PLA") of the People's Republic of China ("PRC"), as well as
training in the examination of digital devices and digital
device networks.  Before joining the FBI, I collectively served
for four years in the United States Air Force and United States
Air Force National Guard.

## II.  PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint against GUAN LEI ("GUAN") for a violation of 18 U.S.C. § 1519 (Destruction of Evidence).

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents, witnesses, and open-source online resources.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are approximate.

## III. SUMMARY OF PROBABLE CAUSE

4.    In July of 2020, the FBI began investigating GUAN in connection with visa fraud and the possible transfer of sensitive software or technical data from the University of California, Los Angeles ("UCLA") to high-ranking PRC military officers and the PRC's National University of Defense Technology ("NUDT"), an entity suspected of procuring U.S.-origin items to develop supercomputers with nuclear explosive applications.

5.    During the federal investigation, GUAN – an NUDT student from the PRC conducting research at UCLA on a J-1 visa[1] –

_____

[1] Based on my review of the U.S. Citizenship and Immigration Services website, I know that a J-1 classification (exchange visitors) is authorized for those who intend to participate in an approved program for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting,

appears to have deliberately concealed digital storage drives from the FBI, falsely told U.S. Customs and Border Protection ("CBP") officers that he never contacted the PRC consulate while in the United States, and, several days after refusing the FBI's request to conduct an offsite search of his laptop, walked circuitously around his apartment building, reached into his sock, and threw a destroyed hard drive into a trash dumpster nearby. As detailed further below:

a. GUAN was a student at NUDT and originally came to Los Angeles to work as a researcher in UCLA's Department of Mathematics in 2018. On his student visa application, GUAN stated under oath that he never previously served in the military. When later questioned about serving in the PLA, however, GUAN told FBI personnel that he previously wore Chinese military uniforms and participated in military training (but continued to claim that he had not served in the military). GUAN also acknowledged that his faculty supervisors at NUDT were high-ranking Chinese military officers.

b. During an FBI interview on July 17, 2020, FBI personnel warned GUAN that he could not lie to federal law enforcement officers, and the FBI asked GUAN a series of questions about his visa application, NUDT, his potential affiliation with the PLA, his work at UCLA, as well as his

---

demonstrating special skills, receiving training, or to receive graduate medical education or training. See https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/exchange-visitors (last accessed Aug. 24, 2020).

computer, hard drives, and cell phones.  In response to FBI
questioning, GUAN indicated that apart from a Lenovo laptop, his
iPhone, and his Huawei phone, he did not have any other hard
drives or digital storage devices.  On July 18, 2020, when asked
specifically by FBI personnel whether he had any storage drives
"anywhere else," GUAN responded "no[.]"  GUAN consented to an
on-site search of his laptop, but when the FBI asked for
permission to take the laptop with them to conduct the search
and bring it back the next day, GUAN refused.

      c.   Two days later, on July 19, GUAN attempted to
board a flight from Los Angeles International Airport ("LAX") to
China.  CBP officers once again asked GUAN questions about the
PLA, NUDT, and his electronic devices, including his laptop and
his cell phone, and Homeland Security agents later informed GUAN
that multiple federal agencies were interested in him.  When
asked by CBP whether GUAN ever had "contact" with "anyone" from
the Chinese consulate during his stay in the United States, GUAN
responded that he had not.

    6.   As detailed further below, GUAN's representations to
federal law enforcement officers were false.  Contrary to what
GUAN told CBP officers on July 19, Google records show that GUAN
repeatedly emailed the Chinese consulate throughout June and
July.  Moreover, GUAN destroyed evidence:  On July 25, several
days after GUAN lied to CBP officers and attempted to board a
flight from Los Angeles to Xiamen, FBI employees witnessed GUAN
throw an item in the trash dumpster outside his apartment that,
upon further investigation, was a destroyed hard drive.

## IV.  STATUTORY BACKGROUND

### A.  Destruction of Evidence

7.    Title 18, United States Code, Section 1519 provides:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

### V.    BACKGROUND ON THE CHINESE SCHOLARSHIP COUNCIL

8.    Based on my training and experience and my review of U.S. State Department and media reports, I know the following:

a.    The Chinese government established the Chinese Scholarship Council ("CSC") in 1996 as a non-profit institution affiliated with the PRC's Ministry of Education.

b.    The CSC is responsible for the enrollment and administration of Chinese Government Scholarship programs and provides funding for both undergraduate and graduate students, as well as post-doctoral visiting scholars, to Chinese citizens wishing to study abroad and to foreign citizens wishing to study in China.  CSC is financed mainly by the state's special appropriations or scholarship programs.

9.    According to the U.S. Department of State,[2] the Chinese Communist Party ("CCP") exploits the open and transparent nature

---

[2] https://www.state.gov/military-civil-fusion/ (last accessed Aug. 24, 2020).

of academic research institutions in the United States to bolster China's own military capabilities through bodies like the CSC, which requires academic scholarship recipients to report their overseas research to PRC diplomats.

**VI.**  **CHINA'S NATIONAL UNIVERSITY OF DEFENSE TECHNOLOGY**

10.  Based on my training and experience, I know that the PLA is the military arm of the CCP and the armed forces of the PRC.  One of three schools the PLA uses to formulate military strategy, conduct research, and advance its military capabilities is the NUDT.

11.  According to the Federal Register, NUDT was placed on the U.S. Department of Commerce's Entity List for nuclear nonproliferation reasons related to the use of NUDT's Tianhe 1 & 2 supercomputers.[3]  According to the Federal Register, "NUDT has used U.S.-origin multicores, boards, and (co)processors to produce the TianHe-1A and TianHe-2 supercomputers located at the National Supercomputing Centers in Changsha, Guangzhou, and Tianjin," and "[t]he TianHe-1A and TianHe-2 supercomputers are believed to be used in nuclear explosive activities as described

---

[3] The U.S. Department of Commerce, Bureau of Industry and Security publishes the names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals, and other types of legal persons - that are subject to specific license requirements for the export, reexport and/or transfer (in-country) of specified items.  These persons comprise the Entity List, which is found at Supplement No. 4 to Part 744 of the Export Administration Regulations ("EAR").  The persons on the Entity List are subject to individual licensing requirements and policies supplemental to those found elsewhere in the EAR.

in § 744.2(a) of the [Export Administration Regulations ("EAR")]." <u>See</u> 80 Fed. Reg. 8524 (February 18, 2015).

<b>VII.  STATEMENT OF PROBABLE CAUSE</b>

**A.  GUAN Denies Serving in the Chinese Military on His 2018 Visa Application**

12.  Based on my review of U.S. Department of State records, I know that GUAN completed a digital J-1 U.S. visa application on August 14, 2018.  In his visa application, GUAN stated that he was a student at NUDT in the PRC and claimed that he was applying for a U.S. visa in order study at UCLA's Department of Mathematics, and to collaborate with UCLA Professor 1[4] on an optimization algorithm and its application in machine learning.  GUAN denied ever having served in the military, and he denied seeking to engage in espionage, sabotage, export control violations, or any other illegal activity while in the United States.

13.  The visa application required GUAN to digitally certify that he had completed the application himself, that he read and understood the questions in the application, and the answers were true and correct to the best of his knowledge and belief.  The application warned that all of GUAN's declarations were made under the penalty of perjury.

14.  By clicking "Sign and Submit Application," GUAN certified that he understood that any willfully false or

---

[4] The FBI knows the identity of and interviewed UCLA Professor 1, but his name is concealed here to protect his identity.

misleading statement or willful concealment of a material fact
within the application could subject him to permanent exclusion
from the United States, as well as criminal prosecution and/or
deportation.

### B. GUAN Admits to Wearing a Military Uniform and Acknowledges that His Supervisors at NUDT are Senior Chinese Military Officials

15. On July 17, 2020, GUAN agreed to a voluntary interview
with FBI personnel at an apartment GUAN shared with his
girlfriend, Z.Y., and their roommate, M.Z., in Irvine. During
the interview, GUAN told me that between 2018 and 2020, he
conducted research at UCLA's Department of Mathematics.
According to GUAN, his advisor at UCLA was UCLA Professor 1, and
GUAN used UCLA's Graphics Processing Unit ("GPU") machine to
complete research on deep neural networks in a pipeline fashion,
otherwise described as the simultaneous use of multiple GPU
machines working together to increase efficiency.

16. GUAN stated that UCLA Professor 1 (who later told the
FBI he was not alarmed by GUAN's activities and could not think
of military or proprietary applications GUAN might have
unlawfully accessed at UCLA) left UCLA to work for a Chinese
multinational technology company about "six months" after GUAN
arrived in the United States (i.e. sometime in 2019). GUAN also
stated that he (GUAN) could access the UCLA GPU machine
remotely.

17. I know based on my training and experience, as well as
online electronics and academic publications, that GPU machines

8

have both military and non-military applications.  For example,
according to an online publication issued by Military &
Aerospace Electronics,[5] GPU advancements are used in
intelligence, surveillance, and reconnaissance applications,
such as wide-area persistent surveillance, hyperspectral sensor
fusion, improvised-explosive device detection, and synthetic
aperture radar processing.  According to a research paper from
Iowa State University, GPU technology can also be used to
validate the effectiveness of hypervelocity kinetic impact and
nuclear subsurface explosions.[6]  GPU technology also has a
variety of civilian uses, ranging from videogames to astronomy
to medical imaging.

    18.  During my July 17 interview with GUAN, he claimed that
there were two types of students at NUDT:  "normal" students,
and students who had to "obey" certain types of
"arrangement[s]."[7]  When asked if he had to listen to
instructions or orders, GUAN responded with, "No, we are two
different types of people."  GUAN claimed he was a normal
student, that some other students had to wear uniforms, but GUAN

---

    [5]See
https://www.militaryaerospace.com/computers/article/14034425/emb
edded-computer-graphics-processing-unit-gpu-sensor-processing.

    [6] See GPU-Accelerated Computational Tool Development For
Studying the Effectiveness of Nuclear Subsurface Explosions" and
https://iaaspace.org/wp-
content/uploads/iaa/Scientific%20Activity/conf/pdc2015/IAA-PDC-
15-03-15.pdf

    [7] Quotation marks reflect the written verbatim translations
of GUAN's statements prepared by an FBI linguist in a draft
transcript.

wore plain clothes. I understood GUAN to mean that there were two types of students at NUDT: civilian and military.

19. GUAN said he was usually separated from students who wore military uniforms, and that he didn't know if the uniforms were hot because he wore plainclothes. GUAN claimed he didn't know if his professors were military or common people, but also said that some wore military uniforms and some were common people.

20. Later in the interview, GUAN told agents that his academic advisor at NUDT was X.L. and that he met X.L. no more than five times. According to GUAN, X.L. was GUAN's advisor "by name only," but GUAN's real advisor was D.L. GUAN stated that he had never seen X.L. in military uniform and was unsure whether X.L. wore military uniform.

21. When asked if D.L. had worn a military uniform, GUAN responded "probably, I have seen him wear it a couple times." GUAN attempted to clarify by saying, "I guess he is, but I am not sure if he is military or not." GUAN stated he "didn't pay attention" to whether or not D.L.'s uniform had ribbons or rank, but sometimes professors had a 5-point star on their shoulder. GUAN thought they "probably" had military rank.

22. At this point in the interview, I warned GUAN that he "cannot lie to a federal law enforcement officer."[8] After the admonishment, GUAN stated "I told you what I know."

---

[8] According to the draft verbatim translation, the FBI linguist translated my warning as, "[h]e forgot to tell you earlier, usually before we started talking, he should have told you that you cannot lie to a federal law enforcement officer."

23.  GUAN also said he did not want to join the military.
When GUAN was asked if he was a member of the "cadre," GUAN
replied that he was just a "normal student," and asked if people
wearing "green clothes" were "cadre."[9]

24.  Despite initially telling FBI agents that he never
wore a military uniform, GUAN later changed his response.  In
particular, when asked twice if photos could be found on the
Internet of GUAN in military uniform, GUAN responded "probably
not" both times and then said that he was "nervous."  After
again claiming that the FBI "probably" would not find online
photographs of GUAN in military uniform, GUAN ultimately
admitted that he did in fact wear a military uniform when he
first entered NUDT for "military training."

25.  GUAN told agents that, at NUDT, he wore a uniform
during military training consisting of "green clothes" with
"patterns" for about the first month of school and did a lot of
walking, running, and standing.[10]

26.  When I asked GUAN if he no longer had to wear a
military uniform after the first 15 days of school, GUAN
initially said "correct."  Later, however, GUAN claimed that he
sometimes did wear a military uniform but that the question was
hard to answer because he had been in the U.S. for almost two
years and he couldn't "remember clearly."  GUAN claimed he wore

---

[9] Based on my training and experience, I know that Civilian
Cadre are uniformed PLA personnel in technical positions.

[10] Based on my training and experience, I know that the
types of activities apparently required of GUAN are consistent
with basic military training.

a uniform rarely, such as on holidays like the China National
Holiday.  But GUAN indicated that August 1 (PLA Day),[11] did not
seem to be celebrated "much" at NUDT.

27.  According to GUAN, he did not "pay attention" to the
uniform but described it as being green and stated they "all
have lines" on the shoulder and no stars, "they are the same,
not much difference" than military.  Stars were for older
personnel.

28.  When presented with several photos of GUAN's academic
advisor – X.L. - in PLA military uniform, including the ones
below, GUAN immediately recognized X.L.:[12]

 

29.  GUAN initially said he thought the stars on X.L.'s
uniform were his rank, but said he wasn't sure what rank
exactly.  GUAN then said he "guess[ed]" the two stars on X.L.'s
shoulder meant X.L. was a General.  GUAN said again the stars on

---

[11] Based on my training and experience, as well as numerous
open source web articles (e.g.
https://www.chinadaily.com.cn/a/201908/01/WS5d42722ba310cf3e3556
355f.html), I know that the founding of the People's Liberation
Army is celebrated annually on August 1st.

[12] Multiple websites in China depict X.L. in PLA uniform.
See, e.g., http://szb.jingjiang.gov.cn/art/2012/10/
15_9765_285107.html from 2012, and www.gxbbs.cc/wap/4389-1.html
from 2019 (accessed July 22, 2020)

X.L.'s shoulder "should be General." He then was more specific and revealed he understood it to be either Lieutenant General or Major General, also referred to as "middle" General.

30. GUAN stated again that X.L. was not his real advisor, that his real advisor was D.L. (who, as noted above, GUAN had already reported "probably" wore a military uniform). X.L., he explained, was retired.

31. According to an archived version of an apparent NUDT alumni website preserved by the Internet Archive, X.L. is an academic at the Chinese Academy of Engineering and an expert in computer science.[13] X.L. was a researcher of the Galaxy series of giant computers made by NUDT. X.L. has been with NUDT since 1965 and was the president of NUDT's Institute of Computers. In 2006, X.L. became PLA General Armament Department's Science & Technology Committee deputy director. X.L. is a lieutenant general in the PLA and was in charge of successful development of the Galaxy II high speed internet software system. According to the same website, the Galaxy computers have been used in PLA General Staff Department, PLA General Armament Department, Air Force, military weather forecasts, and nuclear technology.

---

[13]The Internet Archive is a digital library that provides public access to archives of Internet websites, which the library makes accessible through an online portal called the "Wayback Machine." The archived website related to LU is located at the following address: https://web.archive.org/web/20120722171731/http://www.lovenudt.com/detail.asp?fileid=136.

**C. GUAN Conceals His Knowledge of U.S. Government Restrictions on NUDT from the FBI**

32. I also asked GUAN whether he knew that the United States had "denied" NUDT, and whether he knew it was on a U.S. Department of Commerce "list." According to a draft verbatim translation of this portion of the interview, the FBI Linguist translated my question to GUAN as whether he knew that NUDT was "embargoed" by the U.S., meaning whether GUAN knew that it was "prohibit[ed] to sell" items to NUDT. GUAN responded that he was not aware of any such prohibition, and said that he did not follow the U.S. news. Additionally, GUAN said, "I really don't know much about it" and stated he did not "pay much attention to these." GUAN suggested that I search the internet to find out whether NUDT was embargoed.

33. The month before my interview with GUAN, however, emails obtained from Google pursuant to a federal search warrant show that, in fact, GUAN knew NUDT was on a United States "black list." In particular, in an email dated June 18, 2020, GUAN specifically asked the Chinese consulate in Los Angeles about flights back to the PRC given that "[GUAN's] university in China" had been placed on the "so called black list" by the United States and that GUAN's DS-2019 (the Certificate of Eligibility for an Exchange Visitor (J-1) Status) was about to expire.

34. The email address at which GUAN contacted the PRC Consulate in L.A. was "educationsection@gmail.com." In response to GUAN's inquiry, consular employees referred GUAN to the

Office of Consular Protection and used a signature line that
stated in English, "Consulate General of the People's Republic
of China in Los Angeles, 433 Shatto Place, Los Angeles, CA
90020."

> **D.** **GUAN Denies Having Additional Digital Storage Drives in His Apartment**

35. During my interview, I also asked GUAN whether the PRC
Consulate ever talked to him about WANG XIN's ("WANG") arrest
and whether GUAN was worried about being in the same situation.
(Agent's note: On June 11, 2020 WANG was arrested at LAX on
charges that he falsely stated on his visa application he was no
longer a PLA officer; in fact, WANG allegedly remained a "Level
9" technician in the PLA, employed by a military university lab,
at the time he came to study at the University of California –
San Francisco).

36. In response to my question, GUAN asked "[w]hy would
they talk to me about this" and said that he read about WANG's
arrest online. GUAN indicated that he (GUAN) "[s]houldn't be"
worried; "isn't he [WANG] a soldier? I am not in the same
category as him. Plus, the internet says WANG was stealing
information. I am here openly, you can search my stuff."

37. At this point in the interview, I asked GUAN whether I
could take his laptop, a Lenovo L450 (the "LENOVO L450") with me
to search it offsite and bring it back to GUAN. GUAN told me
that I could copy anything I wanted to while at the apartment,

but that I could not take the LENOVO L450 with me.[14] GUAN did, however, provide me with permission to take a Huawei phone and an iPhone with me to search them as long as I returned them the following day. GUAN said that in early July, he gave the iPhone to his girlfriend who "formatted" it. GUAN also said he received the Huawei phone from a friend in early July and had "reset" it to protect his friend's personal information.

38. When I began searching the LENOVO L450 in GUAN's presence, I noticed that it looked as though someone recently deleted much of the computer's data. I asked GUAN why his laptop looked so "clean." GUAN said that in early July, he reinstalled the operating system on the LENOVO L450 because it was old and running slow. GUAN said he changed the operating system from Windows to Ubuntu.

39. Toward the end of our interview, GUAN stated "I want to reiterate, I didn't lie, whatever you said, I answered truthfully."

40. The next day, July 18, I returned to GUAN's apartment with the phones that he allowed me to search and conducted another brief, recorded interview with GUAN. During the interview, GUAN consented to a search of his Google drive account, part of which I was able to download from the LENOVO

---

[14] FBI personnel did not have the equipment necessary on location to copy the laptop in its entirety.

L450.  I also asked GUAN whether he had "any other thumb drives,
or hard drives, or external hard drives?"[15]

41.  In response, GUAN stated "No, usually, basically all
of my important information were on this."  The FBI linguist
also asked GUAN specifically whether he had "any other storage
drives anywhere else."  GUAN replied, "[n]o, everything is on
the computer, the important stuff."

42.  When other FBI agents and I searched GUAN's apartment
on July 30, 2020 pursuant to a federal search warrant, we
discovered the following digital storage drives and devices
containing hard drives in the bedroom shared by GUAN and Z.Y.
(none of which were disclosed to the FBI by GUAN during his
interview):

  a.  One silver and black four-terabyte external hard
drive.  An FBI computer analyst later discovered that nearly all
of the data on the external hard drive was removed in its
entirety on an unknown date before it was searched on July 30.

  b.  One iPad Air 2.  The iPad Air 2 was logged into
GUAN's WeChat account and contained photos of a Departure
Control Order that the U.S. Department of Homeland Security
served on GUAN at LAX on July 19 (as discussed further below).
GUAN's WeChat account also "favorited" digital items, including
some dated in February of 2017, January of 2020, and March of
2020.

---

[15] The FBI linguist translated my question as, "[d]o you
have any other drives? Like these . . ."

c.   One USB Storage Drive.  The USB drive had some photos and documents that appeared to belong to YANG, but, based on a rough Mandarin-language translation, it also had an application with GUAN's name addressed to the PRC Consulate in Los Angeles seeking a return flight to China on July 2, 2020 (i.e. roughly two weeks before I interviewed GUAN); the document also referenced GUAN's Chinese Scholarship Council number.

d.   One MacBook laptop.  The MacBook displayed Z.Y.'s name on its screensaver.

43.   There were two desks in the room shared by GUAN and Z.Y.  The devices above (with the exception of the iPad Air 2) were found on a desk that appeared to be used by Z.Y.  The desk that appeared to be used by Z.Y. was wooden and had women's vitamins, a small purse, a number of paper items appearing to belong to Z.Y., and her phone was plugged in and charging on the desk.  The desk that appeared to be used by GUAN was white with silver legs, had various photo clippings of GUAN, GUAN's passport, and other paper items appearing to belong to GUAN. The iPad Air 2 was found on the bed in the room.

44.   We also found the LENOVO L450 in the living room of the apartment.  As detailed further below, on July 25, 2020, several days after the FBI and CBP interviews (but before our search of GUAN's apartment), eyewitnesses and DNA analysis indicate that GUAN threw an irretrievably damaged 2.5 inch hard drive – which is capable of fitting inside the LENOVO L450 – into a trash dumpster outside his apartment.  FBI personnel seized the damaged hard drive on July 25.  At the time of our

search on July 30, the LENOVO L450 had a different, functioning 2.5 inch Seagate Laptop Thin SSHD installed inside of it.

   **E.   GUAN Falsely Tells CBP He Never Had Contact with the Chinese Consulate**

   45.  Based on my review of a CBP incident log report regarding an interview of GUAN at LAX, I know the following:

        a.   On July 19, 2020, GUAN attempted to board a Xiamen Airlines flight from LAX to Xiamen.  GUAN was interviewed by three CBP officers, two of whom are fluent in Mandarin and provided translation assistance.  GUAN provided the LENOVO L450[16] and his Huawei phone to CBP for inspection.  CBP officers asked GUAN if at any point during his stay in the United States he had contact with anyone from the Chinese Embassy or Chinese consulate.  GUAN stated that he had not.

   46.  GUAN's statement to CBP that he never had contact with the Chinese Embassy or Chinese consulate was false.  In fact, Google records obtained pursuant to a federal search warrant show that GUAN exchanged multiple emails with the Chinese consulate in Los Angeles and the PRC Embassy in Washington D.C. in June and July of 2020.  For instance, as detailed above, on June 18, 2020, GUAN emailed the PRC Consulate in Los Angeles[17]

---

[16] A CBP report describes the laptop as a "Lenovo T450," which I believe is a typographical error because I know that GUAN owns a Lenovo L450, despite Lenovo having a model T450.

[17] The email address at which GUAN contacted the PRC Consulate in L.A. was "educationsection@gmail.com." In responses to GUAN, consular employees used a signature line that stated in English, "Consulate General of the People's Republic of China in Los Angeles, 433 Shatto Place, Los Angeles, CA 90020[.]" Employees also used a signature block that stated, "Office of

about the fact his "university in China" had been placed on the "so called black list" by the U.S. government, and GUAN inquired about flights back to China. GUAN also emailed the Chinese consulate on June 16, 2020 to ask about his options for flights back to China because his July 2nd flight was cancelled. In addition, on June 18, 2020 GUAN emailed the PRC Embassy in Washington D.C.[18] and asked whether the Embassy was organizing a charter flight, and if they were, how he could get a ticket for it. On June 24, 2020, GUAN again emailed the Embassy to ask if there was a charter flight scheduled.

47. Records obtained from GUAN's Huawei phone also show that he saved the consulate's phone number in his contacts as "LA Consulate." GUAN's iCloud account also showed that he had previously saved a total of three different phone numbers for the PRC Consulate in Los Angeles.

48. In addition, Lyft receipts emailed to GUAN's girlfriend, Z.Y., (with whom GUAN lived at an apartment in Irvine) show that Z.Y. took a Lyft from their Irvine apartment to a street address across from the Chinese consulate in Los Angeles at 12:12 p.m. on July 8, 2020.

---

Consular Protection and Overseas Chinese Affairs, Consulate General of the P.R. China in Los Angeles."

[18] The email address at which GUAN contacted the PRC Embassy in Washington D.C. was "admin@sino-education.org." PRC Embassy employees responded to GUAN's emails with a signature lined that stated in English, "The Office of Educational Affairs of the Chinese Embassy, 2600 Tilden Street, N.W., Washington, D.C. 2008."

49.   Z.Y. was picked up from across the street from the Chinese consulate approximately three hours later, at 2:56 p.m. Digital maps provided to me by an FBI Operational Support Technician showing the distance between GUAN and Z.Y.'s apartment and the drop off location (according to Z.Y.'s Lyft receipt) relative to the location of the Chinese consulate are below:



50.   Throughout July and August of 2020, FBI employees witnessed GUAN and Z.Y. repeatedly share what appear to be rideshare cars (e.g. those operated by Uber and Lyft).  In addition, as noted above, in contrast to what GUAN told CBP officers when he was attempting to leave the country, during his recorded FBI interview on July 17, GUAN admitted traveling to the Chinese consulate in early July.

51.   At the conclusion of GUAN's interview with CBP officers at LAX, GUAN (who is in the United States temporarily

pursuant to a visa, as noted above) was served with a Departure Control Order pursuant to 8 C.F.R. § 215. The Order stated that CBP determined that GUAN's departure would be prejudicial to the interests of the United States. The Order informed GUAN that he had a right to contest the Order in a hearing and warned GUAN that he could be "required . . . to submit for official inspection all documents, articles, and other property in his possession which are being removed from the United States upon, or in connection with," his departure. Before GUAN left the airport, federal agents from the Department of Homeland Security also spoke with GUAN and asked him if he wanted to take the opportunity to explain his side of things; the agents and GUAN discussed the fact that multiple federal agencies spoke or wanted to speak to GUAN, including the FBI.

**F.  After Being Denied Exit from the U.S., GUAN Appears to Throw a Destroyed Hard Drive into a Trash Dumpster Outside His Apartment**

52.  Following GUAN's interviews at LAX, GUAN left the airport and returned to his apartment in Irvine on July 19, 2020. On July 25, 2020, FBI employees witnessed GUAN leave his apartment unit (with nothing in his hands) and walk in a circuitous fashion around the outside of the building. Eventually, GUAN appeared to reach into his sock and throw a small item into a trash dumpster outside the apartment. Z.Y. was standing some distance away from GUAN as he walked toward the dumpster, and Z.Y. appeared to be looking around the parking lot.

53.  After GUAN and Z.Y. returned inside the apartment, FBI employees examined the dumpster.  Inside, they saw a small hard drive next to a napkin surrounded by a few kitchen-sized trash bags.  On July 25, 2020, FBI employees photographed the hard drive as it appeared in the dumpster and seized the hard drive as evidence:

 

### G.   FBI Analysis Shows that GUAN Likely Contributed DNA to the Damaged Hard Drive, which Fits the LENOVO L450

54.  As noted above, on July 30, 2020, FBI agents executed a search of GUAN's apartment pursuant to a warrant issued by a United States Magistrate Judge.  Only Z.Y. and M.Z. (GUAN and Z.Y.'s roommate) were inside the apartment.  As soon as the other FBI agents and I arrived outside GUAN's building, GUAN –

23

who was doing laundry in a common space outside of his unit across the street – briskly walked toward the nearby U.C. Irvine campus when he saw the FBI team arrive. Agents – who also had a warrant to search GUAN's person - followed GUAN but were unable to locate him that night.

55. During our search of GUAN's apartment, we recovered (among other items) the LENOVO L450, as noted above. Based on my review of the internal components of the laptop with a member of the FBI Computer Analysis Response Team, I know it has a 2.5-inch internal hard drive, the same type of hard drive FBI personnel retrieved from the dumpster on July 25, 2020.

56. Additionally, based on my review of emails obtained pursuant to a federal search warrant, I know that Z.Y. received an email about rating her transaction from a vendor on Amazon indicating that sometime before July 15, 2020, Z.Y. bought a 2.5 inch internal hard drive. That same type of hard drive is currently installed in the LENOVO L450.

57. I sent the hard drive retrieved by FBI personnel and the LENOVO L450 to an FBI laboratory for DNA analysis on August 5, 2020. The hard drive recovered from the dumpster and the LENOVO L450 were swabbed to determine if DNA was present.

57. On August 21, 2020, I obtained a federal search warrant for buccal samples to create DNA exemplars for GUAN and Z.Y. to compare with the DNA samples recovered from the hard drive and laptop described above. On August 22, 2020, the samples from GUAN and Z.Y. were sent to the FBI DNA laboratory in Quantico, Virginia, for comparison. According to the FBI

laboratory's report dated August 24, 2020, male and female DNA was found on the LENOVO L450, and there is "very strong support" to include both GUAN and Z.Y. as contributors of DNA to the LENOVO L450. In particular, the "likelihood ratio"[19] for GUAN on the exterior of the LENOVO L450 is "78 septillion," meaning it is 78 septillion times more likely that GUAN and an unknown source contributed DNA to the laptop than if two unknown sources contributed to the laptop.

58. According the report, the damaged hard drive contained male DNA and was interpreted as originating from two individuals, although "[t]he presence of male DNA in a mixture may limit the ability to determine if female DNA is also present in that mixture." While there was limited support for excluding Z.Y.'s DNA from the hard drive, it is 60 times more likely that GUAN and an unknown, unrelated person are contributors than if two unknown, unrelated people are contributors. Thus, the report concludes that there is "limited support" for including GUAN as a contributor of DNA to the damaged hard drive.

### H.  The Hard Drive was Intentionally Destroyed

58. Based on my conversations with an FBI Computer Scientist, I know that the hard drive seized by FBI employees on July 25 was irreparably damaged and that all previous data associated with the hard drive appears to have been removed

---

[19] The likelihood ratio is a statistical approach that compares the probabilities of observing the DNA results under two alternative propositions. Calculations were performed using the African American, Caucasian, Southeastern Hispanic, and Southwestern Hispanic populations.  The lowest calculated likelihood ratio is reported.

deliberately and by force.  In particular, the FBI Computer
Scientist told me the following:

     a.    In order to access this type of hard drive's
platters, which stored the hard drive's data, the platters must
be accessed from the top of the hard drive chassis, rather than
by force through the bottom of the hard drive chassis.  The top
of the hard drive chassis had "torx" screws to remove the cover,
which would provide access to the hard drive's platters.

     b.    In this case, the top of the recovered hard drive
still had all of the torx screws in place, with one appearing to
be stripped.  The printed circuit board ("PCB") on the bottom of
the hard drive was removed by force, leaving only a small
portion of it attached to the PCB connection point.  The
connection point on the bottom still had the torx screws in
place, indicating that whoever destroyed the hard drive did not
have access to the correct torx screw driver or was in a
circumstance that did not allow for it.

     c.    After removing the PCB, whoever destroyed the
hard drive would have gained access to the platters and spindle
by forcefully prying, cutting, or breaking the aluminum casing.
The platters were then removed, which could have been easily
shattered.  There would be no data left on the recovered hard
drive.  Additionally, the label on the top of the hard drive was
removed, which would have had the product information.  The
label is typically not removed by hard drive technicians,
because it is a quality control measure.  Hard drive technicians
normally access the screws under the part sticker by puncturing

the sticker. The technicians then usually leave a label indicating that a certified technician accessed the hard drive.

       d.   In light of the foregoing facts, the FBI Computer Scientist's opinion is that the recovered hard drive appears to have been intentionally destroyed by someone who wanted to ensure that no data could ever be recovered from the device.

## VIII.    CONCLUSION

   57.  For all the reasons described above, there is probable cause to believe that GUAN committed a violation of 18 U.S.C. § 1519 (Destruction of Evidence).


                             /S/
                             Timothy D. Hurt, Special Agent
                             Federal Bureau of Investigation


Attested to by the applicant in
accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
 26th day of  August  , 2020.

THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT B

**Pence, George (USACAC)**

| | |
|---|---|
| **From:** | Harland Braun <████████████> |
| **Sent:** | Friday, October 16, 2020 11:54 AM |
| **To:** | Pence, George (USACAC) |
| **Cc:** | `Bin Li |
| **Subject:** | FW: Guan Lei |

I noticed that you became counsel of record in the  US v. Guan Lei matter. The attached e-mail request of October 8, 2020 has never been answered. Mr. Bin Lei and I have been retained by the Lei family in China to represent their relative here in LA. Mr. Li speaks Mandarin and I am a certified criminal specialist.

As our e-mail indicates, the fact the public defender is doing an excellent job in representing Mr. Lei is irrelevant under the Gonzalez-Lopez case. After a half dozen attempts, I finally briefly spoke to Mr. Lei yesterday. We set up a face-to-face meeting with Mr Lei on Monday, the 19th, at 11 AM but have just been informed by the government that Mr. Lei cannot be available and the government cannot tell us when we can see our potential client.

Mr. Lei can decide to stay with the public defender or chose Mr. Li and myself as his lawyers. But the decision is constitutionally required to be his. As of now, Mr. Lei is being held incommunicado by the government despite his constitutional right to choose counsel of his choice.

As an American, it is quite embarrassing that a citizen of the People's Republic of China is being mistreated by my government. I also doubt whether you can take an admissible deposition of Ms. Zang while the issue of the representation of Mr. Guan is left unresolved.

Sincerely,
Harland Braun



This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

Braun & Braun LLP

---

**From:** Harland Braun ████████████████████>
**Sent:** Thursday, October 8, 2020 1:07 PM
**To:** '[william.rollins@usdoj.com](mailto:william.rollins@usdoj.com)' <[william.rollins@usdoj.com](mailto:william.rollins@usdoj.com)>
**Cc:** `Bin Li ████████████████████>
**Subject:** Guan Lei

In *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, the Supreme Court held that defendant has the absolute right to a lawyer of his choice if he can afford it. The Supreme Court reversed the conviction even though an appointed lawyer did an impeccable job of defending Mr. Gonzalez-Lopez.

In simple terms, a perfectly fair trial will be reversed if the defendant has been denied his choice of counsel so matter how competent the appointed defense attorney is. Mr. Li and I have been retained by the Lei family in China to defend Guan. The Federal Public Defender as far as we can  tell is doing a good job of defending Mr. Lei. Under our law constitution, the choice is Mr. Lei's.

Our government has detained Mr. Lei and is holding him incommunicado. Mr. Bin Li have been trying to talk to our client over the phone for three days. The government agents holding Mr. Lei have been uncooperative and dishonest with us. The conduct of our government is despicable in this case. Do you really think our remedy is a complaint to the government of the People's Republic of China? Or the local consulate?

As a representative of our government, I think you should either release Mr. Lei so he can consult with counsel or Mr. Bin Li and I should be given access to our client.


Sincerely,
Harland Braun



This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

Braun & Braun LLP