NICOLA T. HANNA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
WILLIAM M. ROLLINS (Cal. Bar No. 287007)
GEORGE E. PENCE (Cal Bar No. 257595)
Assistant United States Attorneys
Terrorism and Export Crimes Section
      1500 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-7407/2253
      Facsimile: (213) 894-2927
      E-mail:    william.rollins@usdoj.gov
                 george.pence@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-127-MWF |
|---|---|
| Plaintiff, | GOVERNMENT'S EX PARTE APPLICATION (1) FOR CONTINUANCE OF TRIAL DATE, (2) FOR FINDINGS OF EXCLUDABLE TIME PURSUANT TO SPEEDY TRIAL ACT, AND (3) TO SET HEARING DATE |
| v. | |
| GUAN LEI, | |
| Defendant. | **CURRENT TRIAL DATE: 11/17/2020**<br>**PROPOSED TRIAL DATE: 3/9/2021**<br>**PROPOSED HEARING DATE: 10/29/2020** |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys George E. Pence and William M. Rollins, hereby files its Ex Parte Application (1) For Continuance of Trial Date, (2) For Findings of Excludable Time, and (3) To Set Hearing Date.

This Ex Parte Application is based upon the attached memorandum of points and authorities and exhibits thereto, the files and records

1  in this case, and such further evidence and argument as the Court may
2  permit.

3  Dated: October 26, 2020          Respectfully submitted,

4                                   NICOLA T. HANNA
                                    United States Attorney
5
                                    CHRISTOPHER D. GRIGG
6                                   Assistant United States Attorney
                                    Chief, National Security Division
7

8                                   _____/s/_____
                                    GEORGE E. PENCE
9                                   Assistant United States Attorney

10                                  Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

A one-count indictment charges defendant Guan Lei ("GUAN") with Destruction of Evidence, in violation of 18 U.S.C. § 1519.  This case, however, is far more complex than the current charging document suggests.  The government continues to disclose voluminous discovery, much of which needs to be translated into English, and has notified the parties of its intent to invoke the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. 3.  (CR 48.)  CIPA necessitates following certain procedures designed to balance complex issues while preserving defendant's right to a fair trial.  A continuance of the trial will ensure the parties and the Court will have sufficient time to address these issues and prepare for the trial without violating defendant's right to a speedy trial.

A continuance of the trial date is further justified by the national emergency presented by the COVID-19 pandemic, which has caused jury trials in the Central District of California to be suspended since March 2020.  Trials continue to present grave health risks to the parties, their attorneys, jurors, and the Court. Moreover, the pandemic has substantially impaired the government's ability to make available for trial witnesses who reside in other parts of the United States and overseas, who, due to quarantine measures imposed by foreign governments and/or personal safety concerns, are either unwilling or unable to travel to Los Angeles for a trial beginning on November 17, 2020.

Although GUAN has not waived his right to a jury trial, his current counsel – who, as detailed below, may not continue to serve in that role – has advised the U.S. Attorney's Office that GUAN may

file such a waiver and elect to proceed via a bench trial.  No bench trials have been conducted in this district since March 2020 and the current order suspends all jury trials in criminal cases and does not set forth procedures for the safe conduct of bench trials.  <u>See</u> General Order 20-09, at 2.  Especially in light of the potentially District-wide impacts of any proposal for a bench trial, a schedule should be imposed that contemplates the exchange of proposals by the parties and the opportunity for the parties to litigate, and the Court to resolve, any disagreements.

Accordingly, the government respectfully requests that the Court:  (1) grant a trial continuance pursuant to 18 U.S.C. § 3161(h)(7)(A); (w) find that the time period of November 17, 2020 to March 9, 2021, inclusive, should be excluded pursuant to the ends-of-justice provision in 18 U.S.C. § 3161(h)(7)(A), as well as those factors set forth in 18 U.S.C. § 3161(h)(B)(i) and (B)(iv), and (3) hear the parties' positions on this <u>Ex</u> <u>Parte</u> Application at the October 29, 2020 status conference.[1]

## II.   STATEMENT OF FACTS

### A.   GUAN Disposed of a Computer Hard Drive to Obstruct an FBI Investigation into the Transfer of Sensitive Information to the PRC

On August 26, 2020, the Honorable Rozella A. Oliver authorized a criminal Complaint against GUAN, which charged him with Destruction of Evidence, in violation of 18 U.S.C. § 1519.  As detailed in the

---

[1] Based on the undersigned AUSA's discussions with GUAN's current counsel, the U.S Attorney's Office for the Central District of California understands that GUAN opposes this <u>Ex</u> <u>Parte</u> Application.  As detailed in the Declaration of George E. Pence, which is attached hereto as **Exhibit A**, the parties met and conferred with respect to this Application but were unable to resolve their differences.

affidavit in support of that Complaint, which is attached as **Exhibit B**, GUAN is a computer scientist at the National University of Defense Technology ("NUDT") in the People's Republic of China ("PRC"), an institution affiliated with that country's armed forces, otherwise known as the People's Liberation Army ("PLA").  The U.S. Department of Commerce has placed NUDT on its Entity List for non-proliferation reasons related to its development of supercomputers believed to be used in nuclear explosive activities using U.S.-origin multicores, boards, and (co)processors.  See 80 Fed. Reg. 8524 (Feb. 18, 2015).

On October 17, 2018, GUAN traveled to the United States on a J-1 visa to conduct research on machine learning at the University of California, Los Angeles ("UCLA").  While at UCLA, after his faculty advisor apparently departed the school to work elsewhere, GUAN used UCLA's Graphics Processing Unit machine to complete research on advanced computer systems.  After being alerted to the fact that NUDT was on a United States "black list" (as GUAN referred to it in an email to the PRC consulate), GUAN repeatedly reached out to the PRC consulate in Los Angeles and the PRC embassy in Washington, D.C. GUAN also deleted data from his phone and computer.

Furthermore, after an interview with agents from the Federal Bureau of Investigation ("FBI"), during which GUAN lied about his activities in the United States and attempted to obfuscate his involvement in military activities at NUDT,[2] GUAN destroyed a

---

[2] During a voluntary interview with FBI personnel at his apartment on July 17, 2020, GUAN initially denied wearing a military uniform at NUDT.  After he was asked whether photos could be found of him on the Internet wearing military uniform, GUAN responded "probably not," then later admitted that he did in fact wear a

computer hard drive and surreptitiously discarded the hard drive in a dumpster near his apartment.  GUAN's destruction of evidence occurred just days after he attempted to leave the United States by trying to board a flight to the PRC at Los Angeles International Airport ("LAX").

After GUAN's arrest by FBI agents, the government filed a motion requesting that GUAN be detained before trial.  Notably, in support of that motion, the government cited the work of Alex Joske, an analyst at the Australian Strategic Policy Institute.  (CR 29-1.)  As detailed in that motion and supporting exhibits, the Chinese Scholarship Council ("CSC"), provides grants to researchers seeking to study abroad and publishes lists of scholarship winners.  Those lists include a code associated with each scholarship winner.  Mr. Joske has identified in those codes a four-digit sequence that designates certain scholarship winners as uniformed Chinese military personnel.  GUAN's research at UCLA was funded by the CSC, and his CSC code includes the four-digit sequence associated with PLA members.

On the government's motion, the Honorable Patricia Donahue ordered GUAN detained.  Since his initial appearance in this Court, GUAN has been represented by Deputy Federal Public Defenders ("DFPD") Michael Schachter and Nadine Hettle.

---

military uniform when he first entered NUDT for "military training." When asked whether he no longer had to wear a military uniform after the first 15 days of school, GUAN initially said "correct," but later said he sometimes did wear a military uniform but that the question was hard to answer because he had been in the United States for two years and couldn't "remember clearly."  He then said that he wore a uniform rarely, such as on holidays.  When shown a photograph of his advisor at NUDT, a PLA scientist who appeared in uniform in the photograph, GUAN identified his advisor as a General based on the number of stars on his shoulder.

4

**B.    GUAN's Girlfriend, Zhihui Yang ("YANG"), Attempted to Flee the United States After a Material-Witness Warrant Was Issued for Her Arrest**

On August 21, 2020, GUAN's girlfriend, YANG was served with a subpoena to testify in a federal proceeding in connection with the government's investigation of GUAN.

On August 30, 2020, after the FBI learned that YANG had scheduled a flight from LAX to the PRC departing on August 31, 2020, at 12:15 a.m., Judge Oliver authorized a material witness arrest warrant for YANG.  (CR 8.)  Later that evening, the undersigned AUSA contacted YANG's counsel, informed her of the warrant, and requested that YANG not board a flight to the PRC.  Thereafter, YANG's counsel, after speaking with YANG, advised AUSA Rollins that YANG would not board the flight and the parties agreed to YANG's self-surrender the following day.  Despite this assurance, at approximately midnight on August 31, 2020, YANG attempted to board the flight and the FBI was forced to execute its arrest warrant.

On August 31, 2020, on the government's motion (CR 14), Judge Oliver designated YANG as a material witness pursuant to 18 U.S.C. § 3144 and ordered that YANG be detained, (CR 16).

**C.    YANG's Motion for a Videotaped Deposition**

On September 10, 2020, a Grand Jury in the Central District of California returned an indictment charging GUAN with the same violation alleged in the Complaint.  (CR 35.)  GUAN's trial is currently scheduled for November 17, 2020 (CR 41), and a status conference is set for October 29, 2020 (CR 45).[3]

---

[3] This status conference was originally set for October 19, 2020, but was rescheduled after defense counsel was unable to timely file the necessary video-teleconference waiver, apparently due to COVID-19-related limitations imposed on his access to GUAN.

On October 11, 2020, YANG filed a Motion for a Videotaped Deposition pursuant to Federal Rule of Criminal Procedure 15(a)(2). (CR 43.)  The hearing on YANG's motion is set for November 9, 2020, leaving just eight days before GUAN's scheduled trial date for the parties to prepare for the safe conduct of that deposition, over which the Court may choose to preside.

**D.   GUAN May Seek to Substitute Counsel**

In October 2020, attorney Harland Braun sent emails to the Court, defense counsel, and the United States Attorney's Office for the Central District of California.  (See CR 50, Ex. B.)  Those emails state that GUAN's family retained Mr. Braun to represent GUAN, that the U.S. Bureau of Prisons ("BOP") has restricted Mr. Braun's access to his prospective client, and that Mr. Braun doubted that the government could "take an admissible deposition of Ms. Zang (sic) while the issue of the representation of Mr. Guan is left unresolved."  To date, the status of GUAN's representation appears unsettled, and Mr. Braun has not filed a notice of substitution of counsel.

**E.   YANG is No Longer Detained**

On October 16, 2020, YANG filed an Unopposed Ex Parte Application for Proposed Order Setting Bond, which reflected terms that she had negotiated with the government to ensure her appearance at GUAN's trial.  Judge Oliver granted that Application, which authorized YANG's release from the Metropolitan Detention Center subject to certain conditions, including conditions that restrict her travel and provide for home detention and electronic monitoring.  The government has subpoenaed YANG to testify at the November 17, 2020 trial.

**F.    The Status of Discovery and The Government's CIPA § 2 Notice**

The government has provided voluminous discovery to GUAN, including recordings, forensic images of numerous electronic devices and accounts searched pursuant to warrants, draft transcripts and translations, and thousands of documents.  The government anticipates producing additional discovery to GUAN, to include final transcriptions of Mandarin-language recordings and items seized pursuant to search warrants.  Among the items requiring translation is a recording of YANG's October 23, 2020 interview by the government.  During that interview, YANG claimed that she saw GUAN destroy and then discard the damaged hard drive in a dumpster near their apartment.[4]

On October 19, 2020, the Government filed a Notice in this case indicating that, in addition to the discovery already produced, the government will need to rely on the procedures outlined in CIPA, including by bringing to the Court's attention certain discovery issues or other matters relating to classified material.

The government has diligently been preparing to address issues related to classified information.  Indeed, between October 21 and 24, 2020, the undersigned Assistant United States Attorney traveled outside the Central District of California to address issues related to this CIPA filing.  At this time, the government anticipates that the preparation and filing of a motion pursuant to

---

[4] During her interview, YANG also claimed the hard drive belonged to her and was never used by GUAN.  This claim is incredible in light of numerous other obfuscating and misleading statements YANG made during her interview, which the government is prepared to introduce at trial.

7

CIPA § 4, as described in the government's CIPA § 2 notice (CR 48), will require at least six weeks.

### G. Constraints on Witness Travel

The pandemic has placed restrictions on the ability of the government's witnesses to appear for a November trial. On October 22, 2020, the government notified GUAN of the proposed testimony of certain witnesses in the event the testimony of any of them could be construed to require notice under the Federal Rules of Evidence and/or the Federal Rules of Criminal Procedure. Among the identified witnesses is Alex Joske. On October 20, 2020, Mr. Joske told the undersigned AUSA that due to quarantine measures currently in effect in Australia, where he resides, he would not be able to travel to Los Angeles to testify at trial if it proceeded on November 17, 2020.[5] The FBI computer scientist who opined on the condition of the destroyed hard drive in this case – as well as the FBI forensic analyst who examined the destroyed hard drive and laptop for DNA – are located on the East Coast. Additional potential expert witnesses, both in Australia and the United States, who can offer testimony regarding NUDT, the PLA, and GUAN's academic work have declined to travel to Los Angeles due to foreign-government-imposed quarantine measures or concerns for their personal health and safety in light of the COVID-19 pandemic.

### H. The COVID-19 Pandemic and the Central District of California

On March 13, 2020, following the President's declaration of a national emergency in response to COVID-19, the Court entered a

---

[5] See https://www.health.gov.au/news/state-quarantine-requirements-for-interstate-travel (last accessed Oct. 24, 2020).

8

General Order suspending jury selection and jury trials scheduled to
begin before April 13, 2020.  C.D. Cal. General Order No. 20-02, In
Re: Coronavirus Public Emergency, Order Concerning Jury Trials and
Other Proceedings (Mar. 13, 2020).  The Court renewed that
suspension, until a "date to be determined," on August 6, 2020.  C.D.
Cal. General Order No. 20-09, In Re: Coronavirus Public Emergency,
Further Order Concerning Jury Trials and Other Proceedings (Aug. 6,
2020).  On September 14, 2020, the Court relaxed certain restrictions
concerning in-person hearings in the Central District's Southern
Division in light of improved conditions there.  C.D. Cal. General
Order No. 20-12, In Re: Coronavirus Public Emergency Order Concerning
Reopening of the Southern Division (Supersedes, in part, General
Order No. 20-09) (Sept. 14, 2020)).  However, the suspension of jury
selection and jury trials remains in effect throughout the district.

Also on March 13, 2020, the Court imposed health- and travel-
related limitations on access to Court facilities.  C.D. Cal. General
Order No. 20-03, In Re: Coronavirus Public Emergency, Order
Concerning Access to Court Facilities (March 13, 2020).  On March 19,
2020, by Order of the Chief Judge, the Court instituted its
Continuity of Operations Plan ("COOP"), closing all Central District
of California courthouses to the public (except for hearings on
criminal duty matters) and taking other emergency actions.  C.D. Cal.
Order of the Chief Judge No. 20-042 (March 19, 2020).  On March 29
and 31, recognizing COVID-19's continued spread in the community, the
Court took further action: implementing video-teleconference and
telephonic hearings and suspending all grand-jury proceedings.  C.D.
Cal. Orders of the Chief Judge Nos. 20-043 (March 29, 2020) and 20-
044 (March 31, 2020).  The Court's most recent General Order

1   maintains court facilities' general closure to the public; however,

2   it allows in-person criminal hearings for defendants who do not

3   consent to remote appearance, and it allows up to 10 members of the

4   public to attend.  General Order No. 20-09, at 2-3 (August 6, 2020).

5       These orders were imposed based on (1) the California Governor's

6   declaration of a public-health emergency in response to the spread of

7   COVID-19, as well as (2) the Centers for Disease Control's advice

8   regarding reducing the possibility of exposure to the virus and

9   slowing the spread of the disease.  See, e.g., General Order 20-02,

10  at 1.  The Chief Judge has recognized that, during the COVID-19

11  crisis, all gatherings should be limited to no more than 10 people

12  and elderly and other vulnerable people should avoid person-to-person

13  contact altogether.  See Order of the Chief Judge No. 20-042, at 1-2.

14  The Court has more broadly recognized CDC guidance advising

15  "precautions to reduce the possibility of exposure to the virus and

16  slow the spread of the disease[.]"  General Order 20-09, at 1.

17      Local and state governments have adopted similar policies.  On

18  March 19, 2020, both Los Angeles Mayor Eric Garcetti and California

19  Governor Gavin Newsom issued emergency orders requiring residents to

20  "stay home," subject to limited exceptions.  California Executive

21  Order N-33-20 (March 19, 2020); accord Safer at Home, Public Order

22  Under City of Los Angeles Emergency Authority ¶ 1 (March 19, 2020).

23  Subject to similarly limited exceptions, all travel was prohibited.

24  Safer At Home ¶ 4.  Non-essential businesses requiring in-person

25  attendance by workers were ordered to cease operations.  Id. ¶ 2.

26  All schools in the Los Angeles Unified School District remain closed

27  to in-person classes.

28

1    The BOP has likewise adopted aggressive procedures to protect

2    federal inmates.  On April 1, 2020, all BOP facilities nationwide

3    instituted a two-week lock-down, in order to combat the spread of

4    COVID-19 and to protect people in custody.  See Federal Bureau of

5    Prisons, COVID-19 Action Plan: Phase Five (March 31, 2020), available

6    at

7    https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

8    . Under earlier orders, the BOP updated its quarantine and isolation

9    procedures to require all newly admitted inmates to be quarantined

10   for a minimum of 14 days.  Id.  It likewise suspended in-person

11   social visitation and restricted inmate movement between facilities.

12   See Federal Bureau of Prisons, Bureau of Prisons Update on COVID-19

13   (March 24, 2019), available at

14   https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_co

15   vid19_update.pdf.  As evidenced by Mr. Schachter's filings in this

16   case and correspondence received by the undersigned AUSA from Mr.

17   Braun, these restrictions remain in place.

18   As these orders reflect, the novel coronavirus pandemic is a

19   global emergency that is unprecedented in modern history.  As data

20   from both the U.S. Centers for Disease Control ("CDC") and the

21   California Department of Public Health reflect, the virus has spread

22   through the United States community at an alarming rate.  See

23   Coronavirus Disease 2019 (COVID-19) in the U.S., Centers for Disease

24   Control and Prevention (updated daily), available at

25   https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-

26   us.html; Coronavirus Disease 2019 (COVID-19), California Department

27   of Public Health (updated daily), available at

28   https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019

11

.aspx.  The death toll, across the world, is staggering.  As of October 26, 2020, the CDC has identified 8,617,022 cases of the COVID-19 disease in the United States, resulting in 224,601 deaths.[6]

The Court's August 6, 2020 General Order concluded, based on these facts, that "in order to protect public health, and in order to reduce the size of public gatherings and reduce unnecessary travel," it was necessary to suspend criminal jury trials until further notice.  General Order 20-09, at 1 (Aug. 6, 2020).  The Court concluded that, given the increased rates of COVID-19-related hospitalization and death over the preceding 30 days, "holding jury trials substantially increases the chances of transmitting the Coronavirus," and it would thus "place prospective jurors, defendant, attorneys, and court personnel at unnecessary risk."  Id. at 3.  The Court concluded that suspending jury trials thus served the ends of justice and outweighed the interests of the public and defendants in a speedy trial.  Id.

The Central District of California thus has not adopted any protocols for safely conducting either bench or jury trials.  See id. The undersigned AUSA is not aware of any criminal trial conducted in this district since March 2020.

III. APPLICABLE LAW – DEFENDANT'S RIGHT TO A SPEEDY TRIAL

A defendant's right to a speedy trial is enshrined in the Sixth Amendment and codified in the Speedy Trial Act.  See U.S. Const. 6th Amend. and 18 U.S.C. § 3161.  The Sixth Amendment provides that an accused shall "enjoy the right to a speedy trial" and the Speedy

---

[6] See https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last accessed Oct. 26, 2020).

Trial Act requires that a trial ordinarily commence within seventy days from the unsealing of an indictment or initial appearance. Id. But neither is inflexible.

The constitutional speedy trial right is measured against the four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of the speedy trial right, and (4) the prejudice caused by the delay. United States v. Baker, 10 F.3d 1374, 1401 (9th Cir. 1993) (citing Baker v. Wingo, 407 U.S. 514, 530 (1972)).

Similarly, the Speedy Trial Act permits courts to delay trial by excluding periods of time from the 70-day speedy trial period. The Act expressly provides that periods of delay "resulting from any pretrial motion, from the filing of the motion through" resolution of the motion "shall be excluded . . . in computing the time in which trial . . . must commence." 18 U.S.C. § 3161(h)(1)(A). Equally significant here is § 3161(h)(7)'s exclusion for matters in which "the ends of justice" served by delay "outweigh the best interests of the public and the defendant in a speedy trial." A district court may grant an "ends of justice" continuance if the continuance is "specifically limited in time" and it is "justified [on the record] with reference to the facts as of the time the delay is ordered." United States v. Jordan, 915 F.2d 563, 565 (9th Cir. 1990).

The relevant factors courts consider in determining whether § 3161(h)(7) exclusion are applicable are:

> (i)   Whether the failure to grant such a continuance in
> the proceeding would be likely to make a continuation of
> such proceeding impossible, or result in a miscarriage of
> justice.
>
> . . . .

13

(iv)  Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. § 3161(h)(7)(B)(i), (iv).

## IV.  ARGUMENT

### A.  CIPA Imposes a Time-Consuming but Necessary Process to Balance Defendant's Rights and Protect National Security

CIPA litigation is a complex and time-consuming process.  CIPA was designed "to harmonize a defendant's right to a fair trial with the government's right to protect classified information."  United States v. Sedaghaty, 728 F.3d 885, 903 (9th Cir. 2013).  CIPA allows the government to meet its discovery obligations while protecting national security information and ensures defendants receive the information necessary to present a defense.

In this case, the government notified the parties and the Court of its intent to invoke CIPA.  The preparation and review of a CIPA § 4 motion is especially time consuming because the Court must examine lengthy submissions to determine whether to restrict discovery in order to protect national security.  See United States v. Sarkissian, 841 F.2d 959, 965 (9th Cir. 1988) ("Congress intended section 4 to clarify the court's powers under Fed.R.Crim.P. 16(d)(1) to deny or restrict discovery in order to protect national security.").  The Court needs time to examine the record and decide whether the government has appropriately invoked a classified information privilege over the relevant materials and to ensure that any information that is "relevant and helpful to the defense of an

accused" is disclosed to defendant.  <u>United States v. Klimavicius-Viloria</u>, 144 F.3d 1249, 1261 (9th Cir. 1998) (citing <u>Roviaro v. United States</u>, 353 U.S. 53, 60-61, (1957)).

Moreover, that fact that GUAN is currently charged in a narrowly-construed indictment does not diminish the government's obligation to protect classified information.  It is the presence of relevant classified information that dictates the government's use of CIPA, not the nature of the prosecution.  <u>See</u> <u>e.g.</u>, <u>Sedaghaty</u>, 728 F.3d 885, 903 (government invoked CIPA in tax fraud prosecution); <u>Klimavicius-Viloria</u>, 144 F.3d 1261 (government invoked CIPA in drug conspiracy prosecution).

**B.   With Respect to CIPA Litigation, the Ends of Justice Warrant a Continuance**

An "ends of justice" continuance, as envisioned by the Speedy Trial Act, is warranted here because the continuance is "specifically limited in time" and it is "justified" by the facts. <u>See</u> <u>Jordan</u>, 915 F.2d at 565.  Section 3161(h)(7)'s applicable factors support a continuance here.

First, absent a continuance, the government will not be able to fulfill its duty to protect national security information and the Court will not have sufficient time to safeguard defendant's constitutional and statutory rights to a fair trial.  <u>See</u> 18 U.S.C. §§ 3161(h)(7)(B)(i).  Before proceeding to trial, or even before proceeding to YANG's proposed pre-trial deposition, the Court must consider issues raised in anticipated CIPA pleadings.  Allocating sufficient time to resolve those issues is necessary to avoid a miscarriage of justice.

A continuance is also warranted because failure to grant a continuance would "deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." 18 U.S.C. § 3161(h)(7)(B)(iv). As detailed above, the government must compile a voluminous submission and the Court must have sufficient time to review the material to ensure defendant's rights to a fair trial are protected.

Courts have granted trial continuances upon the government's motions, even over defendants' objections, in matters involving CIPA. In United States v. Salad, for example, the district court continued trial over defendant's objection based, in part, on the government's representation that it *might* invoke CIPA. 779 F. Supp. 2d 509, 514 (E.D. Va. 2011)(citing United States v. Warsame, No. 04-29, 2007 WL 748281 at *3 (D. Minn. March 8, 2007) (granting the government's motion for a continuance because of the government's invocation of CIPA)); accord United States v. Hasan, Crim. No. 2:10cr56, slip op. at 2 (E.D. Va. May 21, 2010) (granting the Government's motion continue trial date because, *inter alia*, the potential involvement of CIPA in the case); United States v. Said, Crim. No. 2:10cr57, slip op. at 2 (E.D. Va. May 5, 2010) (same)).

C.    **The COVID-19 Pandemic Also Justifies an Ends-of-Justice Continuance of GUAN's Trial**

Certain periods of time are excluded from the Speedy Trial Act's trial clock. Id. § 3161(h). Some periods of time are automatically excluded, including periods of delay resulting from the absence or unavailability of the defendant or an essential witness. Id. § 3161(h)(3)(A). Other periods of time are excluded only when a

16

judge continues a trial and finds, on the record, that "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  Id. § 3161(h)(7)(A).

In this case, the time between November 17, 2020 and March 9, 2021 should also be excluded from the Speedy Trial Act under the ends-of-justice provision, 18 U.S.C. § 3161(h)(7)(A).

Although General Orders 20-02 through 20-12 address district-wide health concerns and make Speedy Trial Act findings under § 3161(h)(7)(A), individualized findings are nevertheless necessary in this case.  See General Order 20-02 at 2 ¶ 4; General Order 20-09 at 2 ¶ 6(a).  The Supreme Court has emphasized that the Speedy Trial Act's ends-of-justice provision, § 3161(h)(7)(A), "counteract[s] substantive openendedness with procedural strictness," "demand[ing] on-the-record findings" in a continued case.  Zedner v. United States, 547 U.S. 489, 500 (2006).  "[W]ithout on-the-record findings, there can be no exclusion under" § 3161(h)(7)(A).  Moreover, any such failure generally cannot be harmless.  Id. at 509.

Judged by the plain language of the Speedy Trial Act, the General Orders require specific supplementation here.  Specifically, ends-of-justice continuances are excludable only if "the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(7)(A).  Moreover, no such period is excludable unless "the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the

17

1  public and the defendant in a speedy trial." Id.  The period must

2  also be "specifically limited in time." United States v. Lewis, 611

3  F.3d 1172, 1176 (9th Cir. 2010).

4      As the above facts reflect, the ends of justice justify

5  excludable time here.  Pandemic, like natural disaster or other

6  emergency, grants this Court the discretion to order an ends-of-

7  justice continuance.  "Although the drafters of the Speedy Trial Act

8  did not provide a particular exclusion of time for such public

9  emergencies (no doubt failing to contemplate, in the more innocent

10 days of 1974, that emergencies such as this would ever occur), the

11 discretionary interests-of-justice exclusion" certainly covers this

12 situation.  United States v. Correa, 182 F. Supp. 2d 326, 329

13 (S.D.N.Y. 2001) (addressing September 11 attacks); see Furlow v.

14 United States, 644 F.2d 764, 767-69 (9th Cir. 1981) (affirming Speedy

15 Trial exclusion after eruption of Mount St. Helens); accord United

16 States v. Stallings, 701 F. App'x 164, 170-71 (3d Cir. 2017) (same,

17 after prosecutor had "family emergency"); United States v. Hale, 685

18 F.3d 522, 533-36 (5th Cir. 2012) (same, where case agent had

19 "catastrophic family medical emergency"); United States v. Scott, 245

20 Fed. Appx. 391, 394 (5th Cir. 2007) (same, after Hurricane Katrina);

21 United States v. Richman, 600 F.2d 286, 292, 293-94 (1st Cir. 1979)

22 (same, after a "paralyzing blizzard" and the informant was

23 hospitalized).

24      Here, the public health risks outlined above - and the findings

25 articulated in General Orders 20-02 and 20-09 - justify a

26 continuance.  As the President, the California governor, the Los

27 Angeles mayor, and this Court's own General Orders have recognized,

28 we are in the midst of a grave public-health emergency requiring

18

people to take extreme measures to limit contact with one another. The Central District of California has no established jury- or bench-trial protocol at present; instead, the Court has concluded that jury trials would "place prospective jurors, defendant, attorneys, and court personnel at unnecessary risk."  General Order 20-09 at 3, ¶ 6(a).  In the absence of such a district-wide protocol, proceeding with a jury or bench trial is unsafe.

An ends-of-justice delay is particularly apt in this case because:

- This trial involves witnesses who must travel, including from overseas, and thus would put themselves and others at risk if they were to come to court during this crisis.  Multiple public agencies have recommended against unnecessary travel, particularly for vulnerable populations.  Specifically, one government witness is located in Australia, where quarantine- and travel-restrictions are in place, and other possible government expert witnesses have declined to testify on the currently-scheduled trial date due to such restrictions and personal concerns about their health and safety.  At least two FBI witnesses are located on the East Coast.

- The closure of Los Angeles's public schools (through at least the currently-scheduled trial date and potentially through the end of the school year), will require a significant number of jurors to handle child-care responsibilities and thus be unavailable for jury service.

- It will be almost impossible for jurors – particularly jurors over 65 – to maintain adequate social distance during jury selection, trial, and deliberations. Indeed, to leave their homes to come to court, such jurors would violate the recommendations of the Centers for Disease Control and multiple other public-health authorities.

In addition, due to the restrictions imposed by current public-health concerns, it is also unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within Speedy Trial Act time limits.  Counsel, United States Attorney's Office personnel, and victim-witness specialists have been encouraged to telework to minimize personal contact to the greatest extent possible.  And defense counsel has repeatedly – both in filings and emails to the Court and in conversations with the undersigned AUSA – expressed frustration with their inability to meet with GUAN. Moreover, as detailed above, it is uncertain whether GUAN's current counsel will continue to represent him, and his prospective counsel, Mr. Braun, has objected to any deposition of YANG occurring before the issue of his engagement is resolved.

Finally, trial preparation necessarily involves close contact with witnesses, inconsistent with advice from the CDC and the Los Angeles County Department of Public Health, which currently warns that the COVID-19 threat level in Los Angeles County presents "very high and widespread risk," requiring residents to "minimize all contact."[7]  Under these unusual and emergent circumstances – GUAN's

---

[7] See https://corona-virus.la/covid-19-threat-level (last accessed Oct. 26, 2020).

20

arrest and indictment arose not from a years' long investigation but from an investigation that moved quickly after identifying him as a person-of-interest and after FBI determined that he planned to leave the United States to the PRC, a jurisdiction that does not have an extradition treaty with the United States – a denial of a continuance is likely to deny all counsel reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

**D.   A Short Continuance Does Not Violate GUAN's Sixth Amendment Right to a Speedy Trial**

The government's request for a trial continuance does not violate defendant's Sixth Amendment right to a speedy trial.  The four Baker factors favor continuance here.  See Baker, 407 U.S. at 530.  First, the requested continuance is relatively short when considered in light of this case's complexity.  Id. (the delay that can be tolerated for an "ordinary street crime" is less than for a more complex charge).  Second, protection of classified information and ensuring defendant has the material necessary to mount a defense are important reasons justifying a continuance.  Third, although defendant may object to any delay, a relatively short and necessary one will protect both the government's right to protect national security information and defendant's rights to a fair trial.  Fourth, any claim by defendant that he will be prejudiced because a delay will allow the government to investigate additional criminal conduct is unavailing.  The government will continue to investigate his conduct whether a continuance is granted or not.

### E.    The Parties Should Be Heard on this <u>Ex Parte</u> Application at the October 29, 2020 Status Conference

As detailed above, this case involves: (a) discovery issues related to CIPA; (b) grave concerns arising from the COVID-19 pandemic about proceeding to trial (whether it be a bench or jury trial) on the looming trial date of November 17, 2020; and (c) uncertainty as to defendant's continued representation by his current counsel.  In light of these issues and the exigencies presented by the trial date, the government requests that the Court hear the parties' positons on this <u>Ex Parte</u> Application at the October 29, 2020 status conference.

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court:  (1) grant a trial continuance pursuant to 18 U.S.C. § 3161(h)(7)(A); (2) find that the time period of November 17, 2020 to March 9, 2021, inclusive, should be excluded pursuant to the ends-of-justice provision in 18 U.S.C. § 3161(h)(7)(A), as well as those factors set forth in 18 U.S.C. § 3161(h)(B)(i) and (B)(iv); and

//

//

(3) hear the parties' positions on this Ex Parte Application at the

October 29, 2020 Status Conference.

Dated: October 26, 2020            Respectfully submitted,

                                   NICOLA T. HANNA
                                   United States Attorney

                                   CHRISTOPHER D. GRIGG
                                   Assistant United States Attorney
                                   Chief, National Security Division


                                   _____/s/_____
                                   GEORGE E. PENCE
                                   Assistant United States Attorney

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA