CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
MICHAEL A. SCHACHTER (Bar No. 298610)
(E-Mail: Michael_Schachter@fd.org)
Deputy Federal Public Defender
411 West Fourth Street, Suite 7110
Santa Ana, California 92701-4598
Telephone: (714) 338-4500
Facsimile: (714) 338-4520

Attorneys for Defendant
GUAN LEI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    v.<br><br>GUAN LEI,<br><br>              Defendant. | Case No. CR 8:20-CR-00127-MWF<br><br>**DEFENDANT GUAN LEI'S OPPOSITION TO GOVERNMENT'S *EX PARTE* APPLICATION (1) FOR CONTINUANCE OF TRIAL DATE, (2) FOR FINDINGS OF EXCLUDABLE TIME PURSUANT TO SPEEDY TRIAL ACT, AND (3) TO SET HEARING DATE**<br><br>**Hearing Date: Wed., Nov. 4, 2020**<br>**Hearing Time: 10:00 a.m.** |

Defendant, Guan Lei, by and through his attorneys of record, Deputy Federal Public Defenders Michael Schachter and Nadine Hettle, hereby files this opposition to the government's *ex parte* application (Dkt. No. 62) for a continuance of trial and for findings of excludable time under the Speedy Trial Act.

/ / /

/ / /

/ / /

/ / /

/ / /

1    This opposition is based on the attached memorandum of points and authorities,

2   the Declarations of Michael A. Schachter (Schachter Decl.) and Haji Shah (Shah

3   Decl.), the files and records in this case, and any evidence or argument introduced at

4   the hearing on this matter.

5

6

7                                           Respectfully submitted,

8                                           CUAUHTEMOC ORTEGA
                                            Federal Public Defender
9

10  DATED:  November 2, 2020        By   */s/*
                                         _____
11                                       MICHAEL SCHACHTER
                                         Deputy Federal Public Defender
12                                       Attorney for Defendant Brandon Vidal

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................. 1

II. FACTUAL BACKGROUND ................................................. 6

    A.    The Government's Case On Its Obstruction Charge Has Fallen Apart. ................................................................................. 6

    B.    The Government's Eleventh Hour Charges for False Statement and Visa Fraud Likewise Lack Evidentiary Support. ........................... 10

        1.    The False Statement Charge ................................. 10

            a.    The iPad Air 2 ........................................... 10

            b.    The USB Drive ........................................... 11

        2.    The Visa Fraud Charge ........................................ 12

III. ARGUMENT ................................................................. 14

    A.    Mr. Guan Seeks a Bench Trial to Vindicate His Speedy Trial Rights. ................................................................................. 14

    B.    The Sixth Amendment Entitles Mr. Guan to a Speedy Trial. .............. 15

    C.    The Speedy Trial Act Likewise Entitles Mr. Guan to a Speedy Trial. ................................................................................. 16

        1.    The COVID-19 Pandemic Does Not Justify a Continuance and, If Appropriate, This Court Can Hear This Case in Santa Ana. ................................................................. 17

        2.    The Government's Belated Invocation of CIPA Does Not Justify a Continuance. ................................................. 21

            a.    The Government's Failure to Show Due Diligence Should Preclude a Continuance Here. ................... 21

            b.    The Government's Claims that its Belated CIPA Invocation Renders This Case Complex and Entitles it to a Continuance Are Disingenuous. ................... 23

        3.    The Superseding Indictment Does Not Justify a Continuance. ................................................................. 25

    D.    If the Court Grants a Continuance, It Should Release Mr. Guan on His Own Personal Recognizance. ................................................. 25

IV. CONCLUSION ................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Betterman v. Montana*,
    136 S. Ct. 1609 (2016)................................................................14, 15

*Furlow v. United States*,
    644 F.2d 764 (9th Cir. 1981) ................................................4, 16, 18

*Klopfer v. State of N.C.*,
    386 U.S. 213 (1967)......................................................................15

*U.S. v. Jaimes-Oliveros*,
    2011 WL 1897610 (D. Id. May 18, 2011) ..................................6

*U.S. v. Jaimes-Oliveros*,
    2011 WL 2607157 (D. Id. July 1, 2011) ....................................6

*U.S. v. Warsame*,
    2007 WL 748281 (D. Minn. Mar. 8, 2007) ...............................23

*United States v. Anderson*,
    CR No. 20-71-RGK ....................................................................4, 2

*United States v. Cohn*,
    __ F. Supp. 3d __, 2020 WL 5050945 (E.D.N.Y. Aug. 26, 2020)....................15

*United States v. Correa*,
    182 F. Supp. 2d 326 (S.D.N.Y. 2001) ......................................18

*United States v. Karsseboom*,
    881 F.2d 604 (9th Cir. 1989) .....................................................6

*United States v. Marion*,
    404 U.S. 307 (1971)................................................................15, 16

*United States v. Mehrmanesh*,
    652 F.2d 766 (9th Cir. 1981) .....................................................16

*United States v. Nance*,
    666 F.2d 353 (9th Cir. 1982) .....................................................17

*United States v. Salad*,
    779 F. Supp. 2d 509 (E.D. Va. 2011) .......................................23

ii

## TABLE OF AUTHORITIES

Page(s)

*United States v. Thomas*,
    2011 WL 2472576 (D. Az. June 22, 2011) ..........................................6

*United States v. Villegas*,
    No. 2:19-CR-568-AB, 2020 WL 1649520 (C.D. Cal. Apr. 3, 2020)................18

**Statutes**

18 U.S.C. App. 3 § 2 ..........................................................................21, 22

18 U.S.C. App. 3 §§ 4, 6. 10 .....................................................................22

18 U.S.C. § 1001(a)(2)..............................................................................10

18 U.S.C. § 1519.................................................................................6, 2

18 U.S.C. § 1546(a) ..................................................................................12

18 U.S.C. § 3161(h)(7)(A)..........................................16, 17, 18, 19, 20

CIPA ....................................................................................................*passim*

Classified Information Procedures Act...........................................................4

Classified Information Procedures Act...........................................................2

Criminal Procedure or the Speedy Trial Act ..............................................22

Excludable Time Pursuant to Speedy Trial Act .............................................1

However, the Speedy Trial Act ...................................................................20

Sixth Amendment and the Speedy Trial Act ...............................................25

Speedy Trial Act ................................................................................*passim*

Cal. General Order No. 20-12, In Re: Coronavirus Public Emergency
    Order Concerning Reopening of the Southern Division (Sept. 14, 2020) .........20

N.D. Cal. General Order No. 72-6..............................................................19

Cal. Order of the Chief Judge, No. 36 ......................................................19

Federal Rules of Criminal Procedure Rule 23(a) ......................................14

## **TABLE OF AUTHORITIES**

Page(s)

*Jury Trials Since May, Thanks Jurors*, DAILY JOURNAL (Oct. 21, 2020), available at https://tinyurl.com/y6l6o4oj ..................................................19

*Nationalism 101*, FOREIGN POLICY (Oct. 25, 2019), https://tinyurl.com/yxa2oggc ..........................................................................13

News Release, Orange County Superior Court Celebrates Special Juror Appreciation Week October 26- 30, 2020, SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE (Oct. 20, 2020), https://www.occourts.org/media-relations/current-news-releases/10-20-2020_JurorAppreciationWeek.pdf ....................................................................19

*Presiding Judge Kevin C. Brazile Issues New General Order Extending Some Matters as Court Continues Phased Ramp Up of Proceedings*, SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES (Sept. 10, 2020), available at https://tinyurl.com/yx9q4rmg ................................................19

Sean Silbert, *Forced Military Training For Chinese Students Encounters Resistance*, LOS ANGELES TIMES (Oct. 12, 2014) ("Training became compulsory for all high school and university students in 2001.")...................13

*Trump Defends Using 'Chinese Virus' Label, Ignoring Growing Criticism* (Mar. 18, 2020), available at https://www.nytimes.com/2020/03/18/us/politics/china-virus.html ...................2

iv

# I.  INTRODUCTION

Defendant Guan Lei and his girlfriend ZhiHui Yang came to the United States for commendable reasons.  Like so many international students before them, they travelled here on visas to study at American universities, contribute to scholarship at these institutions, and advance their careers.  Mr. Guan and Ms. Yang are both PhD students in computer science, Mr. Guan at the National University of Defense Technology and Ms. Yang at Fudan University.  Each was successful in finding professors to sponsor their research in the United States, he at UCLA and she at UCI.[1]

But the couple also sought positions in California for a more practical, and romantic, reason.  Because of the proximity of UCLA and UCI, Mr. Guan and Ms. Yang could spend much more time together here than they otherwise could in China, where their respective universities are separated by an 11.5 hour drive.

For most of their two-year visit, Mr. Guan and Ms. Yang were extremely happy. They worked hard, went sightseeing in places like Yellowstone National Park, and, most important, got engaged.  In fact, but for the COVID-19 pandemic and this case, they would have been married this past September back in China.

Mr. Guan also excelled at UCLA, where he worked for and was advised by Wotao Yin, a Professor of Mathematics.  In a June 2020 letter to NUDT, Professor Yin wrote that Mr. Guan was a very valuable member of his research group.  Ex. 1.  Similarly, during a July 2020 call with FBI Special Agent Timothy D. Hurt, the principal investigator in this case, Professor Yin described Mr. Guan as a "quality researcher" and "the best programmer in [his] lab."  Ex. 2 at 1.

---

[1]    In 2018, Mr. Guan was one of more than 10,000 Chinese PhD and postdoc students to receive the National Construction High-Level University Postgraduate Program ("NCHUPP") scholarship from the nonprofit China Scholarship Council ("CSC") that year alone.  An estimated one in 14 Chinese students in the United States receives funding from the CSC.  *See* Dkt. No. 29-1 at 1; China Scholarship Council, www.csc.edu.cn (last visited on Nov. 2, 2020).

It was not until the last several months that the couple's American dream became an American nightmare.  The couple's trouble began with the COVID-19 pandemic.  Mr. Guan's student visa was scheduled to expire on July 30th, but the ongoing pandemic hindered his ability to book a flight back to China.  (*See* Dkt. No. 31, Ex. 2 at 3, 31; Dkt. No. 1 at ¶ 33.)  In June, he sought advice from the Chinese consulate about booking a flight.[2]  (Dkt. No. 1 at ¶¶ 33, 46.)  At one point, he had a flight scheduled for July 2nd, but that flight was cancelled due to the COVID-19 pandemic.  (Dkt. No. 31, Ex. 2 at 3; Dkt. No. 1 at ¶ 46.)  On July 7th, a new ticket was issued to Mr. Guan, for a flight leaving on July 20th.[3]  Ex. 3; Dkt. No. 31, Ex. 2 at 3.  But, unbeknownst to him, Mr. Guan had by then become a potential target in an FBI investigation.

According to the government's own memorandum, its investigation into Mr. Guan is rooted in a May 29, 2020 White House Proclamation alleging that China is engaged in a campaign to steal United States technologies and was using Chinese students to operate as collectors of intellectual property.  Ex. 4 at 1-2.[4]

Following the White House Proclamation, the FBI Los Angeles Field Office began taking a closer look at visa holders from Chinese military institutions, including NUDT. *Id.* at 3.  This led FBI LA to investigate Mr. Guan, despite the fact that he had openly stated his NUDT affiliation in his visa application.  *Id.*

---

[2]     The government's *ex parte* application attempts to recast Mr. Guan's contacts with the Consulate as sinister acts.  (*See* Dkt. No. 62 at 3.)  But the actual record makes clear that he was simply seeking help in obtaining a return flight so as not to overstay his visa.

[3]     The government insinuates that Mr. Guan attempted to leave the United States on his scheduled departure date to evade its investigation.  (*See* Dkt. No. 62 at 4.) But Mr. Guan's flight was scheduled ten days before his first contact with the FBI on July 17th.  Further, the FBI did not at any time before July 20th advise him that he could not leave the country.

[4]     The White House Proclamation, which also issued certain restrictions on student visas for Chinese students, came on the heels of President Trump's labeling of COVID-19 as the "Chinese Virus."  *See, e.g.*, Katie Rogers et al., N.Y. TIMES, *Trump Defends Using 'Chinese Virus' Label, Ignoring Growing Criticism*, (Mar. 18, 2020), available at https://www.nytimes.com/2020/03/18/us/politics/china-virus.html.

2

On July 17, 2020, at just after 9:00 p.m., Agent Hurt visited Mr. Guan and asked if he could interview him at his home in Irvine. Even though he was packing for his return flight to China, Mr. Guan welcomed Agent Hurt into his home and sat for what turned out to be a four-hour interview lasting until almost 1:00 a.m. During the interview, Agent Hurt assured Mr. Guan more than a dozen times that he was "not in trouble" and that he just needed to get a few questions cleared up so that he could "go back and tell [his] boss that 'hey, this guy is good to go.'" (Dkt. No. 31, Ex. 2 at 3.) Mr. Guan answered hundreds of questions from Agent Hurt and consented to searches of his laptop and mobile phones, even allowing him to take one phone with him to be returned the following day. On July 18th, Agent Hurt did not return with Mr. Guan's phone until after 10:00 p.m. *Id.* at 43. Nonetheless, Mr. Guan voluntarily sat for an additional hour of questioning and allowed Agent Hurt to copy documents from his Google Drive.

On July 20th, the government prevented Mr. Guan from boarding his flight, presumably so that it could continue its investigation. And on August 27st, Mr. Guan was arrested and charged in a criminal complaint with destruction of evidence.

Since charging Mr. Guan, the government's case has hit two major roadblocks. First, Mr. Guan declined the government's plea offer, despite the government's expressed concern that, absent a plea, Mr. Guan would overserve his sentence on the original obstruction charge even if found guilty. Schachter Decl., ¶ 3.[5]

Second, the government's case on its obstruction charge has fallen apart. Its theory for the charge was that Mr. Guan obstructed an investigation into his alleged theft of technology from UCLA by destroying an internal hard drive from his own computer, but the government's October 23rd interview with Ms. Yang has now alerted it to the fact that the hard drive at issue was an external drive belonging to Ms. Yang, not Mr. Guan, and that Mr. Guan never used it. The government has also failed to identify any

---

[5]     The government's instant request to continue this case to March, if successful, may make it inevitable that Mr. Guan will overserve his sentence, no matter what the result is at trial.

3

1 | discovery showing theft of technology or sensitive information from UCLA, or that Mr.
2 | Guan was even working on a project providing him access to sensitive information.

3 | In the wake of these developments, the government now seeks to continue trial,
4 | filing its *ex parte* application just three weeks before the scheduled trial date.

5 | "Except for the right of a fair trial before an impartial jury, no mandate of our
6 | jurisprudence is more important" than a defendant's right to a speedy trial. *Furlow v.*
7 | *United States*, 644 F.2d 764, 769 (9th Cir. 1981). Here, Mr. Guan wishes to proceed on
8 | the current trial date of November 17, 2020 and is seeking a bench trial to vindicate his
9 | constitutional and statutory rights to a speedy trial.

10 | The government asserts that an "ends of justice" continuance is warranted because
11 | of the COVID-19 pandemic and so that it may file a motion under the Classified
12 | Information Procedures Act ("CIPA"). But neither justifies a continuance here nor a
13 | finding of excludable time under the Speedy Trial Act.

14 | As to the COVID-19 pandemic, while courts may exclude *brief* periods of time
15 | under the Speedy Trial Act due to a community emergency, they may do so only when
16 | good cause show the triggering exigency is still emerging and the orderly process of the
17 | court remains impossible to carry out. The government hasn't met its burden here,
18 | especially for a bench trial in this Southern Division case, which this Court could hear
19 | either in Los Angeles or Santa Ana. Currently, regular functions of the Court continue
20 | when it seemingly benefits the government — grand juries convene, new arrests are made
21 | on indictment or complaint in increased numbers, and defendants are ordered detained
22 | on government motion pending trial. Additionally, many courts have held in-person
23 | hearings, including with witnesses.[6] Meanwhile, jury trials in other courts have resumed

---

25 | [6]   For example, in *United States v. Anderson*, CR No. 20-71-RGK,
26 | undersigned counsel participated in a two-day suppression hearing, where the defendant,
who was in custody, counsel for the defendant and the government, and seven potential
27 | witnesses all appeared in person (three of whom testified). *See* Dkt Nos. 33-34 (Minutes
of Suppression Hearing). A larger courtroom in the Roybal Federal Building, equipped
28 | with Plexiglas protection, was used for the hearing. Schachter Decl., ¶ 4.

with safeguards in place to protect public health. We recognize that there is no certainty in facing the novel coronavirus. But under current circumstances we believe the various stakeholders can implement creative solutions to reasonably assure community health while holding a bench trial and respecting Mr. Guan's speedy trial rights.

The government's claim that it needs additional time to file a CIPA motion likewise does not warrant a continuance. The government filed this case on August 26th, but it did not even file its *notice* of its intent to invoke CIPA until October 19th, less than a month before trial and three days after defense counsel first raised the prospect that Mr. Guan may proceed by bench trial. Schachter Decl., ¶ 3; Dkt. No. 48. The government was aware of its discovery obligations when it filed this case and its *ex parte* application provides no justification for its delay in invoking CIPA. Accordingly, it has no right to now ask the Court to bail it out with a lengthy continuance, and any adverse impact that this may have on its case is of its own making.

Finally, on October 27th, exactly three weeks before trial and one day after the government filed it instant *ex parte* application, a superseding indictment was issued. (Dkt. No. 66.) Besides restating the government's obstruction charge, the superseding indictment also presents two new charges for false statement and visa fraud. The defense anticipates that the government may point to these new charges as an additional basis for a continuance. But a continuance will not assist the parties in addressing these charges. First, neither is based on any new allegations. To the contrary, the government stated its purported factual support for both charges in its August 26th criminal complaint. (*See* Dkt. No. 1 at ¶¶ 5(a), 12-26, 40-43.) Second, as with the government's obstruction charge, the state of the evidence on both charges tends to establish Mr. Guan's innocence:

- The false statement charge alleges that Mr. Guan lied by failing to disclose his ownership of an iPad Air 2 and a USB drive, but the factual record shows these items were owned by Ms. Yang, not Mr. Guan; and

- The visa fraud charge alleges that Mr. Guan committed fraud by failing to state that he had served in the military, but the factual record shows that Mr. Guan has not served in the military and is a civilian student at NUDT.

Thus, more time is not necessary for the parties to prepare their cases on these charges. Moreover, and crucially, as to the original obstruction charge, the filing of the superseding indictment does not restart the 70-day Speedy Trial clock. *See, e.g.*, *U.S. v. Jaimes-Oliveros*, 2011 WL 1897610, at *3-4 (D. Id. May 18, 2011) (collecting cases); *U.S. v. Jaimes-Oliveros*, 2011 WL 2607157 (D. Id. July 1, 2011) (dismissing charges on under Speedy Trial Act notwithstanding restatement in superseding indictment); *United States v. Thomas*, 2011 WL 2472576 (D. Az. June 22, 2011) (similar); *United States v. Karsseboom*, 881 F.2d 604, 606 (9th Cir. 1989) (stating that the 70-day speedy trial period is not be "restarted upon the filing of a superseding indictment when the superseding indictment charges the same offenses as the original indictment").

For all of these reasons, the government's requests for a continuance and findings of excludable time under the Speedy Trial Act should be denied.

## II.  FACTUAL BACKGROUND

The state of the evidence tends to establish Mr. Guan's innocence on all three charges.

## A.    The Government's Case On Its Obstruction Charge Has Fallen Apart.

The government's original charge, preserved in its superseding indictment, is that Mr. Guan committed obstruction in violation of 18 U.S.C. § 1519.  (Dkt. Nos. 35, 66.)

The government's theory of the case is that Mr. Guan violated 18 U.S.C. § 1519 by destroying and discarding an internal hard drive, which the government contends came from his personal computer, with the intent of obstructing the government's investigation into his alleged theft of technology or sensitive information from UCLA. (*See generally* Dkt. Nos. 1, 35, 66.)

On October 23rd, the government's investigation unearthed contradictory and exculpatory evidence.   The government met that day with Ms. Yang, whom the

6

government has designated as their own material witness.  During the interview, Ms. Yang told the government, among other things, the following facts:

- The hard drive at issue belonged to her, not Mr. Guan;

- Mr. Guan never used the hard drive;

- The hard drive was an external hard drive, not an internal hard drive;

- The external hard drive might have been a Western Digital drive; and

- Ms. Yang had asked Mr. Guan for his help in throwing it out.

Schachter Decl., ¶ 5.  To date, Ms. Yang is the only person who has provided potential testimony about who owned and used the hard drive.

In its application, the government acknowledges Ms. Yang reported these facts but shrugs them off as "incredible," claiming without evidence that she made obfuscating statements during her voluntary interview, and implying that the government is therefore entitled to ignore her offer of exculpatory evidence.  (Dkt. No. 62 at 7 n.4.)  And, in its superseding indictment, the government sticks to its guns, alleging once again that Mr. Guan destroyed an "external hard drive" to obstruct an investigation.[7]  (Dkt. No. 66.)

But, as the defense advised the government before the latter obtained its superseding indictment, an investigation by Haji Shah and Aaron Bateman -- colleagues at the Federal Public Defender's Office with expertise in computer systems and computer forensics[8] -- corroborates key aspects of Ms. Yang's account.[9]

---

[7]    It is unknown at this time whether the government played an audio recording of Ms. Yang's exculpatory statements to the grand jury before obtaining the superseding indictment.  *See* U.S. Attorney's Manual 9-11.233 ("It is the policy of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person.").

[8]    *See* Shah Decl., ¶¶ 2, 6 (summarizing Mr. Shah and Mr. Bateman's qualifications and experience).

[9]    The defense addressed the key preliminary conclusions discussed here in an October 24th email, which the defense sent in advance of the parties' October 26th meet and confer on the government's *ex parte* application.  Schachter Decl., ¶ 13.

On October 2nd, Mr. Shah examined and took photographs of the recovered hard drive shell and Mr. Guan's personal computer, a Lenovo L450. Shah Decl., ¶ 3. Based on this examination, Mr. Shah and Mr. Bateman believe the hard drive shell came from a Western Digital external hard drive, not an internal hard drive as the government believes. The hard drive shell has a model number stamped on the outside that begins with the letters "WXA." *See id.*, ¶ 7 and Ex. D. Mr. Shah and Mr. Bateman are of the collective opinion that this model number signifies a Western Digital hard drive specifically manufactured for use in an external hard drive enclosure: the letters "WXA" found in the model number are consistent with what Mr. Shah and Mr. Bateman have observed as letters found on external Western Digital hard drives (the FPD purchases 100 or so such drives each year), and are not consistent with the letters found on internal hard drives manufactured for use inside of a laptop computer. *Id.*, ¶ 7.

Mr. Shah is also of the opinion that the hard drive shell could not have fit inside Mr. Guan's Lenovo laptop as the government believes. *Id.*, ¶¶ 4-6. During his October 2nd examination, Mr. Shah compared the hard drive shell with the hard drive found inside Mr. Guan's laptop and the hard drive bay where a hard drive would be seated inside the laptop. *Id.*, ¶ 4. As the photographs enclosed with Mr. Shah's declaration illustrate, while the hard drive shell measured 1.2 cm deep, the depth of the hard drive bay of the laptop measured just 0.8 cm deep. *Id.*, ¶ 5 and Exs. A-C. Based on these facts, Mr. Shah believes it would not have been possible for the hard drive shell to have fit inside the Lenovo laptop with the back cover of the laptop installed. *Id.*, ¶ 5.

Mr. Shah also finds nothing unusual about Ms. Yang's decision to dispose of her hard drive. To the contrary, he reports that it is a common practice among individuals within the information technology community to physically destroy hard drives no longer being used. *Id.*, ¶ 8. This is because people in this community are knowledgeable about how sensitive and personal information can remain on a hard drive even after formatting, and they likewise appreciate how easily that information can be recovered. *Id.* Mr. Shah himself has destroyed his own personal hard drives in order to protect the kind of

sensitive information typically used in identity theft, and the FPD office owns a hard drive crushing device to protect sensitive information of clients and employees.  *Id.*

Besides Ms. Yang's statements, there is another major fissure in the government's obstruction theory.  To date, the government has identified zero evidence of wrongdoing or work on sensitive national security projects by Mr. Guan at UCLA.  The government has identified no discovery showing theft of technology or sensitive information, or that Mr. Guan was even working on a project providing him access to any sensitive information, technology, or projects.  Schachter Decl., ¶ 5.  In fact, produced discovery instead points in the opposite direction.  For example, in his interview with Agent Hurt, Professor Yin reported that his own research was not in sensitive areas; no activity by Mr. Guan alarmed Professor Yin; there was nothing concerning about Mr. Guan's having access to the team's graphics processing unit machine ("GPU"); there was nothing private about the information stored on the GPU; Mr. Guan was allowed to keep the code he developed at UCLA; and, aside from the possible exception of Mr. Guan's own research, the team's research wasn't even worth taking.  Ex. 2 at 1-2.  Professor Yin also elaborated that Mr. Guan's "code was the most advanced," and "if anything people would steal Guan's code and not the code made by others."  *Id.* at 2.[10]

Because the weight of the evidence tends to establish Mr. Guan's innocence, the appropriate course of action for the government would be to dismiss the obstruction charge, not seek a four-month continuance.

---

[10]    Consistent with these comments, UCLA attorney Robert Swerdlow advised Agent Hurt in July 2020 that Professor Yin would not lie to protect a student. Ex. 5 at 1. Mr. Swerdlow also told Agent Hurt that, while he would agree to make Professor Yin available for an interview with the government, he believed Agent Hurt would be disappointed with the interview in light of the Agent's stated objective of investigating an alleged crime against UCLA.  *Id.* at 2.

It is unknown at this time whether the government presented evidence about Professor Yin and Mr. Swerdlow's respective statements as exculpatory evidence to the grand jury before obtaining the original and superseding indictments.  *See* U.S. Attorney's Manual 9-11.233.

**B.    The Government's Eleventh Hour Charges for False Statement and Visa Fraud Likewise Lack Evidentiary Support.**

As stated, the government's belated visa false statement and visa fraud charges do not introduce any new allegations into this case.  And, as with its obstruction charge, the state of the evidence on both charges tends to establish Mr. Guan's innocence.

### 1.    The False Statement Charge

The government's false statement charge alleges that Mr. Guan made a false statement in violation of 18 U.S.C. § 1001(a)(2) at his July 18th FBI interview.  (Dkt. No. 66 at 3.)  Specifically, the government alleges that, when asked about whether he had any digital storage aside from certain storage he had already identified,[11] Mr. Guan failed to disclose his ownership of a USB drive and an iPad Air 2.[12]  *Id.*

The government's false statement charge lacks evidentiary support because as illustrated by its own criminal complaint, investigation, and the discovery it has produced, the iPad Air 2 and USB drive belonged to Ms. Yang, not Mr. Guan.

### a.    The iPad Air 2

During Ms. Yang's October 23rd interview, she stated the following facts about the iPad: she was in possession of it most of the time; she is the one who used it most of the time; she thinks Mr. Guan bought it for her several years earlier; and she thinks it

---

[11]    During his July 18th interview, Mr. Guan described and gave FBI Agent Hurt access to his Lenovo L450 and Google Drive account.  Mr. Guan also voluntarily provided Agent Hurt copies of documents from his laptop computer and Google Drive account, which Agent Hurt loaded onto his own government-issued USB drive.  (*See* Dkt. No. 31, Ex. 2 at 44-45.)

[12]    According to a rough transcript of the July 18th FBI interview already on file with the Court, Mr. Guan was asked the following question and provided the following answer at his interview:

> Agent Hurt: Do you have any other storage anywhere else?
> Linguist Jerry Wu: Do you have any other storage drives anywhere else?
> Mr. Guan: No, everything is on the computer, the important stuff.

(Dkt. No. 31, Ex. 2 at 45.)

10

1  belonged to her.  Schachter Decl., ¶ 5.  Ms. Yang also stated that, aside from Mr. Guan's
2  Lenovo computer, he did not own any computers.  *See id.*

3  Ms. Yang's account is corroborated by the FBI's interview of Meng Zhao, a UCI
4  postdoctoral student who was Ms. Yang's roommate in Irvine for about one year.[13]  Ex.
5  6 at 1.  During his interview, Mr. Meng stated that Ms. Yang used an iPad (and an Apple
6  laptop) and that he only saw Mr. Guan use a black Lenovo laptop and a phone.  *Id.*

7  It can be inferred from these facts that Mr. Guan bought the iPad Air 2 for Ms.
8  Yang and that it belonged to her.

9  **b.    The USB Drive**

10  During Ms. Yang's October 23rd interview, she was also asked about the USB
11  drive seized by the government.  After being shown a photograph of it, Ms. Yang stated
12  that she thought it was hers.  Schachter Decl., ¶ 5.

13  Ms. Yang's account is corroborated by the circumstances surrounding its seizure
14  and its contents.  As the government's own criminal complaint concedes, the USB drive
15  was found on Ms. Yang's desk at the time of its seizure.  (Dkt. No. 1 at ¶ 42(c).)  Indeed,
16  from a photograph taken at the time of seizure, it appears it may have been found either
17  in or on top of a pencil case that likewise appears to have belonged to Ms. Yang:



18
19
20
21
22
23
24
25
26

27  ---
28  [13]     Mr. Meng stated that Mr. Guan frequently stayed with Ms. Yang in her
room.  Ex. 6 at 1.  Undersigned counsel understands that at some point around the
summer of 2020, Mr. Guan moved in with Ms. Yang.

Ex. 7.   Additionally, the government's criminal complaint states that the photos and documents on the USB drive appeared to belong to Ms. Yang, aside from one document that appeared to relate to a communication Mr. Guan had with the Chinese consulate about a possible return flight to China.[14]  (Dkt. No. 1 at ¶ 42(c).)

It can be inferred from these facts that the USB drive belonged to Ms. Yang.[15]

## 2.  The Visa Fraud Charge

The government's visa fraud charge alleges that Mr. Guan committed visa fraud in violation of 18 U.S.C. § 1546(a) by stating in his application that he had never served in the military when, in fact, he had done so.  (Dkt. No. 66 at 1-2.)

The problem with the government's charge is simple: Mr. Guan has not served in the military and is a civilian student at NUDT.  (*See, e.g.*, Dkt. 1 at ¶ 18.)

The thrust of the government's argument to the contrary is that Mr. Guan admitted during his July 17th FBI interview that had participated in military training while at NUDT and worn military uniforms.  (*See* Dkt. No. 1 at ¶¶ 24-26; Dkt. No. 62 at 3, 3 n.2.)  But these activities are consistent with his assertion that he is not in the military.

The government, at best, lacks basic knowledge about military service in China or, at worst, is knowingly misrepresenting the facts.  It is well established that all high school and university students in China must participate in a military training course  as

---

[14]    It is unknown at this time whether the government presented evidence about Ms. Yang's statements regarding the iPad and USB drive, or the other sources of evidence discussed in this section, as exculpatory evidence to the grand jury before obtaining the superseding indictment.  *See* U.S. Attorney's Manual 9-11.233.

[15]    Even assuming for argument's sake Mr. Guan owned either the iPad or the USB drive, his statement to Agent Hurt in response to being asked whether he had any other storage drives was that the "important stuff" was on the drives he had already disclosed.  (*See* Dkt. No. 31, Ex. 2 at 45.)  Given this limitation that Mr. Guan interposed on his own answer, even if he had owned one of these devices and stored files in it, those findings would not necessarily clash with his statement to Agent Hurt.

Further, the defense's statement here of certain flaws in the government's false statement charge is without prejudice to any additional defenses it may raise at trial, including any defenses arising from errors or ambiguities in interpretation.

part of their education.  *See* Celine Sui, *Chinese Universities' First Course is Nationalism 101*, FOREIGN POLICY (Oct. 25, 2019), https://tinyurl.com/yxa2oggc ("Every university student in China is required to complete a military training program (junxun) ranging from two weeks to a month as part of their matriculation."); Sean Silbert, *Forced Military Training For Chinese Students Encounters Resistance*, LOS ANGELES TIMES (Oct. 12, 2014), https://tinyurl.com/yyjfdnre ("Training became compulsory for all high school and university students in 2001.").  Students must wear uniforms and perform activities such as drills and marching.  This military training is not the same as military service.  It is a compulsory educational credit and the public has generally seen it as a physical fitness program.  *See id.*  Indeed, even UCLA Professor Yin described the existence of the military training requirement during his July 2020 interview with Agent Hurt.  *See* Ex. 2 at 2 ("YIN thought it was normal for students to go through two weeks of military style training on a Chinese campus with PLA officials teaching to march, discipline, and political implications.  It was pretty universal and to honor traditions.").[16]

Accepting the government's position that participation in this military training program is tantamount to serving in the military, despite the fact that no civilian student from China would view it this way, would essentially allow the government to arrest any student from China for visa fraud.[17]

---

[16]    The defense previously cited the newspaper articles referenced here in its opposition to the government's request for detention, meaning that the government has had notice of them since that brief's filing.  (Dkt. No. 31 at 5-6.)  It is unknown at this time whether the government presented these or similar secondary sources, Professor Yin's statement about military training, or any documentary evidence establishing that Mr. Guan is a civilian student at NUDT as exculpatory evidence to the grand jury before obtaining the superseding indictment.  *See* U.S. Attorney's Manual 9-11.233.

[17]    The government's only other support for its assertion that Mr. Guan is in the military is based on the research of an Australian "think tank" analyst, Mr. Alex Joske.  (Dkt. No. 62 at 4; Dkt. No. 29-1 at 1.)  Mr. Joske purportedly concluded that the code "0317" is found in the China Scholarship Council scholarship file numbers of uniformed military personnel in the PLA.  (Dkt. No. 62 at 4; Dkt. No. 29-1 at 2.)  According to the government, this is based on comparing publicly available academic

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# III.  ARGUMENT

"[A] presumptively innocent person should not languish under an unresolved charge."  *Betterman v. Montana*, 136 S. Ct. 1609, 1614 (2016).

## A.    Mr. Guan Seeks a Bench Trial to Vindicate His Speedy Trial Rights.

Mr. Guan wishes to exercise his right to a speedy trial and proceed on the current trial date of November 17, 2020.[18]

Under Rule 23(a) of the Federal Rules of Criminal Procedure, a court may hold a bench trial where the defendant waives a jury trial in writing, the government consents, and the court approves.  Fed. R. Crim. P. 23(a).  Here, Mr. Guan seeks a bench trial to vindicate his speedy trial rights and proceed to trial on the current trial date.

---

work and websites in China to "eight years' worth (2010-2018) of lists [with] at least three dozen CSC scholarship winners designated with the '0317' code."  *See id.*

But based on a preliminary search of publicly available CSC scholar lists, the defense discovered nearly eight times that many with the same "0317" code (nearly 300 scholars), placed in the exact same sequence in the scholarship file number.  This was from a narrow search of only NCHUPP scholarship awards, one of many types of scholarships awarded by the CSC, and only analyzing the most recent two years (2018 and 2017) reviewed by Mr. Joske.  This includes the list where Mr. Guan's file number is published. Therefore, the defense has reason to believe there are hundreds more scholars with the "0317" sequence in their scholarship file number, the vast majority of whom have not been vetted by Mr. Joske or linked to the military.  Schachter Decl., ¶ 14.

Moreover, the government has not provided any documents to validate the reliability of Mr. Joske's apparently erroneous and incomplete analysis or his speculation that the "0317" sequence denotes military service based on a fraction of scholarship file numbers.  This number may instead simply be an indicator of the field of study pursued by the scholar, given that the CSC supports dozens of post-doc and PhD fields.  *See id.*

[18]     Mr. Guan's wish to proceed on the current trial date is not contingent on what counsel he has.  Undersigned counsel has been in contact with Harlan Braun, who may come into the case, and Mr. Braun has represented that if he comes into the case he will abide by Mr. Guan's wishes and be ready to proceed on the current trial date. Schachter Decl., ¶ 2.

14

1    The government's *ex parte* application does not interpose an objection to a bench

2    trial.[19]  But even if the government were to later object to a bench trial, the circumstances

3    surrounding the unavailability of juries during the COVID-19 pandemic would dictate

4    that a bench trial be held notwithstanding that objection.  *See, e.g.*, *United States v. Cohn*,

5    __ F. Supp. 3d __, 2020 WL 5050945 (E.D.N.Y. Aug. 26, 2020) (granting defendant's

6    right to bench trial over government's objections because of COVID-19 pandemic).

7    **B.    The Sixth Amendment Entitles Mr. Guan to a Speedy Trial.**

8    The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused

9    shall enjoy the right to a speedy and public trial . . . ."  U.S. Const. amend. VI.

10   The right to a speedy trial is "one of the most basic rights preserved by our

11   Constitution."  *Klopfer v. State of N.C.*, 386 U.S. 213, 226 (1967).  "Prior to conviction,

12   the accused is shielded by the presumption of innocence, the bedrock[,] axiomatic and

13   elementary principle whose enforcement lies at the foundation of the administration of

14   our criminal law."  *Betterman*, 136 S. Ct. at 1614 (internal quotation marks omitted).

15   Similarly, an "[a]rrest is a public act that may seriously interfere with the

16   defendant's liberty, whether he is free on bail or not, and that may disrupt his

17   employment, drain his financial resources, curtail his associations, subject him to public

18   obloquy, and create anxiety in him, his family and his friends."  *United States v. Marion*,

19   404 U.S. 307, 320 (1971).  Here, Mr. Guan and his fiancé's lives were upheaved and

20   irreparably harmed when the government arrested and indicted him.

21   The government is, of course, free to see it differently.  But it must then afford Mr.

22   Guan the right to defend himself in a speedy and public trial.  That is particularly so

23   where, as here, the weight of the evidence on all three charges strongly favors Mr. Guan.

24   When the government elected to prosecute Mr. Guan, it formally accused him of a crime.

---

[19]    The government does, however, request that the parties exchange proposals for addressing any logistical issues raised by holding a bench trial, and that the Court resolve any disagreements.  The defense has no objection to this request and is confident the parties can resolve these issues before the current trial date.

The government arrested him and booked him into custody.  At least for now, he remains in custody.  And while Ms. Yang has been released from custody, she is still subject to home detention and electronic monitoring.  (Dkt. No. 62 at 6.)

In sum, Mr. Guan is suffering from all of the harms and indignities that the Sixth Amendment was meant to address.  This indictment has "disrupt[ed] his [education and] employment, drain[ed] his financial resources, curtail[ed] his associations, subject[ed] him to public obloquy, and create[d] anxiety in him, his family and his friends."  *See Marion*, 404 U.S. at 320.

## C.  The Speedy Trial Act Likewise Entitles Mr. Guan to a Speedy Trial.

The Speedy Trial Act implements the protections of the Sixth Amendment's speedy trial guarantee.  *See Furlow v. United States*, 644 F.2d 764, 769 (9th Cir. 1981). "Congress recognized that a defendant who must wait long periods to be tried suffers from a 'magnitude of disabilities,' only one of which is the inability to defend himself at trial."  *United States v. Mehrmanesh*, 652 F.2d 766, 769 (9th Cir. 1981) (citing H.R. Rep. No. 93-1508, 93d Cong., 2d Sess., reprinted in (1974) U.S. Code Cong. & Ad. News 7401, 7408). "A defendant also suffers from severe emotional and financial strain when forced to undergo a non-speedy trial." *Id.*

The Speedy Trial Act plainly requires that a defendant be brought to trial within 70 days of the later of (1) the indictment, or (2) the defendant's first appearance on the indictment. 18 U.S.C. § 3161(c)(1).  Mr. Guan was arraigned on the indictment on September 25, 2020.  (Dkt. No. 41.)  He therefore has a right to be brought to trial on the obstruction charge no later than 70 days later, which is December 4, 2020.   The government's motion for findings of excludable time until March 9, 2021 could result in a delay of 165 days following the date of the arraignment — more than twice the interval permitted under the Speedy Trial Act.

The only legal authority the government cites in support of permitting such an extended delay is the "ends of justice" exception set forth in 18 U.S.C. § 3161(h)(7)(A):

Any period of delay resulting from a continuance granted by any judge

16

> on his own motion or at the request of the defendant or his counsel or
> at the request of the attorney for the Government, if the judge granted
> such continuance on the basis of his findings that the ends of justice
> served by taking such action outweigh the best interest of the public and
> the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A).  The ends of justice provision should be "rarely used."  *United States v. Nance*, 666 F.2d 353, 355 (9th Cir. 1982) (citation omitted).  When determining whether to grant an "ends of justice" continuance, the court must consider "whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice." 18 U.S.C. § 3161(h)(7)(B)(i).  It must also consider whether refusing a continuance would "deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." 18 U.S.C. § 3161(h)(7)(B)(iv).

Here, the governments argues that an "ends of justice" continuance is justified because of the COVID-19 pandemic and its belated invocation of CIPA.   Neither warrants a continuance nor a finding of excludable time under the Speedy Trial Act.

### 1.      The COVID-19 Pandemic Does Not Justify a Continuance and, If Appropriate, This Court Can Hear This Case in Santa Ana.

The government argues that the generalized risk of holding any kind of trials during the pandemic — even bench trials — and the lack of a district-wide protocol for controlling those risks supports a trial continuance and a finding of excludable time under § 3161(h)(7)(A).  Dkt. No. 62 at 18-19 (quoting General Order 20-09) ("the Court has concluded that jury trials would 'place prospective jurors, defendants, attorneys, and court personnel at unnecessary risk.").

But pointing to the generic risks associated with COVID-19 is not enough.[20]  The

---

[20]      In an analogous circumstance, courts in this district have held that the "generalized risk" posed by COVID-19 does not justify releasing a defendant from

Court must make individualized findings that the "ends of justice" served by the delay outweigh the best interests of the public and Mr. Guan in a speedy trial. The government urges this Court to make those findings here but fails to supply this Court with adequate facts to support them. It speculates that some jurors may be unavailable due to their child-care responsibilities, argues that it would be "almost impossible" for jurors — particularly jurors over 65 — to maintain adequate social distance during trial, and cites the need for witnesses to travel. (Dkt. No. 62 at 19-20.) But, aside from citing possible travel constraints for Mr. Joske, a prospective expert witness whose relevance is disputed,[21] the government provides no evidentiary support for any of these claims.

The government points to cases in which Courts have found excludable time under section 3161(h)(7)(A) based on "public emergencies." Dkt. No. 62 at 18. But in each of those cases the public emergency made a trial *impossible*, and the continuance was brief and narrowly tailored to the emergency that justified it. *See Furlow v. United States*, 644 F.2d 764, 767-68 (9th Cir. 1981) (eruption of volcano days before trial was set to begin "paralyz[ed] . . . surrounding geographies" and "prohibited trial to proceed," justifying continuance of 15 days beyond the speedy trial deadline); *United States v. Correa*, 182 F. Supp. 2d 326 (S.D.N.Y. 2001) ("extraordinary events" following 9/11 terrorist attack less than half a mile from the courthouse justified excluding time from September 11, 2001 to October 1, 2001, where the court and the United States Attorney's Office were

pretrial detention -- another setting where congregating in close quarters presents a risk to presumptively innocent people. *See, e.g.*, *United States v. Villegas*, No. 2:19-CR-568-AB, 2020 WL 1649520, at *2 (C.D. Cal. Apr. 3, 2020) (reasoning that "the dangers that Defendants cite are not unique to prisons, much less to them individually, but affect the entire human population").

[21] The government's application claims constraints on witness travel would make a November trial difficult, but during the parties' meet and confer conference it could identify only one witness by name: Mr. Joske, a prospective expert witness, which the defense contends has no relevance to this case. Schachter Decl., ¶ 8; *see also supra* at 13 n.17 (questioning the legitimacy, relevance, and admissibility of Mr. Joske's findings). The government's *ex parte* application likewise identifies no other potentially unavailable witnesses by name. (*See* Dkt. No. 62 at 8, 19.)

closed, telephone and internet access in the court was disrupted, and agents assigned to the defendant's case were "massively redeployed to emergency service work and the pressing needs of the investigation of the terrorist attack").

Here, the government's motion to exclude time calls for more than *doubling* the time permitted under the Speedy Trial Act, with no explanation for why COVID-19 makes such a continuance necessary. The government does not contend that conducting trials, especially *bench trials*, within the time established by the Speedy Trial Act would be "impossible," as would be required under 18 U.S.C. § 3161(h)(7)(B)(i). *See United States v. Olsen*, SACR 17-00076-CJC, Dkt. No. 98 at 8-12, 15-16, 20 (Oct. 14, 2020). In fact, *jury trials* are happening all around us. The Southern District of California has been allowing jury trials, with appropriate safeguards in place, since August 31, 2020. S.D. Cal. Order of the Chief Judge, No. 36. The Northern District permitted jury trials in criminal cases to proceed under appropriate safety protocols since September 16, 2020. N.D. Cal. General Order No. 72-6. Los Angeles County Superior Courts began holding trials the first week of September 2020.[22] The Orange County Superior Court just marked its 100th jury trial since the inception of the COVID-19 pandemic.[23] As Presiding Judge Kirk H. Nakamura stated, "[t]he fact that we held 100 jury trials since the partial reopening of the court in May is a testament to the commitment of our citizens to the Constitution and our shared values."[24]

The government also argues that the pandemic has made it impossible for it to

---

[22]     Press Release, *Presiding Judge Kevin C. Brazile Issues New General Order Extending Some Matters as Court Continues Phased Ramp Up of Proceedings*, SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES, (Sept. 10, 2020), available at https://tinyurl.com/yx9q4rmg.

[23]     Maclachlan, Malcolm, *OC Celebrates 100 Jury Trials Since May, Thanks Jurors*, DAILY JOURNAL (Oct. 21, 2020), available at https://tinyurl.com/y6l6o4oj.

[24]     News Release, Orange County Superior Court Celebrates Special Juror Appreciation Week October 26- 30, 2020, SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE, (Oct. 20, 2020), https://www.occourts.org/media-relations/current-news-releases/10-20- 2020_JurorAppreciationWeek.pdf.

prepare and that it is therefore unable to proceed to trial on the current date.  However, the Speedy Trial Act expressly prohibits continuances based on the lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government.  18 U.S.C. § 3161(h)(7)(C).

Moreover, the government has already thoroughly investigated this case, committing dozens of law enforcement officials to surveilling and investigating Mr. Guan and Ms. Yang over a period of several months and performing dozens of interviews.  In truth, the government's likely problem lies not in preparation, but instead in the fact that the current state of the evidence simply does not support its charges.

In any event, should the government need to conduct follow up interviews, it is able to do so while practicing social distancing.  After all, if it is safe enough for employees of the Federal Public Defender's Office to conduct in-person legal meetings in tiny rooms at a jail sitting less than six feet apart from clients (as undersigned counsel has done a half dozen times with Mr. Guan and a Mandarin interpreter at MDC),[25] it is surely safe enough for prosecutors to interview witnesses wearing masks, meeting outside, meeting inside and sitting more than six feet apart, or speaking over the phone or by video.  If the government maintains that it is not prepared for trial in this matter, the case should be dismissed, not continued.

Finally, while this case is assigned to this Court, it is designated as a Southern Division case and two of the three charged crimes are alleged to have taken place in Irvine.  As the government itself notes, on September 14th, the Court relaxed restrictions concerning in-person hearings in the Southern Division in light of improved conditions there.  C.D. Cal. General Order No. 20-12, In Re: Coronavirus Public Emergency Order

---

[25]     *See* Ex. 8, MDC Update No. 19 (noting that the BOP was moving toward in-person legal visits and reducing the availability of VTC attorney-client meetings at MDC).  Notably, the government has required defense counsel throughout the district to go into the jails to have one-on-one contact with their clients in order to meet plea agreement and other deadlines.

Concerning Reopening of the Southern Division (Sept. 14, 2020); Dkt. No. 62 at 9. Accordingly, should the Court find that it is unable to hold a bench trial in Los Angeles, the defense respectfully proposes that it instead hear this case in Santa Ana.

### 2. The Government's Belated Invocation of CIPA Does Not Justify a Continuance.

#### a. The Government's Failure to Show Due Diligence Should Preclude a Continuance Here.

Again, under the Speedy Trial Act, no continuance shall be granted because of "lack of diligent preparation . . . on the part of the attorney for the Government." 18 U.S.C. §3161(h)(7)(C). As discussed, the government has failed to demonstrate diligence here with respect to its invocation of CIPA. For example, it does not explain why it failed to file a CIPA notice until October 19th, less than a month before trial and three days after the defense stated that Mr. Guan may proceed by bench trial. And, while it asserts government counsel traveled out of district in late October to begin work on CIPA matters, it doesn't explain why it waited this long to get the ball rolling.

Notably, the government is empowered to file a request for pre-trial conference "any time after the filing of the indictment or information." 18 U.S.C. App. 3 § 2. Thus, the government could have filed its notice on September 10th, right after it filed its indictment (Dkt. No. 35), instead of waiting for five weeks to file on October 19, 2020. The government's theory underlying its obstruction charge has always been that Mr. Guan entered the United States with the purpose of concealing associations with the Chinese military in order to gather and transmit sensitive computer technology back to China. Thus, the government can't credibly claim now that it had no knowledge then that national security issues were purportedly implicated.

In truth, the government's failure to actually request a pretrial conference may be telling. Its notice is carefully worded and only suggests there is a possibility that CIPA is implicated. The notice make no reference to any specifics in this case. Rather, it only cites general legal arguments. Of course, CIPA leaves the defendant's counsel in the

least knowledgeable position to argue what evidence the government has in its possession.  However, CIPA allows the government to divulge to the Court *in camera* the evidence that it has in its possession so that the Court can make a relevancy determination and determine the likelihood of whether CIPA impacts this prosecution. *See* 18 U.S.C. App. 3 §§ 4, 6.  But, to date, the government appears to have provided no information to the Court about the nature and volume of  the evidence that it is concerned implicates CIPA.  Even more telling, its notice specifically declines to request a pre-trial conference pursuant to 18 U.S.C. App. 3 § 2, which would set in motion the scheduling of time to hasten the CIPA production process.  As CIPA's only provision for setting a timeline for the government's disclosure is "at a time before trial specified by the court," 18 U.S.C. App. 3 § 10, the government can theoretically ignore its responsibilities and postpone its production merely by delaying a request for a pre-trial conference.  Indeed, the government's conduct here raises the concern that it either has not done the work to identify possible CIPA discovery or that it is using a remote existence of CIPA concerns as a grounds for a continuance.

In any event, it is ultimately of no matter that the government now claims without evidence that it needs six weeks to prepare its belated CIPA motion, because CIPA does not call for any suspension of the Rules of Criminal Procedure or the Speedy Trial Act. Simply put, the right to government secrets does not trump a defendant's right to a speedy and fair trial, and the government's lack of diligence in invoking CIPA does not result in excludable time.  To the contrary, this kind of administrative delay is precisely the kind of bureaucratic error that should not override a defendant's speedy trial rights.  As the court correctly noted in *United States v. Dog Taking Gun*:

> [W]hen balancing the demand of Congress that the Public and the Defendant have a statutory right to a speedy public trial, the rights of the defendant cannot be compromised by the [FBI's] administrative processing of evidence. Thus, the Government either complies with the Rules of Criminal Procedure, or as here, when it fails to do so, the defendant cannot be charged with the problems of bureaucracy.  The lack of diligence by the government in processing evidence, and any workload issues in the FBI lab do not constitute

22

1        a factual basis to exclude time from the Speedy Trial computation "in the
2        interests of justice."

3 7 F. Supp 2d 1118, 1122 (D. Mont. 1998).  Likewise, Mr. Guan cannot be charged with

4 the government's failure to timely start the CIPA procedure before the trial date.  For that

5 alone, the government's *ex parte* application for a continuance should be denied.

6       **b.**     **The Government's Claims that its Belated CIPA Invocation**
7                 **Renders This Case Complex and Entitles it to a Continuance**
8                 **Are Disingenuous.**

9        The government suggests that its invocation of CIPA alone makes this case

10 complex and thus requires a continuance.  (Dkt. No. 62 at 14.)  But if this were true, the

11 government could have attempted to designate this case as a complex case, which it did

12 not, or hit the ground running by noticing CIPA issues from the beginning so that the

13 parties could timely prepare for trial.  In the absence of these efforts, the government's

14 claim of complexity now lacks credibility.

15        The government also incorrectly cites law to support its suggestion that merely

16 raising a CIPA concern is grounds for a continuance.  In *United States v. Salad*, 779 F.

17 Supp. 2d 509, 514 (E.D. Va. 2011), cited by the government for that proposition, the

18 court stated that "the mere possibility of the involvement of classified information in a

19 case might not suffice, by itself, to justify a continuance beyond the Act's time period,"

20 but that it could be a relevant factor in combination with other facts.  There, the additional

21 facts justifying a continuance included fourteen defendants, with multiple Somali

22 speaking defendants, and a shortage of Somali interpreters in the district.  In addition,

23 there were multiple charges, novel legal issues, and the acts of alleged piracy happened

24 outside the country on the high seas, requiring the presence of crew members of an U.S.

25 Navy vessel.  These facts collectively made the case complex and required additional

26 time.  *See id.* at 514-515.  This hardly stands for the proposition that merely invoking

27 CIPA on its own justifies a continuance.  *U.S. v. Warsame*, 2007 WL 748281 (D. Minn.

28 Mar. 8, 2007), another case cited by the government, is likewise distinguishable.  There,

the prosecution represented to the court that CIPA material needed to be produced to the defense, unlike in the this case where the government has not confirmed CIPA discovery exists.

Further, the state of the evidence casts further doubt that *any* purported CIPA discovery would even be relevant in this case as inculpatory or exculpatory evidence. For example, in its obstruction charge, the government alleges Mr. Guan discarded his own internal hard drive to obscure an investigation.  But the evidence now shows the destroyed hard drive was an external hard drive that belonged to her, not Mr. Guan, and that Mr. Guan never had access to sensitive information at UCLA.  The other charges are similar: the government claims Mr. Guan failed to disclose his ownership of an iPad and USB drive, but it turns out they too belong to Ms. Yang, and the government's visa fraud allegation that Mr. Guan is in the military likewise falls flat in the face of his claims to the contrary and the absence of any concrete evidence.  This begs the question: what could CIPA discovery possibly add to this picture?  To be sure, the defense suspects the government may seek to introduce CIPA discovery about Mr. Guan's associations with NUDT, professors in the military, and the Communist Party.  But, in this country, we do not presume guilt by association and, in the absence of any concrete evidence showing that Mr. Guan ever even worked on sensitive information while at UCLA, any such evidence would be irrelevant and prejudicial.  Thus, if this is the nature of the government's CIPA evidence, it is inadmissible at trial.

Of course, had the government moved this court in a timely fashion to set a pretrial conference that would trigger a briefing schedule and a hearing to determine the relevancy of this information, the Court would have already been at a point now where it could evaluate whether any CIPA information was relevant and admissible.

But, in the absence of any such signposts, or any realistic indication that CIPA evidence would add anything to this case, it's time to move forward with trial.

### 3.   The Superseding Indictment Does Not Justify a Continuance.

As stated, while the superseding indictment was filed after the government's *ex parte* application, the defense anticipates the government may point to its new charges at the Court's upcoming status conference as an alternative basis for a continuance.  But, again, neither charge is based on any new allegations, the state of the evidence on both of them establish Mr. Guan's innocence, and more time is therefore not needed for the parties to prepare their cases on the new charge.  *See supra* at Parts I, II.B.  Additionally, as noted, the filing of the superseding indictment does not restart the 70-day Speedy Trial Clock.  *See supra* at Part I (citing cases).  Accordingly, for all of these reasons, the government's new eleventh hour indictment does not justify a continuance.

### D.   If the Court Grants a Continuance, It Should Release Mr. Guan on His Own Personal Recognizance.

To the extent the Court grants the government's request for a continuance, the defense respectfully asks that the Court also release Mr. Guan on his own personal recognizance.  It would be unjust for him to solely bear the burden of the government's delay in invoking CIPA or its objection to a timely bench trial, especially given the parties' updated understanding that the weight of the evidence favors him.

## IV.  CONCLUSION

The government's motion to exclude nearly four months of time based on generalized concerns about the COVID-19 pandemic and its belated invocation of CIPA fails to treat the Sixth Amendment and the Speedy Trial Act with the respect they deserve. Its motion for a trial continuance and exclusion of time should be denied.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  November 2, 2020       By  */s/*
_____
MICHAEL SCHACHTER
Deputy Federal Public Defender
Attorney for Defendant Brandon Vidal

25

### DECLARATION OF MICHAEL A. SCHACHTER

I, MICHAEL A. SCHACHTER, declare:

1.     I am an attorney with the Office of the Federal Public Defender for the Central District of California.  I am licensed to practice law in the State of California and I am admitted to practice in this Court.  I am submitting this declaration in support of Defendant Guan Lei's Opposition to Government's *Ex Parte* Application (1) For Continuance of Trial Date, (2) For Findings of Excludable Time Pursuant to Speedy Trial Act, and (3) to Set Hearing Date.

2.     Defendant Guan Lei wishes to exercise his right to a speedy trial and proceed on the current trial date of November 17, 2020.  Mr. Guan's wish to proceed on the current trial date is not contingent on what counsel he has.  Undersigned counsel has been in contact with Harlan Braun, who may come into the case, and Mr. Braun has represented that if he comes into the case he will abide by Mr. Guan's wishes and be ready to proceed on the current trial date.

3.     On October 26th, at 9:49 p.m., the government filed a 23-page motion for a continuance, styled as an *ex parte* application, to continue the November 17th trial date. During the parties' one-hour meet and confer conference held earlier that evening, the parties agreed that the government's prospective motion implicated the following crucial and disputed issues:

- •     Whether a trial of any kind can take place on November 17th or during the period required by the Speedy Trial Act;

- •     Whether the government will consent to a bench trial to vindicate Mr. Guan's constitutional and statutory right to a speedy trial;

- •     Whether, if the government objects to a bench trial, the circumstances surrounding the unavailability of juries during the COVID-19 pandemic dictate that a bench trial be held notwithstanding that objection;

- •     Whether the government's proffered safety concerns about a bench trial override Mr. Guan's constitutional and statutory right to a speedy trial where, as here, the

1

courts are open; the grand jury has been convening for months; numerous courts have held in-person hearings, including hearings with witnesses; the government hasn't slowed in filing cases; and the government has required defense counsel throughout the district to go into the jails to have one-on-one contact with their clients in order to meet plea agreement and other deadlines.

- Whether there is a good cause for a continuance where, as here, the evidence tends to establish a defendant's innocence;

- Whether there is good cause for a continuance overriding Mr. Guan's constitutional right to a speedy trial where, as here, the government has admitted and expressed concern that, absent a plea, Mr. Guan would overserve his sentence on the present charge even if found guilty;

- Whether the government's Classified Information Procedures Act notice, which it failed to file during the first two months of this case, and which it did not file until October 19th, less than a month before trial and three days after defense counsel first raised the prospect that Mr. Guan may proceed by bench trial to vindicate his speedy trial rights, provides good cause for a continuance and outweighs Mr. Guan's constitutional and statutory right to a speedy trial; and

- Whether travel constraints impacting a prospective expert witness, whose relevance is disputed, provide good cause for a continuance and outweigh Mr. Guan's right to a speedy trial.

4. In *United States v. Anderson*, CR No. 20-71-RGK, undersigned counsel participated in a two-day suppression hearing, where the defendant, who was in custody, counsel for the defendant and the government, and seven potential witnesses all appeared in person (three of whom testified). *See* Dkt Nos. 33-34 (Minutes of Suppression Hearing). A larger courtroom in the Roybal Federal Building, equipped with Plexiglas protection, was used for the hearing.

5. The government's theory of the case is that Mr. Guan violated 18 U.S.C. § 1519 by destroying and discarding an internal hard drive, which the government contends

came from his personal computer, with the intent of obstructing the government's investigation into his alleged theft of technology or sensitive information from UCLA. *See generally* Dkt. Nos. 1, 35.  In the last week, the government's investigation has unearthed contradictory and exculpatory evidence.  During a meeting with their own designated material witness ZhiHui Yang on October 23rd, Ms. Yang told the government, among other things, that the hard drive at issue belonged to her, not Mr. Guan; that Mr. Guan had never used that hard drive; that it was an external hard drive, not an internal hard drive; that the external hard drive might have been a Western Digital drive; and that she had asked for his help in throwing it out.  To date, Ms. Yang is the only person who has provided potential testimony about who owned and used the hard drive.  During Ms. Yang's October 23rd interview, she also stated the following facts about the iPad: she was in possession of it most of the time; she is the one who used it most of the time; she thinks Mr. Guan bought it for her several years earlier; and she thinks it belonged to her.  During Ms. Yang's October 23rd interview, she was also asked about the USB drive seized by the government.  After being shown a photograph of it, Ms. Yang stated that she thought it was hers.  This summary is based on information provided by Marilyn Bednarski, counsel for Ms. Yang, who was at the meeting.  Additionally, I have listened to portions of the audio recording.  Due to time constraints, I have not yet listened to the entire four-hour recording, but I will aim to do so if possible before Thursday's status conference.

6.      Further, the government has identified zero evidence of wrongdoing or work on sensitive national security projects at UCLA: the government has identified no discovery showing theft of technology or sensitive information from UCLA, or that Mr. Guan was even working on a project providing him access to any sensitive information, technology, or projects.

7.      During the parties' plea discussions a few weeks ago, the government expressed concern that, absent a plea, Mr. Guan would likely overserve his sentence on

1  the present charge.  But its request to continue the case now to March would likely make

2  that inevitable, no matter what the result is at trial.

3       8.    The government's motion claims constraints on witness travel would make

4  a November trial difficult, but during the parties' meet and confer conference it could

5  identify only one witness by name: Alex Joske, a prospective expert witness, which the

6  defense contends has no relevance to this case.

7       9.    During the parties' October 26, 2020 meet and confer, government counsel

8  noted its motion for a continuance was subject to several layers of review.

9       10.   Before filing this application, the defense sought to negotiate a briefing

10  schedule with the government and made themselves available almost the entire weekend

11  of October 24th and 25th to have a meet and confer.  The government declined to find

12  time to meet earlier than Monday and, unfortunately, defense counsel was unavailable

13  until 4:30 p.m. on Monday.

14      11.   During the parties' meet and confer on the government's motion, the

15  defense suggested that an agreed upon schedule would allow both parties to have an equal

16  opportunity to present their arguments.  The defense also noted that the Court's meet and

17  confer rules encourage the parties to agree on briefing schedules where possible instead

18  of inviting judicial intervention.  But the government declined, requiring this application.

19      12.   During the parties' meet and confer, the government advised that it can

20  make someone available for a hearing on November 3rd if the Court schedules a hearing

21  for this day.

22      13.   The defense addressed the key preliminary conclusions discussed in this

23  opposition about the investigation of Haji Shah and Aaron Bateman regarding the hard

24  drive in an October 24th email, which the defense sent in advance of the parties' October

25  26th meet and confer on the government's *ex parte* application.  The defense's October

26  24th email described the conclusions but did not name Mr. Shah and Mr. Bateman.

27      14.   Based on a preliminary search of publicly available CSC scholar lists, the

28  defense discovered nearly eight times that many with the same "0317" code (nearly 300

scholars), placed in the exact same sequence in the scholarship file number.  This was from a narrow search of only NCHUPP scholarship awards, one of many types of scholarships awarded by the CSC, and only analyzing the most recent two years (2018 and 2017) reviewed by Mr. Joske.  This includes the list where Mr. Guan's file number is published. Therefore, the defense has reason to believe there are hundreds more scholars with the "0317" sequence in their scholarship file number, the vast majority of whom have not been vetted by Mr. Joske or linked to the military.  Moreover, the government has not provided any documents to validate the reliability of Mr. Joske's apparently erroneous and incomplete analysis or his speculation that the "0317" sequence denotes military service based on a fraction of scholarship file numbers.  This number may instead simply be an indicator of the field of study pursued by the scholar, given that the CSC supports dozens of post-doc and PhD fields.  The defense obtained the scholar lists and information about the fields CSC supports from the following web site: www.csc.edu.cn.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 2, 2020, at Santa Ana, California.


_s/ Michael A. Schachter_          .
MICHAEL A. SCHACHTER

5