TRACY L. WILKISON
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
WILLIAM M. ROLLINS (Cal. Bar No. 287007)
GEORGE E. PENCE (Cal Bar No. 257595)
Assistant United States Attorney
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-7407/2253
     Facsimile: (213) 894-2927
     E-mail:    william.rollins@usdoj.gov
                george.pence@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 20-127-MWF |
| Plaintiff, | <u>GOVERNMENT'S OPPOSITION TO DEFENDANT'S EX PARTE APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER DENYING RELEASE</u> |
| v. | |
| GUAN LEI, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys William M. Rollins and George E. Pence, hereby files this Opposition to Defendant Guan Lei's Ex Parte Application for Review/Reconsideration of Order Denying Relief. This Opposition is based upon the attached

//

memorandum of points and authorities, the attached declaration and exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 25, 2021         Respectfully submitted,

                                      TRACY L. WILKISON
                                      Acting United States Attorney

                                      CHRISTOPHER D. GRIGG
                                      Assistant United States Attorney
                                      Chief, National Security Division

                                            /s/
                                      WILLIAM M. ROLLINS
                                      GEORGE E. PENCE
                                      Assistant United States Attorneys

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

In his latest effort to relitigate the Court's orders of pretrial detention, defendant GUAN LEI ("defendant") repeats old arguments, mischaracterizes the evidence against him and the Bureau of Prisons' ("BOP") response to COVID-19, and omits key facts surrounding his detention at the Metropolitan Detention Center ("MDC").  Because the only "new" terms of bail that defendant proposes – release to his attorney's residence in Pomona with location monitoring and a $50,000 cash bond (purportedly provided by defendant's father in the People's Republic of China ("PRC")) – still do not adequately mitigate his risk of flight, the Court should deny defendant's application.

**II.   ARGUMENT**

    **A.   Defendant's Request for Release Should Be Denied**

The Bail Reform Act of 1984 (the "Act") permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).[1]  Flight risk need only be established by a preponderance of the evidence, United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985), and a pretrial

---

[1] The District Court's review of detention decisions is de novo. United States v. Koenig, 912 F.2d 1190, 1192 (9th Cir. 1990).  While the "district court is not required to start over . . . and proceed as if the magistrate's decision and findings did not exist," the district court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." Id. at 1193.  In support of that task, the district court may hold additional evidentiary hearings, if the court concludes such hearings would be helpful.  Id.

detention hearing may only be reopened "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing," and that information "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f).

Courts have interpreted this provision strictly, holding that hearings should not be reopened if the evidence was available at the time of the initial hearing.  See United States v. Dillon, 938 F.2d 1412, 1415 (1st Cir. 1991) (per curiam).  The unknown information is "material" if it "increases the chances the defendant appears for his criminal hearing or decreases the danger the defendant poses to an individual or the community as a whole." United States v. Martin, No. 13-CR-00466-JSW-2(KAW), 2015 WL 3464937, at *2 (N.D. Cal. May 29, 2015); see also United States v. Ward, 63 F. Supp. 2d 1203, 1206-07 (C.D. Cal. 1999).  The rationale is that "a rule that would not discourage a party for failing to acquire readily available evidence for presentation the first time is a rule that encourages piecemeal presentations.  Judicial efficiency is not served by such a practice."  Id. (citations omitted).

Here, defendant's offer of $50,000 in untraceable cash from overseas – and his proposal to reside at defense counsel's residence on home confinement with GPS monitoring – are insufficient to reasonably assure his appearance at trial, which is scheduled for March 9, 2021.  As the Court previously recognized, defendant has "strong ties to [the PRC]," a country "with which the United States has no extradition treaty," and the "circumstantial evidence of Defendant's connections to the PLA . . . supports the inference that

2

Defendant would have access to resources and assistance to leave the United States regardless of any conditions of release that could be imposed." (CR 34 at 2-3.) That remains especially true when there are still no sureties or real property in the United States to secure defendant's reappearance, and neither the government nor the Court can confirm whether the $50,000 cash bond offered by defendant is in fact from his father, the PRC government, or the PLA.[2] (See CR 34 at 3-4 (Order of Detention) (observing that defendant has "minimal, if any, ties to the Central District of California or to the United States" and noting that defendant's only "only known close associate in the United States is his girlfriend, also a citizen of the PRC, who was arrested on August 31, 2020, after attempting to board a flight from Los Angeles to the PRC and detained as a material witness."))[3] Of course, the origin of these funds is material to the Court's assessment of flight risk, because, at least for the PRC government and PLA (and possibly even for defendant's own father), a $50,000 forfeiture would be a relatively small price to pay if the party staking that cash bond were sufficiently motivated to assist defendant in fleeing from the United States to the PRC, a jurisdiction from which the government would have little hope of ever returning defendant for trial.

---

[2] The government asks that the Court conduct a Nebbia hearing regarding the $50,000 cash bond, in the event the Court is inclined to order defendant's release.

[3] Defendant claims that meet and confer efforts have "consistently failed." But as the emails attached to his own brief show, the government closely considered defendant's proposal before ultimately making clear that it would oppose defendant's ex parte request for release by the time of his filing.

3

Although home detention and electronic monitoring do provide some additional assurance that defendant will not flee, it is indisputable that a private residence unguarded by federal authorities is a far cry from jail cell, and ankle bracelets can always be cut. There is no guarantee that a monitoring service would be able to respond to such an effort at evasion until it was too late. The government also notes the potential ethical dilemmas and conflicts of interest that could arise for a defense attorney whose client might choose to flee from his lawyer's home while ordered to reside there on pretrial release.[4]

Nor is it material to defendant's pretrial detention (let alone his guilt or innocence) that the government is "presently" unaware of any classified or confidential information to which defendant had access (an issue the government is continuing to investigate). (CR 125 at 8.) Defendant is charged with visa fraud, false statements, and destruction of evidence – not unauthorized access of a protected computer (18 U.S.C. § 1030), export violations (50 U.S.C. § 1705), or espionage (18 U.S.C. § 37). Indeed, defendant's destruction of a

---

[4] While the government has no reason to question the integrity, good faith, or professionalism of defense counsel Bin Li in offering his home to defendant, defendant's other retained counsel, Harland Braun, has expressed extreme personal views about the government's case against his client and opposing counsel. (See CR 109 at p. 5; see also CR 117 (Court order describing defendant's most recent request for defendant's release as "Mr. Braun's Screed, or An Embarrassment"). More recently, in meet and confer correspondence, Mr. Braun described both prosecutors as "evil." (Ex. 1 at 1; see also, e.g., id. at 3 (stating that this case makes the United States look like "chicken shit"); id. at 8 (suggesting that the prosecutors personally show defendant's engagement photo to their "spouses or girlfriends" and "explain how you ruined [defendant's] wedding").) These invectives are troubling to the extent they suggest that Mr. Braun may not share the government's dispassionate view that the interests of justice are best served by these proceedings culminating in a verdict or negotiated resolution.

4

hard drive is precisely what may have prevented the government from obtaining direct evidence of other criminal activity that FBI was then investigating, as the United States Sentencing Guidelines themselves recognize.[5]

Similarly, defendant's challenges to the weight of the evidence regarding his military service and an expert analysis of his CSC code were raised in part by prior defense counsel during oral argument before Judge Donahue, and then again in December 2020 before this Court. (CR 33); (CR 29) (Gov't Br.); CR 34 (Order of Detention), CR 113); Martin, 2015 WL 3464937, at *2 (explaining that defendants are not entitled to "multiple bites at the apple" based on presentations that could have been "made at the original detention hearing"). Regardless, as the government has previously explained, defendant's CSC code is only one aspect of the government's evidence proving his PLA service, as detailed more extensively in the government's prior briefing (CR 6, 29). Significantly, defendant once again omits the fact that, after his original detention hearing, the government recovered a 2019-2020 NUDT admissions document from his laptop which, according to a draft translation, states that defendant's academic advisor at NUDT – the same advisor who vouched for him in his U.S.

---

[5] Defendant has been detained since August 28, 2020. If defendant were sentenced solely under U.S.S.G. § 2J1.2, his base offense level would be 14 if convicted at trial, rendering a Sentencing Guidelines range of 15-21 months. Moreover, for cases involving obstructing the investigation of a criminal offense, § 2J1.2(c)(1) cross-references § 2X3.1 (Accessory After the Fact), and "[Section] 2J1.2(c)(1) requires cross referencing without regard to whether the underlying offense whose prosecution was obstructed was or is provable." United States v. Arias, 253 F.3d 453, 461 (9th Cir. 2001). Accordingly, it is possible that defendant could be subject to a higher Guidelines range tethered, for example, to export violations being investigated by the FBI at the time he destroyed the hard drive. See U.S.S.G. § 2M5.1 (setting base offense level at 26).

visa application – "only" admitted "soldier PhD students." (CR 113-1 at 14.) See also United States v. Grebro, 948 F.2d 1118, 1121 (9th Cir. 1991) (weight of the evidence, and more accurately any purported weakness of the evidence, is the least important of the factors governing pretrial release).[6]

Moreover, defendant has attempted to explain away his admissions that he wore a military uniform at NUDT by suggesting that he was merely complying with a PRC law requiring students to undergo military training, regardless of whether they actually served in the PLA. (See CR 125 at 9.) In support of this assertion, defendant has pointed to a 2001 PRC law (the viability of which is as uncertain as its proper interpretation) apparently requiring military training in "institutions of higher education, senior secondary schools and schools equivalent to senior secondary schools." (CR 125-2 at pp. 43-44.) Although the term "senior secondary school" does not seem to have a settled definition, it generally refers to education that

---

[6] In support of defendant's latest motion, defendant submitted a declaration of counsel appearing to attest to facts and information requiring an expert. Those purported facts include that the sequence "0317" in defendant's China Scholarship Council Code only "means the school or the type of the school." (CR 125 at 10; but cf. CR 111 at 11 (defendant previously offered a different explanation of that code, asserting that it referred specifically to NUDT.) When the government asked defendant to produce expert discovery that appears to form the basis of the declaration, Mr. Braun's response was characteristically ad hominem but indicated that co-counsel would serve as the necessary expert and that defendant would produce no such discovery. (Ex. 1 at 6.) Counsel's declaration thus appears to violate the prohibition against counsel serving as both advocate and witness in the same matter. See Cal. Rule of Prof'l Resp. 3.7 ("A lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless: (1) the lawyer's testimony relates to an uncontested issue or matter; (2) the lawyer's testimony relates to the nature and value of legal services rendered in the case; or (3) the lawyer has obtained informed written consent from the client."). As such, the Court should strike the declaration in its entirety.

6

occurs in the years immediately preceding a student's eighteenth birthday.[7] Even if this law were properly interpreted to extend to collegiate students – as defendant suggest it should, based on his references to cadets at the Virginia Military Institute and R.O.T.C. participants (CR 125 at p.9) – that law would not cover defendant, who admitted to wearing a military uniform as a *doctoral candidate* at NUDT. Furthermore, and in stark contrast to defendant's suggestion that his wearing of a military uniform was standard practice for civilians, his own girlfriend, when questioned under oath about whether she participated in military training or wore a military uniform as a doctoral candidate (as opposed to an undergraduate) at another Chinese university, denied that she did either.

Once again, defendant's latest brief also ignores the evidence of his false and misleading statements to law enforcement and an immigration judge that remain relevant to his flight risk. (CR 29-1, 2.) As detailed in the government's prior briefing, defendant not only appears to have manipulated NUDT admissions documents so that the Mandarin characters "Liberation Army" were deleted when submitted to the immigration court, he also misleadingly claimed under penalty of perjury that he was not present during an FBI search of his apartment (despite walking away from FBI agents briskly when he saw them arrive from a common laundry space in the apartment complex). (CR 29.)[8] This deceptive behavior before a separate U.S. court only

---

[7] See https://en.wikipedia.org/wiki/Senior_secondary_education (last accessed Jan. 24, 2021).

[8] Defendant also claimed under oath that he showed the FBI his computer (which he told the Immigration Court merely contained photos of defendant and his fiancé traveling across the United States) and that the FBI seized all of his electronic devices but that there was
*(footnote cont'd on next page)*

underscores why defendant cannot be trusted to reappear for his March 2021 trial if released on bond here.

### B. Defendant Mischaracterizes His Conditions at MDC

The government agrees that COVID-19 has inflicted a horrible toll on the country. But as of Friday, January 22, 2021, housing units at MDC "6 North, 7 North, 8 South, 9 North, and 9 South no longer need to be on quarantine." (Ex. 3 (BOP Letter to the Court).) In addition, "[s]tarting Monday, January 25, 2021, [MDC] will resume modified operations and inmates on the aforementioned housing units will be able to participate in VTC hearings, VTC legal visits, and in-person legal visits." (Id.) Accordingly, defendant's arguments regarding his purported lack of access to defense counsel are effectively moot and no longer need be addressed by the Court.

In any event, many of defendant's arguments appear to be false or misleading, and they have no bearing on his flight risk. For example, defendant claims that "[c]ommunication rights between Defendant and counsel have been limited to jailhouse telephone calls, which are not protected by the attorney-client communications privilege." (CR 125 at 3.) In fact, MDC records show that defendant has had multiple privileged legal phone calls, including on August 30, 2020; August 31, 2020; September 12, 2020; October 5, 2020, October 12, 2020; October 15, 2020, January 4, 2021; and January 19, 2021. (Rollins Decl. ¶ 2.) Similarly, while defendant claims that his cellmate "recently" tested positive for COVID-19, he fails to

---

"nothing against us." (CR 29-2.) Yet in his statement to the immigration court, defendant omitted the fact that his devices were purged of data before his FBI interview because they were either "formatted," "reset," or had a new operating system, as he told the FBI. (Compl. ¶¶ 37-38.)

8

mention that he has not had a cellmate at all since at least January 1, 2021. (Id.)  BOP's aggressive efforts to respond and control the COVID-19 pandemic, including the conditions and steps taken by BOP at MDC in Los Angeles, have been well-documented, with updates routinely provided to government, the Court, and the legal community. (See, e.g., Exs. 2, 3.)

**III. CONCLUSION**

In short, for the reasons set forth above and in the government's prior briefing (CR 6, 29, 113), Magistrate Judge Donahue's conclusion that there is "no condition or combination of conditions will reasonably assure the appearance of the Defendant as required" remains correct, and there is no material change in circumstances justifying defendant's release. (CR 34.)