HARLAND BRAUN SBN 41842
Braun & Braun LLP
Braun & Braun LLP
10250 Constellation Blvd., Suite 1020
Los Angeles, California 90067
Tel: (310) 277-4777
Fax: (310) 507-0232
email: harland@braunlaw.com

BIN LI, State Bar No. 223126
LAW OFFICES OF BIN LI, PLC
730 N. Diamond Bar Blvd.
Diamond Bar, CA 91765
Telephone: (909) 861-6880
Facsimile: (909) 861-8820
email: bli@libinlaw.com

Attorneys for Defendant
GUAN LEI

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>**GUAN LEI,**<br><br>　　　　Defendant. | No. CR 20-127-MWF<br><br>**DEFENDANT GUAN LEI'S RESPONSE TO OPPOSITION TO APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER DENYING RELEASE AND IMPOSING DETENTION UNDER 18 U.S.C. § 3142(e)** |

**I.   INTRODUCTION.**

In its latest effort to justify its continued campaign to deny Defendant's Sixth Amendment right to effective assistance of counsel, the government has mischaracterized evidence, defense arguments and omits key facts surrounding Defendant's detention at the Metropolitan Detention Center ("MDC").

The bottom line is, considering that the government's collapsing claim that Defendant is a spy, the infestation of COVID 19 in MDC and Defendant's jail mate was tested positive on COVID 19 exposing Defendant to life risk, release on conditions is the only way to guarantee Defendant's Sixth Amendment rights – an argument ignored in the government's opposition.

**II. THE GOVERNMENT HAS FAILED TO SHOW BY A CLEAR PREPONDERANCE OF THE EVIDENCE, OR CLEARLY SHOW BY A PREPONDERANCE OF THE EVIDENCE, THAT NO COMBINATION OF CONDITIONS CAN REASONABLY ASSURE THE APPEARANCE OF GUAN, SO RELEASE ON CONDITIONS IS "THE LEAST RESTRICTIVE ALTERNATIVE MEANS"**

When determining whether to release a party in pretrial detention, the court shall evaluate if there are conditions of release that will reasonably assure the appearance of the person as required and the safety of the community. The factors are (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) history and characteristics of the person including the person's character, condition, prior offense, (4). The danger to the community by the person's release. 18 US Code Section 3142 (g).

In this case, the Section 3142 factors clearly favor the release of Defendant.

(1) The government document production demonstrates that Defendant only destroyed hard drives of his fiancé for privacy reasons. The government admitted that Guan did not steal any confidential or sensitive military or any information against the national interest of US.  Guan's visa (DS 2019) was expiring by July 2020, he intended to leave to comply with U.S. immigration law.  He

13

was not intending to flee the country. Defendant was **not** charged with espionage or conversion of U.S. intellectual properties or information of US national interest.

    (2) The evidence is entirely circumstantial aggravated by government theatrical histrionics. As to the government's first charge of Guan as a Chinese military Army member, the evidence was based upon an Australian researcher's speculation.  Even he himself stated in his article that he was uncertain as to the numbers of the CSC numbers. All the direct evidence shows that Guan was a civilian student at NUDT.

    (3) Defendant has integrity and solid moral character.  No government produced evidence – as opposed to government argument -- supports a contrary finding.  When he was offered plea for lessor sentence, and immediate release if he disclosed any information about Chinese military, he did not lie in exchange for a release.  He invested ten years of his life into his academic career, and is a scholar interacting with international scholars around the world on their open platforms.  He published his papers on international scholar publications and traveled around the world to attend seminars. It is implausible to believe he would run a risk for having a warrant for his arrest in the United States or other countries via INTERPOL.

    (4) Defendant is a PhD student with no criminal record in the US or China.  He has been in the United States for two years. He anticipated to get married with his fiancé in China and TO complete his PhD degree. Words are cheap and the government has done nothing more than baseless assertions that he poses a threat to the United States.

    As a result, the government has failed to show by a clear

13

preponderance of the evidence, or clearly show by a preponderance of the evidence, that no combination of conditions can reasonably assure the appearance of Guan. United States v. Chen, 820 F. Supp. 1205 (1992)

A court must consider the "possibility of less restrictive alternatives to detention". United States v. Orta, 760 F 2d 889, 890 (8Cir, 1985).  Considering all the factors stated above, Defendant is entitled to personal recognizance.  Nevertheless, Defendant is willing to post a bond in the amount of $50,000.  For a middle-class Chinese family, this borders on extreme hardship.  Defendant is willing to undergo the humiliation of wearing electronic monitoring devices, and his counsel will allow him to stay at his house under house confinement with limited exit for exercises.  Once again, Defendant been incarcerated for more than five months with the critical months being denied of effective assistance of counsel.  As a result, the conditional release of the Defendant should be granted.

**III. THE GOVERNMENT HAS ALWAYS CAST DEFENDANT IN THE ROLE OF A SPY FOR THE PEOPLE'S REPUBLIC OF CHINA ("PRC"), STEALING COMPUTER TECHNOLOGY FOR NUCLEAR WEAPONS DESIGN. THIS TARRED-BRUSH INNUENDO IS WEARING THINNER AND THINNER.**

This is clear from the Criminal Complaint, Doc. 1, paragraph 4 "… the FBI began investigating GUAN in connection with visa fraud and the possible transfer of sensitive software or technical data from [UCLA] to high-ranking PRC military officers … ." Also, part of the Statement of Probable Cause, Doc. 30 at ¶ 12, Defendant was questioned by the FBI declarant about engaging in "espionage, sabotage, export control violations, or any other illegal activity while in the United states." This was a basis for the Pretrial

13

Detention Order, Doc. 34, in which Judge Donahue relied on the government's "circumstantial evidence" of Defendant's ties to the People's Liberation Army.  This is important because the Complaint specifically ties Defendant's computer studies with military applications of computer technology, e.g., "supercomputers are believed to be used in nuclear explosive activities," Id., ¶ 11, "GPU [graphics processing unit] technology can also be used to validate the effectiveness of hypervelocity kinetic impact and nuclear subsurface explosions," Id. at ¶ 17.

Unsurprisingly, it is a political case.  FBI agent Hurt, inquiring of a DNA analyst by email of the status of lab work, stated of the case in an email produced by the government in discovery, "**My case is unusual for me, due to a lot of uncertainty, the main one being the subjects pending permanent departure from the US.  It is getting a lot of attention from high levels at HQ and other government agencies**.  Anything you can share will help me keep them and the AUSA informed."  Presumably, this means high levels of the FBI and of Department of Justice. Declaration of Bin Li, Esq., at paragraph 2, document bates stamped GUAN 00000613 attached as Exhibit "A".  The date of this email is August 8, 2020.  This has always been a political case, likely tied to President Trump's executive orders on Chinese scholars and students in May 2020.

Defendant requests the Court to consider this in evaluating the government's case: from inception to today, the government has produced no evidence to show that Defendant is or was spying for the PRC using access to classified or confidential information **"(an issue the government is continuing to investigate")**, Opposition to ex Parte Motion for Bail sic, opposition to application for review/ reconsideration of order denying release], Doc. 129 p. 4. line 13-14,

emphasis added. After over six months of continued investigation, the government is no closer to showing Defendant was a spy, and no closer to proffering evidence of Defendant's alleged military career. Yet the former assumption colors what evidence the FBI has gathered for the latter, and all other issues and inferences. Take away the assumption and what is left is an immigration case.

**IV. THE FACT THAT COVID 19 RAGING UP AND DOWN THE MDC AND BOP AND THE MARSHALLS'S MISMANAGEMENT OR INEXPERENCE IN TACKLING THE PANDEMIC PUT DEFENDANT'S LIFE AT RISK, AND INTERFERE WITH DEFENDANT'S SIXTH AMENDMENT RIGHTS ARE THE NEW CONDITIONS THAT JUSTIFY A RECONSIDERATION THE DETENTION ORDER.**

The original motion for release was heard a few days after Defendant's incarceration. The judge would have assumed that "Defendant will be afforded with reasonable opportunity for private consultation of counsel." But this has not been the case. Between November 2020 to January 2021, Defendant's counsel had no access to personal meeting with Defendant to review the 37,000 documents due to the MDC's lock down. These conditions unknown – and unpredictable – at the time of the detention hearing justify a reconsideration of the detention order under United States v. Ward, 63 F. Supp. 2d 1203, 1206-07 (C.D. Cal. 1999).

### A. Lockdown and MDC's prior intransigence in making any attempt at accommodating defense requests futile.

The government cannot unring this bell.

More critically, the government cannot decide and advise the Court on how the defense should prepare for trial or what time is needed or how lawyer and client should interact. The government

seeks to do this by trying to minimize the lockdown, but this does not pass Supreme Court muster: <u>Geders v. United States</u>, 425 U.S. 80 (1976) held the trial judge improperly barred consultation between defendant and attorney over a single night.  In this case, it has been at least two months.

Months of interference cannot be rectified by a promise to reopen for attorney-visits in late January 2021.  Correspondence to this effect attached to a supporting declaration is irrelevant for this purpose. The government has no response except for total silence regarding defense counsel's declaration that he has been unable to effectively represent his Defendant at the deposition of the material witness and otherwise prepare for trial.  The MDC would not accommodate a request that Defendant be afforded client-lawyer privacy during the deposition – this is undenied; the one-way calls that were made were presumably monitored by MDC personnel of the government's material witness – the government is silent on this issue as well.  See, correspondence to and from MDC cited in Defendant's <u>Application for Reconsideration, etc.,</u> Doc. 125. Government prosecutors went along with this, of course, and no explanation was offered as to why this was so.

Moreover, the government is making misleading arguments: defense counsel has not been able to communicate with his client at critical times in a way that protects attorney-client privilege.

Initially, the written request dated December 8, 2020 in anticipation of the material witness's deposition.  This was refused. Next, a written request for privileged communications dated December 10, 2020, requesting any of four dates in mid-December.  This was ignored.  Finally, a written request dated January 19, 2021, requesting two dates in January 2021, was granted and arranged.  All

of other phone communications from MDC at critical times have been unprivileged, and Defendant and counsel have assumed the government has been monitoring them. Decl. of Li, ¶ 3 Exhibits "B," "C" and "D."

The government claims that attorney-client privileged calls were made between counsel and Defendant, Declaration of AUSA Rollins, Doc. 129-1. This is misleading, as to calls made in August through October 2020, as these were before the document dump and the deposition of the material witness became issues. The government does admit that the legal calls were suspended in **November and December 2020,** the critical time.

As to calls in January 2021, all the one-way phone calls from MDC by Defendant other than the two calls pursuant to the demand letter January 19, 2021, Defense counsel denies that these calls were privileged. Li decl. ¶ 4. Defendant denies these were privileged. See Declaration of Guan[1] at paragraph 5. Defendant describes the extent of what communication the government allowed:

> "4. The whole quarantine time began around on November 16, 2020 and ended on January 26, 2021. For the first two week of the quarantine time, I couldn't go out of the cell to use the phone and computer. Later, I was allowed to go out of the cell three times a week: on Monday, Wednesday and Friday. Each time, I had about 20 minutes to take a shower, to make a phone call, and to use the computer.
>
> 5. During the long-period quarantine time, I had no chance to see my attorneys and make a face-to-face talk with them."

Declarant Rollins states that he was provided with information regarding calls from an unidentified attorney advisor to the Bureau

---

[1] Defendant does not need to explain the irregular form of this declaration. This is the inevitable consequence of interference with the attorney-client communication privilege.

13

of Prisons regarding conditions at MDC who apparently was not present at that facility. This is inadmissible hearsay and should be disregarded entirely. Fed. Rules of Evidence 801, 802, 803 and 805 (hearsay within hearsay).

Further the purported letters from MDC are also inadmissible both under hearsay grounds and for lack of authentication, FRE 901, 902 (not self-authenticating).

The government tries to distract the Court with the details of where and when Defendant was isolated. Even if the letters from the MDC were admissible evidences, a close look at the Opposition's Exhibit 2 to the AUSA Rollins declaration, A MDC letter dated November 16, 2020 stated that "**…in-person legal and social visitation are also temporarily suspended. All telephone calls, whether legal calls or telephonic hearings, are also temporarily suspended.**" A MDC letter dated December 7, 2020, states that the "majority of housing units at MDCLA are still either on quarantine, isolation or hybrid status," it was only **Unit 6 North** that was considered "recovered." "All other housing units are still under enhanced modified operations in order to mitigate the further spread of the virus in the institution." Defendant was not in this unit, he was jailed in **Unit 9, Cell 937**. Guan Decl. Guan ¶¶ 1-4. The MDC letters dated December 15, and December 18 2020 stated that only **Unit 6 and Unit 7** were "recovered". Guan was not in in these units. Guan Decl. Guan ¶¶ 1-4.

Most importantly, on **December 31, 2020, Guan's cellmate was found COVID 19 positive**, and Defendant was moved to different cell and quarantined. Although not infected he was exposed to COVID 19 and his life was at risk. Guan Decl ¶¶ 1-3.

This is not an argument about the medical need for release. What does matter is that the MDC's poor management caused the large

13

scale infestation of COVID 19 among all the inmates and seriously risked Defendant's life, and its restrictions could not be managed to afford Defendant with his Sixth Amendment rights. The Court does not have to choose which of the conflicting geography lessons about the layout of MDC the parties offer, the Court should recognize the MDC was out of control in handling the inmates' COVID 19 infestation and Defendant's life is in danger, and the effect of however MDC was shuffling around inmates. Good or bad intentions notwithstanding, the effect was a denial of constitutional rights of Defendant. For the sake of humanity and Defendant's 6th Amendment rights, this motion should be granted.

**B.   Government 37,000-page document dump and MDC's continuing interference with Defendant's right to effective assistance of counsel.**

There are 37,000 documents which have not been reviewed by counsel with Defendant's assistance because of the MDC's decision which could not have been anticipated at the time of the detention hearing. Given the gross violation of Defendant's constitutional rights that would have been, this could not have been on the radar of anyone. Even if the MDC reopens, time is far too short for this to be accomplished effectively before trial and it is uncertain how the MDC could accommodate this. The government is silent here as well.

Review of 37,000 documents, most of which are computer-related material which require lots of input from the Defendant himself. It is not a task that can be handled by one attorney meeting sporadically and for limited time at the MDC's whim. This work requires multiple staff assistance and extended face-to-face meetings with the client and out of the prying eyes of the government.

Defendant is not going to signpost the government on defense trial tactics theories and requests the Court not to require Defendant to identify them or what it expects to establish during the document review.  Li decl. ¶ 5.  The Court should not allow the government to be handed a tactical coup from this pandemic.

Defense counsel has not been vaccinated[2] (although according to the AUSA Rollins declaration, MDC staff has) and the pandemic is surging in Los Angeles County: infection numbers are now over 1,000,000 confirmed cases with two-thirds of those in the last two months, partly because of a new, more infectious strain of COVID known as CAL.20C.[3]  Even if non-attorney assistance at MDC were granted, with the pandemic raging, defense counsel will not order paraprofessional or clerical staff (none of whom have been vaccinated) to travel to MDC.

**V.   OTHER ISSUES.**

   **A.   Cash bond.**  The government's argument is that the offer cannot be confirmed as being from Defendant's father rather than the PRC or the PLA, a kind of circular reasoning.  That is because there has not yet been a Nebbia hearing, to which Defendant agrees.  While a forfeiture might be a trivial expense to the Chinese government, it would not be for Defendant's father.

   **B.   Home detention and electronic monitoring.**  The government points out that these are not foolproof.  While the government is in the best position to know its limitations, Defendant observes that

---

[2] Defense counsel has a wife and child and would prefer not to endanger his or their health by visiting an infection hot zone.

[3] MSN Microsoft News, January 27, 2021 https://www.msn.com/en-us/health/medical/researchers-say-a-new-coronavirus-variant-found-in-california-may-have-contributed-to-los-angeles-case-surge/ar-BB1d9dOy

13

GPS monitoring is hardly unusual for the BOP or the courts, and that the government's own witness is on such a plan. The only way to ensure any defendant in any criminal prosecution is to shackle them to a prison wall, an outdated notion in light of the Bail Reform Act, 18 U.S.C. § 3142

**C. The government's 2020 NUDT admission guide**. Reference to this document appears in the government's Opposition briefing. Defendant challenges the relevancy of a document for the 2020 admissions, when Defendant was admitted to UCLA in 2017 and there was a different admissions guide then in effect, not surprisingly, the 2017 version. Defendant supplies relevant portions of this.

The cover page and pages 23-25 of the 2017 PhD Candidates Admissions Guide have been translated. In the 2020 Guide, Xicheng Lu, Lei's instructor, was labeled with a solid triangle. The remark noted that "the instructors with solid triangle only admit soldier PhD students. The instructors with the empty triangle only admit non-military ranking PhD students."

Such remark was not found in the 2017 Guide, and Xicheng Liu was not labeled with a solid triangle. A review of page 22 of the 2017 Guide, there is a remark about solid triangles stating, "the instructors in the solid triangle are off-campus instructors, and the on-campus instructors must be specified when applying for the school." Declaration of Siqi Chen, Exhibit "E."

The only relevance of this admission guide is that **NUDT does accept both civilian and military graduate students in the computer department of NUDT**, which makes Defendant's assertion that he is a civilian student in NUDT more convincing.

13

**D. Law of the People's Republic of China on National Defense Education (Order of the President).**

The government does not address the substance of this law, but instead of rebutting Defendant's contention, the government lampshades it. The defense argument is an explanation of why Defendant wore military fatigues: because this is what students are required to do in China and fatigues characterized as uniforms are the lynchpin in the government's contention. Defendant again requests the Court to note the lack of any connection between "national defense education" and service in the Peoples Liberation Army. A rebuttal – if any the government could muster – would have taken the form "yes, but … ." This was not done.

In a matter of grave concern, it is also notable that the government appears surprised at the existence of this published statute after six months or more of "continuing investigation." The link to this document is not hidden behind an obscure server. Attorneys practicing in California have a duty of candor with respect to adverse authority. Love v. State Dept. of Education (2018) 29 Cal.App.5th 980, and see Federal Rule of Civil Procedure Rule 11. Even if the Court does not accept the defense interpretation of the Chinese statute, the government had the obligation to disclose it in the earlier detention hearing as it squarely covers Defendant's situation.

//
//
//

13

WHEREFORE, for the reasons above stated in order to protect Defendant's Sixth Amendment rights and in the interests of humanity, the best and most equitable action would be to release Defendant from pretrial detention.

Respectfully submitted,

Dated: January 29, 2020

LAW OFFICES OF BIN LI, PLC

/s/ Bin Li
Bin Li, Esq.
Attorney for Defendant
Guan Lei