TRACY L. WILKISON
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
WILLIAM M. ROLLINS (Cal. Bar No. 287007)
GEORGE E. PENCE (Cal Bar No. 257595)
Assistant United States Attorney
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-7407/2253
     Facsimile: (213) 894-2927
     E-mail:    william.rollins@usdoj.gov
                george.pence@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 20-127-MWF |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S EX PARTE APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER DENYING RELEASE |
| v. | |
| GUAN LEI, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys William M. Rollins and George E. Pence, hereby files this Opposition to Defendant Guan Lei's Ex Parte Application for Review/Reconsideration of Order Denying Release. This Opposition is based upon the attached

//

memorandum of points and authorities, the declaration and exhibits attached thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 1, 2021                    Respectfully submitted,

                                        TRACY L. WILKISON
                                      Acting United States Attorney

                                      CHRISTOPHER D. GRIGG
                                      Assistant United States Attorney
                                      Chief, National Security Division

                                             /s/
                                      WILLIAM M. ROLLINS
                                      GEORGE E. PENCE
                                      Assistant United States Attorneys

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Once again, defendant GUAN LEI ("defendant") fails to recognize that the most serious charge in this case is not that he falsely denied prior military service in the People's Liberation Army ("PLA") on his visa application.  Rather, defendant's greatest sentencing exposure – and his greatest incentive to flee - comes from his obstruction of a federal investigation into possible crimes that occurred in the United States.[1]  If convicted of destruction of evidence alone (18 U.S.C. § 1519), defendant faces a Sentencing Guidelines range of 15 to 21 months' imprisonment.  Because defendant has been in custody for about seven months to date, faces trial in the next several weeks, and – as explained in all of the government's prior briefs (CR 6, 29, 113, 129) – remains a significant flight risk, this Court should deny defendant's request for release, which also implicates this Court's Local Rules, the California Rules of Professional Conduct, and the American Bar Association's standards governing defense counsel's role as surety.

**II.   ARGUMENT**

   **A.   Defendant Remains a Significant Flight Risk**

The government has already extensively briefed the reasons that defendant is likely to flee before trial.  (CR 6, 29, 113, 129.)  As Magistrate Judge Donahue previously recognized, defendant has "strong ties to [the People's Republic of China ("PRC")]," a country "with which the United States has no extradition treaty," and the

---

[1] Compare U.S.S.G. § 2J1.2 (base offense level of 14 for violations of 18 U.S.C. § 1519) with U.S.S.G. § 2L2.2 (base offense level of 8 for violations of 18 U.S.C. § 1542(a)).  The visa fraud charge has no impact on defendant' Sentencing Guidelines.

"circumstantial evidence of Defendant's connections to the PLA . . . supports the inference that Defendant would have access to resources and assistance to leave the United States regardless of any conditions of release that could be imposed."  (CR 34 at 2-3.)

Although the government will not repeat all of its prior arguments in support of detention here, it will briefly respond to defendant's latest misleading descriptions of the evidence against him, notwithstanding that the weight of the evidence -- and more accurately any purported weakness of the evidence -- is the least important of the factors governing pretrial release  See United States v. Grebro, 948 F.2d 1118, 1121 (9th Cir. 1991).  For example, defendant tells the Court that he had "no knowledge" of the fact that he was under investigation by the FBI at the time he destroyed the hard drive.  That claim is flatly contradicted by a separate sworn statement defendant wrote to a U.S. Immigration Judge under penalty of perjury (before his arrest for destruction of evidence), in which he acknowledged that the FBI "still wanted to investigate [him]" on the night of July 18, 2020, seven days before he discarded the hard drive at issue in this case.  (Declaration of AUSA Rollins ("Rollins Decl.") ¶ 2, Ex. A.)  Defendant also fails to disclose that, apart from his lengthy FBI interviews, which made abundantly clear that the FBI's investigation involved defendant's digital devices, other federal agents served defendant with a Departure Control Order ("DCO") at LAX on July 19, 2020,[2] told him that "multiple" federal

---

[2] The DCO informed defendant that his departure would be prejudicial to the interests of the United States and referred to Section 215 of the Code of Federal Regulations which, in turn, prohibit departures of aliens who (among others) are witnesses or parties to "any criminal case under investigation or pending in a
*(footnote cont'd on next page)*

2

agencies were interested in him, and asked him whether he wanted to explain "his side of things." (Id. ¶ 4, Ex. C.) Six days later, defendant threw the hard drive into a trash dumpster hundreds of yards away from his apartment unit. (Id., CR 1.) Moreover, contrary to defendant's suggestion (Mot. at 6), the crime of destruction of evidence does not even require defendant's awareness of a pending federal investigation (though the facts plainly show such awareness here).[3] See, e.g., United States v. Gonzalez, 906 F.3d 784, 794 (9th Cir. 2018) ("The court also properly instructed the jury that the government did not need to prove that the defendants knew about a pending federal investigation or that they intended to obstruct a specific federal investigation.").

Equally misleading is defendant's assertion that this prosecution must be "political" because an FBI agent requesting a DNA analysis of the destroyed and disposed-of hard drive at issue in this case referred to "attention" at "high levels of HQ." (Mot. at 4.) Defendant's assertion that a DNA analysis of that hard drive would be of "no relevance" in this case is nonsensical (id.), as possession and control of the hard drive is critical to the issue of defendant's culpability. Furthermore, the agent's email makes clear that he was

---

court in the United States." See 8 C.F.R. § 215.2 (citing 8 C.F.R. § 215.3). Defendant retained an immigration attorney thereafter.

[3] Defendant does not cite the specific portion of the 100-plus page transcript in which the agents purportedly told him he was not under investigation. If defendant is referring to portions of the transcript in which FBI personnel told him he was not "in trouble," (e.g., CR 167 at 101), defendant himself responded immediately thereafter by stating "I feel you [the FBI] are interrogating me the way you'd interrogate a criminal." See also, e.g., id. at 133 (FBI agent telling defendant "I don't want you to lie to me. I want you to tell me the truth;") id. at 79 ("[Y]ou can't lie to federal agents."); id. at 160 (defendant denying having any other digital storage or USB drives).

3

merely attempting to expedite the DNA analysis because defendant himself planned to depart the United States "imminent[ly]" (CR 167 at 25.) The results of the expedited FBI Laboratory analysis – indicating defendant likely contributed DNA to the hard drive - were then included in the affidavit in support of the criminal complaint to establish that defendant actually handled the destroyed hard drive that FBI recovered from the dumpster. (CR 1 ¶¶ 54-58.) To the extent "high levels" of FBI were in fact monitoring the investigation, nothing in the agent's email suggests anything remotely improper about supervisors tracking developments in a criminal case.

The Court should also reject defendant's selective and self-serving reading of his fiancée's deposition testimony. While Ms. Yang, a plainly biased witness, did claim that the hard drive belonged to her and that she instructed defendant to destroy it merely because it contained her personal information, her other testimony (among other evidence in this case) completely undermine that dubious assertion. For example, Ms. Yang claimed that she could not remember whether consular officials told defendant to delete data before he left the United States because she was so "relaxed" at the time of their visit. (Rollins Decl. ¶ 3, Ex. B at 160.) She also could not remember whether she told defendant to destroy the hard drive before or after the FBI visited their apartment (id. at 183), let alone explain whether defendant threw the hard drive into a dumpster several hundred yards away from their own apartment (passing several other dumpsters along the way), or whether he reached toward his sock (apparently to retrieve it) before doing so (id., Ex. G at 109-112) -- even though FBI surveillance personnel witnessed Ms. Yang

accompany defendant and stand lookout as he bent down and apparently retrieved an item near his sock before approaching the dumpster. (Compl. ¶¶ 52-53.)  At trial, a forensic analysis of defendant's digital devices will further show that, notwithstanding Ms. Yang's purported memory problems, defendant began deleting his data *en masse* shortly after he visited the PRC consulate in early July 2020.  (Id., Ex E; Compl. ¶¶ 48-49.)

Nor is it material to defendant's pretrial detention (let alone his guilt or innocence) that the government is presently unaware of any classified or confidential information to which defendant had access.  (Mot. at 3.)  The government has not charged any crime requiring it to prove such access.  Again, the most serious charge in this case arises from obstruction of justice, and defendant's destruction of the hard drive in this case is precisely what may have prevented the government from obtaining direct evidence of other criminal activity that FBI was then investigating, as the United States Sentencing Guidelines themselves recognize.[4]

---

[4] Defendant's arguments about time in custody also overlook the effect of his rejection of the government's plea offer, which was of course his right, but which would have entitled him to further reductions for acceptance of responsibility under the Guidelines. Defendant has been detained since August 28, 2020. If defendant were sentenced solely under U.S.S.G. § 2J1.2, his base offense level would be 14 if convicted at trial, rendering a Sentencing Guidelines range of 15-21 months, as noted above. Moreover, for cases involving obstructing the investigation of a criminal offense, § 2J1.2(c)(1) cross-references § 2X3.1 (Accessory After the Fact), and "[Section] 2J1.2(c)(1) requires cross referencing without regard to whether the underlying offense whose prosecution was obstructed was or is provable." United States v. Arias, 253 F.3d 453, 461 (9th Cir. 2001). Accordingly, it is possible that defendant could be subject to a higher Guidelines range tethered, for example, to export violations being investigated by the FBI at the time he destroyed the hard drive.  See U.S.S.G. § 2M5.1 (setting base offense level at 26).

Defendant's new claim that "[t]here is nothing in the transcript that would indicate that [he] is a member of the [PLA]" (Mot. at 6) is yet another obfuscation.  For instance, defendant initially claimed to be a "local" or "normal" student at the PRC's National University of Defense Technology ("NUDT"), as compared with students who wear military uniforms, and specifically stated that he "[did not] know" whether military uniforms worn by other students were "hot."  (Tr. at 393-396.)[5]  But seconds later, when asked whether the FBI would find photographs of defendant on the Internet wearing a military uniform, defendant clearly believed he had been caught in a lie:  he began to hedge, saying "probably not" (id. at 411) before ultimately admitting that he wore a uniform during "military training" at NUDT.  (Id. at 412-414.)  When asked whether he wore a military uniform after 2014, defendant initially said he could not remember.  (Id. at 418.)  But defendant later stated that he wore a uniform at NUDT when he was on "official duty," such as on PLA Day. (Id. at 419-20.)  Defendant also admitted that his advisor "on paper" at NUDT was Xicheng Lu ("Lu").  (Id. at 397.)  Defendant's advisor who would "manage his daily life" was Li Dongsheng ("Li").  (Id. at 398.)  According to defendant, Li wore a military uniform, but defendant didn't know whether Li was in the military.  (Id. at 399.) Later, defendant said he believed Li was in the military.  (Id. at 422.)  Notwithstanding his purported lack of military experience, defendant also recognized a photograph of Lu (a Two-Star General in the PLA) wearing a military uniform and identified him as a "middle

---

[5] The government's citations refer to the last three Bates numbers of the transcript attached to defendant's brief, which begins at CR 167, page 35 (GUAN_00009363).

general." (Id. at 431-34.) Of course, the government also recovered a 2019-2020 NUDT admissions document from defendant's laptop stating that Lu, defendant's advisor – and the same NUDT advisor who vouched for defendant in his U.S. visa application - "only" accepted "soldier PhD students." (CR 113-1 at 14.)

Finally, defendant's latest brief again ignores the evidence of his false and misleading statements to law enforcement and an immigration judge that remain relevant to his flight risk. (CR 29-1, 2.) As detailed in the government's prior briefing, defendant not only appears to have manipulated NUDT admissions documents so that the Mandarin characters "Liberation Army" were deleted when submitted to the immigration court, he also misleadingly claimed under penalty of perjury that he was not present during an FBI search of his apartment (despite walking away from FBI agents briskly when he saw them arrive from a common laundry space in the apartment complex). (CR 29.)[6] This deceptive behavior before a separate U.S. court – before his arrest - only underscores why defendant cannot be trusted to reappear for trial if released on bond here.[7]

---

[6] Defendant also claimed under oath that he showed the FBI his computer (which he told the immigration court merely contained photos of defendant and his fiancée traveling across the United States) and that the FBI seized all of his electronic devices but that there was "nothing against us." (CR 29-2.) Yet in his statement to the immigration court, defendant omitted the fact that his devices were purged of data before his FBI interview because they were either "formatted," "reset," or had a new operating system, as he told the FBI. (Compl. ¶¶ 37-38.)

[7] Defendant attaches emails regarding his bail proposal in this case, but he fails to include responsive correspondence from Harland Braun, one of defendant's attorneys, in which Mr. Braun told both prosecutors he would recommend to the Attorney General that they be fired. This invective came in response to an email in which the government asked Mr. Braun to refraining from sending unprofessional emails (including a message in which he suggested that both
(footnote cont'd on next page)

7

### B. The Central District's Local Rules and Potentially Applicable Rules of Professional Conduct

In his application for reconsideration, defendant offers defense counsel Bin Li as surety, and Mr. Li's personal home "currently valued at $550,000.00" to guarantee defendant's appearance at trial (Mot. at 4.) Though Mr. Li's proposal appears well-intentioned, the Central District of California's Local Rules prohibit defense counsel serving as a surety on behalf of his own client. In particular, Local Criminal Rule 46-8 states that the "provisions of Local Rule 65-9 shall apply to all bonds and undertakings in criminal actions," and Local Rule 65-9 provides that "no attorney appearing in the case, will be accepted as surety upon any bond or undertaking in any action or proceeding in this Court." See C.D. Cal. L.R. Cr. 46-9; C.D. Cal. L.R. Civ. 65-9. The American Bar Association's Criminal Justice Standards similarly discourage the practice of defense-counsel-as-surety. In particular, the ABA's standard states that "[d]efense counsel should not act as surety on a bond either for a client whom counsel represents or for any other client in the same or a related case, unless it is required by law or it is clear that there is no risk that counsel's judgment could be materially limited by counsel's interest in recovering the amount ensured." See ABA Standard 4-1.7(m) ("Conflicts of Interest") available at https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/ (accessed March 30, 2021).

---

prosecutors kill themselves) and provided Mr. Braun with a link to the Central District of California's civility guidelines, to which Mr. Braun's response, namely 'stop being such a crybaby' (Rollins Decl., Ex. F), disappointingly evidences an inability or unwillingness to comply.

The California Rules of Professional Conduct may also prohibit the arrangement proposed by defendant and his counsel. For example, California Rule of Professional Conduct 1.7 states that a lawyer shall not, without informed written consent of the client, represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to a third person (e.g., pretrial services) or the lawyer's own interests (e.g., maintaining his own personal home). Cal. Rule. Prof. Conduct 1.7(b); see also id., 1.7(c) (prohibiting representation if the lawyer has a financial responsibility to a witness or party in the same matter). Even if a client waives the potential conflict, representation is only permitted if "the representation is not prohibited by law," but as addressed above, there is a specific Local Rule prohibiting this practice in the Central District. Id. 1.7(d)(2); see also id. 1.8.5 (generally prohibiting guarantees on behalf of existing clients, with limited exceptions). Defendant's suggestion that this Court can and should waive counsel's ethical duties or the Local Rules is unsupported by any authority and invites potential error.

The government also notes that, if defendant were to abscond or violate other conditions of pretrial release, the attorney-client privilege and defense counsel's duties of loyalty and confidentiality could inhibit the U.S. Probation Office, the U.S. Marshals Service, and this Court's abilities to determine the circumstances under which defendant left defense counsel's home or violated applicable terms of pretrial release.

### C. Defendant Should Be Subject to Home Confinement and Electronic Monitoring if the Court is Inclined to Grant His Request for Release

If the Court is nevertheless inclined to order defendant's release based on his new proposal, the government respectfully recommends that the Court: (1) order defendant confined to defense counsel's residence while released on bond; (2) order the U.S. Probation Office to affix a GPS monitor to defendant's ankle; (3) verify the equity in the real property before ordering release; and (4) impose, as a condition of bond, a requirement that defense counsel shall not be reimbursed or compensated by any third party for the loss of his security in the event defendant absconds.

## III. CONCLUSION

For the reasons set forth above and in the government's prior briefing (CR 6, 29, 113, 129), the Court's prior conclusion that there is "no condition or combination of conditions will reasonably assure the appearance of the Defendant as required" remains correct. (CR 34.)  Defendant should remain detained until his trial occurs in approximately the next month or two.

Dated: April 1, 2021              Respectfully submitted,

                                  TRACY L. WILKISON
                                  Acting United States Attorney

                                  CHRISTOPHER D. GRIGG
                                  Assistant United States Attorney
                                  Chief, National Security Division

                                         /s/
                                  _____
                                  WILLIAM M. ROLLINS
                                  GEORGE E. PENCE
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

10