TRACY L. WILKISON
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
WILLIAM M. ROLLINS (Cal. Bar No. 287007)
GEORGE E. PENCE (Cal Bar No. 257595)
Assistant United States Attorney
Terrorism and Export Crimes Section
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-7407/2253
Facsimile: (213) 894-2927
E-mail: william.rollins@usdoj.gov
george.pence@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GUAN LEI,<br><br>Defendant. | No. CR 20-127-MWF(B)<br><br><u>GOVERNMENT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT'S EX PARTE APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER DENYING RELEASE</u> |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys William M. Rollins and George E. Pence, hereby files this Supplemental Brief in Opposition to Defendant Guan Lei's Ex Parte Application for Review/Reconsideration of Order Denying Release. This Supplemental Brief is based upon the attached memorandum of points and

//

//

//

Authorities, the declaration and exhibits attached thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 15, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division

/s/

WILLIAM M. ROLLINS
GEORGE E. PENCE
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

At the April 8 hearing, the Court asked defendant to submit evidence supporting his argument that the social stigma and impact on defendant's future travel arising from a possible conviction in the United States would be so substantial that defendant, if presented with the opportunity to flee, would necessarily choose to appear at trial. The Court also asked the parties to address whether defendant could be tried in absentia and how such a possibility might affect defendant's incentives to flee.

Instead of directly addressing the Court's questions, defendant offers his attorney's generalized and thinly-cited opinions about philosophy, social organization, litigiousness, and communal stigma associated with crime in the People's Republic of China ("PRC"). But defendant offers no proof whatsoever that these broad concepts have meaningfully influenced him personally, let alone that they would deter him from fleeing in advance of trial here. Because defense counsel's arguments rely on stereotyping, they are an unreliable basis upon which to reverse this Court's well-founded determination that defendant is a flight risk.

To the extent defendant has personal reputational concerns, his own conduct to date establishes that those concerns make it *more likely* that he will flee, not less: Defendant has already lied to and evaded U.S. law enforcement and misled a U.S. immigration judge in an effort to return to the PRC. Moreover, defendant himself claims that he wants to work at companies headquartered in the PRC, a country with which the United States has no extradition treaty. Indeed, when discussing the possibility of pleading guilty with a PRC

consular official, defendant repeatedly indicated that he does not "care" about the "personal" impact of a U.S. conviction. Defendant's remaining arguments - which focus solely on selective quotes and inadmissible personal views of potential expert witnesses - are equally unavailing: they completely ignore the evidence seized from defendant's own laptop and other aspects of the experts' data and analyses that tend to incriminate him.

In short, defendant's arguments regarding purported stigma in the PRC that might arise out of a conviction or U.S. arrest warrant remain speculative and do not overcome the overwhelming evidence that he is a flight risk. And even if defendant's concerns were genuine, his own conduct suggests they make it more likely that he would flee to a country with no extradition treaty in order to avoid being convicted in the first place. Given the added legal uncertainty regarding an in absentia trial if defendant absconds and the fact that defendant has not yet served even 80% of the low end of his likely Sentencing Guidelines range, defendant still has strong incentives to flee. He should remain detained until his trial can occur, now scheduled for June 22, 2021.

## II. ARGUMENT

### A. Defendant Remains a Flight Risk and Should be Detained

Defendant devotes most of his brief to his counsel's views about the ways in which Taoism, Confucianism, Fengshui, and other aspects of Chinese culture would purportedly lead defendant to conclude that he would be "stained by the Chinese equivalent of the Scarlet Letter" if convicted of felonies in the United States. (Def. Br. at 5:14-15.) These opinions are speculative at best and appear to rely on stereotyping: defense counsel cites no evidence at all – such as a

percipient witness declaration – that defendant himself would be deterred from fleeing by his adherence to the purported cultural norms counsel describes. The only reputational harm specific to defendant raised in his brief is that defendant's girlfriend, Zhihui Yang, recently "told [d]efendant that rumors and prejudices are spreading among her colleagues in the University[.]" (Id. at 5:16-17.) But this claim about university gossip is, once again, entirely devoid of evidentiary support. And even if true, it also suggests that defendant might abscond to the PRC simply to avoid the risk of being convicted altogether.

Contrary to his recent brief, defendant's jail calls show that, in fact, he is relatively unconcerned about the "personal" impact of a U.S. conviction and instead may have chosen not to plead guilty after coordinating with consular officials. (Declaration of AUSA Rollins ("AUSA Decl.") ¶ 2, Ex. A at 2-3 (When discussing whether to accept a purported government plea offer resulting in his conviction on a single count, defendant stated, "[f]or me personally, I don't care." In that same conversation, the consular official told defendant he "already kn[ew] what [he] should do."); id. at 3 (defendant repeatedly suggesting that he "personally" did not "care" about a conviction but was worried about the PRC's public image); id. at 6 (consular official telling defendant "[n]o, on how you should choose, we have communicated that in the past. I don't need to repeat it to you on the phone. For some things you know what the limit is.")

To the extent defendant ever harbored any genuine concerns about personal reputational harm, his own behavior in this case shows that those concerns are centered on returning to the PRC, and they make it *more likely* that defendant would flee before trial, not less. As the

government has previously explained, defendant appears to have provided falsified documents to an Immigration Judge in advance of a Departure Control Order hearing and further misled that judge by suggesting that he was not at his home when the FBI came to execute the search warrant on July 30, 2020 when, in fact, defendant *was* near his home, but "briskly walked toward the nearby U.C. Irvine campus" when the agents arrived. (CR 29 at 5.) Defendant also falsely told CBP officers that he had not had any contact with the PRC consulate, immediately before attempting to board a return flight to the PRC. (CR 1 ¶ 45.) Unlike the speculation offered by defense counsel, these facts indicate that defendant has consistently been willing to mislead federal officials to return to the PRC. Moreover, defendant has repeatedly claimed that he "would like to work for tech companies like Alibaba." (CR 167 at 67; id at 66 ("I can go to Alibaba or Baidu"); id. at 81 ("My PhD advisor Mr. Yin has recommended me to Alibaba and I'm quite happy about it because Alibaba pays well.")).[1] Alibaba is headquartered in Hangzhou, China, and Baidu is headquartered in Beijing, China.[2] Thus, were defendant to flee, his own statements suggest he intends to pursue his career goals from a country "with which the United States has no extradition treaty[.]" (CR 34 at 2-3) (Order of Detention).

Finally, as detailed in the government's prior briefs, defendant has not yet served even 80% of the low-end of his Guidelines sentence

---

[1] Of course, the government has alleged that defendant falsely certified that he had not served in the military at the time he completed his visa application, so defendant's statements about pursuing a civilian career may also be unreliable.

[2] See https://www.alibabagroup.com/en/about/faqs (accessed April 15, 2021); https://ir.baidu.com/news-releases/news-release-details/baidu-moves-new-headquarters (accessed April 15, 2021).

(if convicted of destruction of evidence in violation of 18 U.S.C. § 1519). As of the date of this filing, defendant has been in custody for a total of seven months and 18 days (CR 22). If defendant were sentenced solely under U.S.S.G. § 2J1.2, his base offense level would be 14 if convicted at trial, rendering a Sentencing Guidelines range of 15-21 months. While the ultimate sentence would of course be up to this Court if defendant is convicted, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." United States v. Treadwell, 593 F.3d 990, 1015 (9th Cir. 2010). Defendant will not have served even 80% of the low-end of a Guidelines-range sentence (i.e. 12 months) until August 2021. So long as defendant faces at least a reasonable likelihood of additional time in custody, he continues to have yet one more incentive to flee before trial.[3]

**B. Defendant's Selective and Misleading Reliance on Expert Witness Interview Reports is Unavailing**

As the Court recently observed at the April 8 hearing, the weight of the evidence is the least important factor in the assessment of defendant's risk of nonappearance. See United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991). Yet even defendant's arguments on this point (which relate solely to the less serious charge of visa fraud, not destruction of evidence) selectively omit significant parts of expert witness analyses – among other evidence in this case - that tend to prove his guilt. For instance, while Dr.

[3] The government also notes that, even though this Court made it clear during the April 8 hearing that Bin Li would have to withdraw in order to serve as surety for defendant (to comply with the Central District's local rules), no such notice of withdrawal has been filed.

Tiffert believes that it is at least "plausible"[4] that defendant might have been a civilian student at NUDT (CR 182 at 25), his analysis also showed that, statistically, possibly as many as 75% of the people in and around defendant's year of admission at NUDT were in the military. (CR 182 at 23.) Dr. Tiffert's research also showed, for example, that significantly more military students were accepted at NUDT following entrance examinations than civilian students. (Id. at 25.)

Defendant also points to Dr. Tiffert's statements regarding anti-Asian bias and racism in the United States, issues that should rightfully concern all Americans. Indeed, "[d]iscrimination against Asian Americans is a long-standing and malignant problem" that disturbingly "found new roots in the pandemic." See https://www.justice.gov/usao-cdca/pr/top-federal-prosecutor-los-angeles-and-head-fbi-field-office-denounce-hate-crimes-and (accessed April 13, 2021) (condemning bigotry, racism and hatred against the Asian American and Pacific Islander community, citizen and non-citizen alike). While Dr. Tiffert's concerns about bigotry are thus understandable, they are not germane to the facts or data that form the basis of his expert opinions about NUDT or PRC military enlistment under Federal Rule of Evidence 702, and they are neither relevant nor admissible in this federal criminal trial to determine whether defendant committed visa fraud, destroyed evidence, or lied to the FBI. See Fed. R. Evid. 402-403.

[4] Dr. Tiffert later clarified that, by "plausible," he did not mean it was more likely than not that defendant was a civilian. (CR 182 at 26.)

Contrary to defendant's other arguments, Mr. Joske's ongoing and updated analyses also do not somehow exonerate defendant. In fact, Mr. Joske's analysis indicates that the China Scholarship Council's ("CSC") 317 sequence identified an individual as either a PLA member or associated with a PLA university and that, based on his research, he could conclude that no less than about half of the individuals with the 317 sequence in their CSC code *are* in the PLA. (AUSA Decl., Ex. B.) But according to Mr. Joske (yet omitted from defendant's brief), that does not mean that the remaining 50% of 317-coded CSC recipients are necessarily civilian; in fact, Mr. Joske has not definitively identified a single individual whose CSC Code includes the 317 sequence that is a civilian.[5] (Id.) Defendant also fails to tell the Court that Lieutenant Colonel Faber opined that defendant's research was indeed generally applicable to the military.[6] (CR 182 at 31.) In fact, it can be applied to anything the military does related to machine learning. (Id.) For example, artificial intelligence has been used in military targeting systems, and while

---

[5] In his brief, defendant misleadingly omits the fact that the government already informed him long ago (and explained in a publicly-filed brief in December 2020) that Mr. Joske "later stated that further investigation was required for him to determine whether the unique code may be assigned to both PLA military servicemembers and non-military PLA university students," that his "analysis remains ongoing," and that "defendant's CSC code is only one aspect of the government's evidence proving his PLA service[.]" (CR. 113.) Since then, the Court has already rejected similar arguments from the defense in support of bond. (E.g., CR 117.)

[6] Defendant's suggestion that the government only sought expert opinions from Lieutenant Colonel Faber after Dr. Tiffert or Mr. Joske's recent interviews is false. In fact, the government initially noticed an artificial intelligence expert to testify about defendant's own claimed areas of academic specialization in its first expert disclosure letter, before it even noticed Dr. Tiffert as an expert witness. (AUSA Decl., Ex. C.) The government identified Colonel Faber as its expert witness two months ago, in February of 2021, at the same time it identified Dr. Tiffert. (Id., Ex. D.)

there was nothing "inherently" military in defendant's published work, defendant's research does have military applications. (Id.)

Of course, ultimately it will be up to the jury - not any single expert witness - to evaluate the totality of the evidence in this case, including defendant's own incriminating statements and the 2019-2020 NUDT admissions document seized from defendant's laptop stating that Xicheng Lu, defendant's advisor - and the same NUDT advisor who vouched for defendant in his U.S. visa application - "only" accepted "soldier PhD students." (CR 113-1 at 14.)

**C. If Defendant Flees, an In Absentia Trial May Become Impermissible**

As noted above, the Court also requested further briefing on the issue of whether the Court could, in fact, try defendant in absentia should he flee and, if so, whether the fact that a jury could draw an adverse inference from defendant's flight at such a trial would substantially deter defendant from fleeing in the first instance.

"The United States Constitution protects the right to be present at one's trial and sentencing." United States v. Ornelas, 828 F.3d 1018, 1021 (9th Cir. 2016) (citing U.S. Const. amends. V, VI, XIV; Illinois v. Allen, 397 U.S. 337, 338 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial.")). Federal Rule of Criminal Procedure 43 also requires that "the defendant must be present at ... every trial stage," including "sentencing." Fed. R. Crim. P. 43(a)(2)-(3). "In fact, Rule 43 was intended to protect a swath of rights broader than those protected by the Constitution alone." Ornelas, 828 F.3d at 1021. "Rule 43 embodies the right to be present derived from the Sixth Amendment

Confrontation Clause, the Due Process Clause of the Fifth and Fourteenth Amendments, and the common law privilege of presence . . . [T]he scope of Rule 43 was intended to be broader than the constitutional right." Id. (citation omitted).

While Rule 43(c) provides that a "defendant who was *initially* present at trial, or who had pleaded guilty or nolo contendere, waives the right to be present ... when the defendant is voluntarily absent after the trial has begun," the Supreme Court has not yet ruled on "whether or not the right constitutionally may be waived in other circumstances[.]" Crosby v. United States, 506 U.S. 255, 261 (1993) (explaining that there are "additional practical reasons for distinguishing between flight *before* and flight *during* a trial," and that "the defendant's initial presence [at trial] serves to assure that any waiver is indeed knowing.") (emphasis added). Thus, because defendant might not be able to be tried in absentia were he to flee before his trial actually begins, he has yet one more incentive to flee this Court's jurisdiction before his convictions might be secured, thereby preventing any guilty verdict from following him.

**D. The Possibility of an Alford or Nolo Contedere Plea**

Although U.S. Department of Justice policy requires the government to oppose the entry of an Alford or nolo contendere plea in this case without approval from the Assistant Attorney General, the Associate Attorney General, Deputy Attorney General or the Attorney General, see Justice Manual §§ 9-27.530, 9-27.440, the government nevertheless summarizes relevant authority regarding such pleas here given the Court's comments at the April 8 hearing and its

request that the parties confer and file supplemental briefing addressing these issues.[7]

"A defendant charged with a federal offense may plead guilty, not guilty, or, with the court's consent, nolo contendere." 1 Ninth Circuit Criminal Handbook § 9.02 (2020). Though unmentioned in Rule 11, "a defendant may seek to enter a so-called Alford plea." Id. (citing North Carolina v. Alford, 400 U.S. 25, 37 (1970)). An Alford plea is, in all respects, a guilty plea, except that the defendant is permitted to enter the plea while maintaining his innocence. United States v. Mancinas-Flores, 588 F.3d 677, 681 (9th Cir. 2009). Fed. R. Crim. P. 11(a)(1) provides that a nolo contendere plea may be entered "with the court's consent." Rule 11(a)(3) provides further that before accepting the plea "the court must consider the parties' views and the public interest in the effective administration of justice." See also Federal Judges Benchbook §§ 2.01 and 2.02; Criminal Constitutional Law § 12.02; 1A Fed. Prac. & Proc. Crim. 3d §§ 175-76.

"[T]he degree to which the Department can express its opposition to Alford pleas may be limited." Justice Manual § 9-27.440. "Although a court may accept a proffered plea of nolo contendere after considering 'the parties' views and the public interest in the

---

[7] In an effort to confer on April 9, 2021, the government asked defense counsel whether defendant was actually considering entering an Alford plea in this case – as one of defendant's own attorneys previously suggested - so that the prosecutors could confer with their supervisors. In response, Mr. Braun would not answer the question, responding "[t]he defense that 'I was only obeying orders' was thrown out at the Nuremberg trial." CR 181-1; but see also CR 167-33 (defense counsel proposing that defendant enter a nolo contendere plea under Federal Rule of Criminal Procedure 11(a)(3)). Because defendant has not since represented that he would enter an Alford or nolo contendere plea, the government has not sought the necessary approvals within the Department of Justice.

effective administration of justice,' (Fed. R. Crim. P. Rule 11 (a)(3)), at least one court has concluded that it is an abuse of discretion to refuse to accept a guilty plea 'solely because the defendant does not admit the alleged facts of the crime.'" Id. (quoting United States v. Gaskins, 485 F.2d 1046, 1048 (D.C. Cir. 1973); see also United States v. Bednarski, supra; United States v. Boscoe, 518 F.2d 95 (1st Cir. 1975)). Before accepting such a plea, however, the Court should allow "government counsel [to] make a representation concerning the facts the government would be prepared to prove at trial (to establish an independent factual basis for the plea)." Federal Judges Benchbook § 2.01 (citing Fed. R. Crim. P. 11(b)(3)).

**III. CONCLUSION**

For the reasons set forth above and in the government's prior briefing (CR 6, 29, 113, 129, 171), the Court's prior conclusion that there is "no condition or combination of conditions will reasonably assure the appearance of the Defendant as required" remains correct. (CR 34.) Defendant should remain detained until his trial can occur, now scheduled for June 22, 2021.